UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| PALMAZ SCIENTIFIC, INC., | § | |
| *Plaintiff* | § | |
| | § | |
| | § | |
| VS. | § | |
| | § | |
| | § | Case No. 5:15-cv-734 |
| SUSAN E. HARRIMAN, | § | |
| *Defendant.* | § | |
| | § | |
| | § | |
| | § | |

**PLAINTIFF'S ORIGINAL COMPLAINT**

TO THE HONORABLE COURT:

Plaintiff Palmaz Scientific, Inc., files this Complaint[1] against Defendant Susan E. Harriman, and in support would respectfully show:

## I.       PARTIES

1.       Plaintiff Palmaz Scientific, Inc., ("Palmaz Scientific," the "Plaintiff" or the "Company") is a Delaware corporation with its principal place of business in San Antonio, Texas.

2.       Defendant Susan E. Harriman ("Harriman") is an individual residing in Jefferson County, Colorado who can be served with process at her residence at 4344 Stonecliff, Evergreen, Colorado 80439.

## II.       SUMMARY

3.       Palmaz Scientific is being victimized by a delusional and malicious campaign of

---

[1]       Plaintiff is also seeking **immediate injunctive relief** in the concurrently filed Application for Temporary Restraining Order, Preliminary Injunction and Permanent Injunction.

EXHIBIT
1

economic terrorism by Defendant Susan E. Harriman.  Harriman's conduct is unfortunately but the latest in her established pattern of obsessive and even criminal behavior, as she has been involved over the last few years alone in several contentious civil suits and multiple criminal matters for offenses ranging from stalking, trespass, harrassment and burglary, to retaliation. Harriman has and continues to intentionally interfere with Palmaz Scientific's business affairs, among other ways, through the dissemination of false, defamatory and disparaging statements about the Company and its agents.

4.      Harriman's malicious activity began after the Company declined her efforts to get involved as an investment broker with Palmaz Scientific investment activities.  She embarked on her first smear campaign in summer 2014, one that took a heavy toll on the Company's hard-earned and well-deserved reputation and disrupted its investment and business operations. Harriman then appeared to briefly abate her conduct after receiving Palmaz Scientific's cease and desist demands.

5.      However, in August 2015, Harriman re-ignited her campaign in earnest, once again causing great harm to Palmaz Scientific.  Harriman's goal appears to be to gain notoriety and an economic benefit for herself by destroying the business and reputation of Palmaz Scientific and its officers and directors—a goal that could be accomplished if Harriman is not ordered to stop. Harriman purposefully targets Palmaz Scientific's shareholders, potential investors, and the brokerage firms working to secure funding for the Company—activities critical for the Company's continued viability.

6.      Harriman's actions have already cost Palmaz Scientific millions of dollars in funding as investors and potential investors have been scared off by Harriman's smear tactics. Palmaz Scientific now faces a serious and possibly fatal disruption in its business as a result of

2

Harriman's ongoing malicious campaign. Injunctive relief is required to prevent Palmaz Scientific from suffering further imminent and irreparable harm.

7.      Palmaz Scientific is a medical technology company dedicated to developing safer, more predictable implantable medical devices to improve the lives of patients. Palmaz Scientific was founded in 2008, along with others, by Dr. Julio Palmaz, a physician and scientist who is world-renowned for inventing the first commercially available intravascular stent for coronary arteries. The Palmaz® Stent, as it became known, forever changed cardiac care, with more than a million people a year undergoing coronary artery stenting to repair clogged arteries. Dr. Palmaz is Palmaz Scientific's Chairman of the Board and Chief Scientific Officer. Today, Palmaz Scientific maintains its offices in San Antonio, Texas, and also operates a facility in Fremont, California.

8.      Steven B. Solomon ("Solomon") has extensive experience in the investment industry and was the Chief Executive Officer of Palmaz Scientific from its formation in 2008 until August of 2015.

9.      Brent E. Barton ("Barton") is an experienced investment broker and is currently Executive Vice President at Emerson Equity, LLC ("Emerson Equity"), a full-service brokerage firm. Palmaz Scientific engaged Emerson Equity, through Barton, to raise capital through a private offering of Palmaz Scientific securities to accredited investors.

10.     Palmaz Scientific, with help from Dr. Palmaz, Solomon, Barton and many others, has worked hard to build its upstanding reputation, form positive business relations, and earn investor confidence.

11.     Defendant Harriman, a former colleague of Barton's, is also in the investment industry and has business contacts in the same circles as Palmaz Scientific.

12.     Beginning in 2014 (stopping briefly after a cease and desist letter from Palmaz Scientific) and resuming in earnest in August 2015, Harriman has embarked on a smear campaign against Palmaz Scientific that has completely disrupted its funding and research operations and severely damaged its reputation.  Harriman did so after Palmaz Scientific declined her solicitation to get involved in the Company's investment activities.  Specifically, Harriman defamed and disparaged the Company by:

- Falsely publishing that Palmaz Scientific engaged in investment and securities fraud;

- Falsely publishing that Palmaz Scientific is a fraud / sham company involved in criminal conduct;

- Falsely publishing that Palmaz Scientific has never conducted any clinical trials;

- Falsely publishing that Dr. Julio Palmaz, Palmaz Scientific's founder, is not involved in the Company; and

- Falsely publishing that Palmaz Scientific has misrepresented its patent portfolio.

13.     These statements by Harriman about Palmaz Scientific are demonstrably false.  The truth is that:

- Palmaz Scientific is a legitimate, operating company with research facilities in Fremont, California where approximately 18 employees are involved in

designing and developing custom, patented, proprietary technology. The facility, employees and activities are real and ongoing;[2]

- Palmaz Scientific has conducted a first-in-man clinical trial of certain patented technologies in Colombia, with supervision by a clinical research organization and a Global Principal Investigator, and Dr. Palmaz and Solomon both traveled to Colombia in connection with the clinical trial;

- Dr. Palmaz has been and remains involved in Palmaz Scientific's business operations by serving as the Chairman of the Board of Directors and Chief Scientific Officer.   In these roles, he is generally familiar with 1) the progress of Palmaz Scientific's research and development, 2) the Company's efforts to protect its intellectual property; and 3) internal and external reviews that have been conducted of the Company's finances and records.

- Both internal reviews and independent external inquiries have confirmed that there is nothing to support Harriman's reckless allegations.[3]

14.     Harriman specifically targeted her false statements at Plaintiff's investors, potential investors, potential business partners and individuals who Harriman knew were already in business relationships with Palmaz Scientific.

---

[2]     The Fremont, California facility employs:  one senior operator; two technicians, four senior technicians and a laser technician; seven engineers; an engineering manager; a quality control manager; and a director of product development.

[3]     Since Harriman first began making false allegations in 2014, Palmaz Scientific has been audited by the independent and respected accounting firm Weaver LLP.  More recently, as explained below, Targeted Technology Fund conducted its own thorough due diligence and independent review of Palmaz Scientific's financial records and had decided to invest in the Company until Harriman's interference.

15.     Harriman's false statements to investors in 2014 tarnished Palmaz Scientific's reputation and caused the Company to agree to repurchase shares of Palmaz Scientific stock from one investor group that became increasingly unsettled by Harriman's scurrilous claims.  This diversion of funds from the Company's valuable ongoing research operations is an irreparable harm.  The damage to Palmaz Scientific's reputation is also an irreparable harm as Harriman has made additional fundraising and strategic business alliances more difficult.

16.     Harriman's false statements have also damaged Palmaz Scientific's relations with its current investors.  These investors, prompted by Harriman's tortious and false claims, have repeatedly contacted Palmaz Scientific and expressed concern caused by Harriman's outrageous claims.  Furthermore, some of these investors appear to be preparing to file a lawsuit based on Harriman's false claims.  Such proceedings, based on these false allegations, if filed, will cause further irreparable harm by diverting additional resources away from business operations, and will cause the Company additional severe financial distress.

17.     Harriman's false statements have also interfered with the Company's prospective relationships with major investor groups, causing them recently to withdraw.  Most recently, on August 19, 2015, Harriman's conduct, in whole or in part, caused Targeted Technology Fund ("TTF") to abandon its planned multi-million dollar investment in Palmaz Scientific, several days after Dr. Palmaz announced the investment to Palmaz Scientific shareholders.  The loss of likely and expected funding from these investors has severely disrupted Palmaz Scientific's ongoing research and development activities, damaged its well-earned reputation and threatens the viability of the Company.

18.     Harriman's false statements have also burdened Palmaz Scientific's relationships with the brokerage firms working to secure additional funding for the Company, and have

6

prevented those relationships from producing the funding required to sustain its research activities.

19.     Also, Harriman's intentional interference with the Company's business relations likely caused it to lose strategic partnerships and research funding that would have otherwise likely occurred.

20.     Because Harriman's ongoing conduct threatens to cause further immediate and irreparable injury, Palmaz Scientific is also filing an application for a temporary restraining order and a preliminary injunction concurrently with this Original Complaint.

### III.    <u>JURISDICTION AND VENUE</u>

21.     This Court has jurisdiction under 28 U.S.C. § 1332 because there is complete diversity of citizenship and the amount in controversy exceeds $75,000.

22.     This Court has personal jurisdiction, both general and specific, over the Defendant. The claims in this action arise directly from Harriman's activities in the state of Texas and elsewhere.  Harriman has committed, and continues to commit, tortious acts in Texas through communications directed to residents of Texas, as described more fully herein, and has intentionally caused, and continues to intentionally cause, significant irreparable harm to Plaintiff in Texas.

23.     Venue is proper in this Court under 28 U.S.C. § 1391(b) because (i) Harriman is subject to personal jurisdiction in this district; and (ii) a substantial part of the events or omissions giving rise to this lawsuit occurred in this district, namely San Antonio, Texas.

### IV.    <u>FACTS</u>

24.     Pursuant to Fed. R. Civ. P. 10(c), Plaintiff incorporates by reference all of the allegations in each of the paragraphs above as if fully set forth herein.

### A. Palmaz Scientific, Inc.

25.     Palmaz Scientific, like many medical technology research companies, relies on financial investments from third parties to provide funding for its projects, including its clinical trials.  In order to raise capital, Palmaz Scientific works with investment banks to structure private offerings of its securities to accredited investors.  In this regard, Palmaz Scientific is able to raise capital by selling shares of stock without taking the Company public.  Typically, a brokerage firm will assist a company such as Palmaz Scientific with private placement offerings and market the offering to their network of elite and accredited investors.

26.     Solomon has extensive experience in the investment industry and was the Chief Executive Officer of Palmaz Scientific from its formation in February of 2008 until August of 2015.  Solomon, a seasoned executive, has more than twenty years of experience with capital transactions including private placement offerings.

27.     Barton is an experienced investment broker and is currently Executive Vice President at Emerson Equity, a full-service brokerage firm.  Palmaz Scientific engaged Emerson Equity, through Barton, to raise capital through a private offering of Palmaz Scientific securities to accredited investors.  Barton has approximately twenty-six years of experience in private equity, investments, and private offerings.

28.     In 2011, Barton—then a Senior Vice President for the independent broker-dealer WFG Investments, Inc. ("WFG Investments")—and Solomon structured a private placement offering of Palmaz Scientific securities that generated millions of dollars in investment funds for the Company.

29.     The reputation of Palmaz Scientific, and the trust and confidence that reputation instills in its brokers, investors and strategic business partners, is critical not only to a successful

private offering, but to the overall success of Palmaz Scientific. Palmaz Scientific values its reputation and business relationships and takes active measures to maintain these relationships.

30.    Following a year of her malicious smear campaign, Harriman's conduct recently culminated in causing a multi-million dollar deal with TTF to unravel at the eleventh hour, leaving Palmaz Scientific on the brink of financial disaster.

**B.    Harriman and Palmaz Scientific**

31.    Barton first met Harriman while they were both at WFG Investments. At the time, Neal Turner ("Turner") also worked at WFG Investments and had introduced Palmaz Scientific to Barton.

32.    In 2011, Harriman resigned from WFG, following concerns raised by investors and potential investors who claimed that Harriman was harassing them.

33.    By late 2012, Harriman had become a registered agent with IMS Securities, Inc. ("IMS Securities"), but Turner was still at WFG Investments. Around this time, Turner contacted Solomon and requested that he take a meeting with Harriman about Palmaz Scientific. Out of professional courtesy, Solomon agreed. Harriman, Turner and Solomon were present at this meeting, at Solomon's Palmaz Scientific office in Dallas. Harriman discussed the services and opportunities she and IMS Securities could offer to Palmaz Scientific and solicited involvement in Palmaz Scientific's current offering. Solomon declined Harriman's offer.

34.    Following this meeting, Harriman continued to contact Solomon and present other investment opportunities. Harriman openly expressed to Solomon that she wanted him to share his network of contacts that he had worked hard to establish over many years. As Harriman knows, in the investment banking community, access to such a rolodex can provide a significant economic opportunity.

35.     In the fall of 2013, Harriman called Solomon requesting that Solomon present certain investment deals she was brokering to his network of contacts.  She praised Solomon's good reputation in the investment community and solicited his guidance.  After asking a few questions, Solomon stated that he was not interested.

36.     At this point, during what seemed to be a routine solicitation call, Harriman became enraged and started screaming and yelling in an alarming and unprofessional manner.  Harriman told Solomon that she would never show him a "f***ing deal again" and further cursed at him. Harriman then abruptly hung up the phone.  Solomon immediately contacted Turner and expressed his shock at Harriman's unprofessional behavior and asked that she not contact him again.  Turner apologized.

37.     Despite Solomon's request not to be contacted again, Harriman called Solomon in February or March of 2014.  After apologizing for her earlier conduct, Harriman again solicited Solomon for business.  Around this time, Harriman recruited Turner to work with her at IMS Securities.  Harriman introduced Solomon to some business owners in Denver, Colorado who were looking for investors.  When the business owners did not pay a commission to Harriman to which she claimed to be entitled, she became enraged and blamed Solomon.

38.     At the end of May 2014, Harriman made her next call to Solomon from a blocked number.  Harriman screamed and yelled at Solomon and made threatening statements, including that she had taped every conversation she ever had with Solomon, that Solomon "f***ed up," and that she would be "taking [Solomon] out."  Harriman then hung up the phone.  It has become clear that, because of Solomon's role at Palmaz Scientific, Harriman's decision to "take Solomon out" has resulted in an ongoing malicious campaign against not only Solomon but the Company as well.

**C.     June 2014—Harriman begins her smear campaign against Palmaz Scientific**

10

i.   *Harriman interferes with Palmaz Scientific's business relationships.*

39.    Soon after the May 2014 threatening phone call, Solomon began receiving reports that Harriman was making false, defamatory, and disparaging statements about Palmaz Scientific. Harriman was apparently obsessed with the concept of "GAS LIGHTING" — a malicious form of psychological abuse via the spreading of false information.

40.    Using the gas lighting technique, Harriman conducted a campaign of false and defamatory statements designed to immediately strain Palmaz Scientific's business relationships, funding, and viability.

41.    For example, in early June 2014, Harriman contacted Brian Ladin ("Ladin"), a financial advisor with Delos Investment Management LLC ("Delos Investment") in Dallas, Texas and investors associated with Delos Investment for the purpose of disrupting Palmaz Scientific's funding.  Ladin represented accredited investors who had invested over $2 million in Palmaz Scientific through a private placement in March of 2014.  On June 10, 2014, Ladin e-mailed Solomon to report Harriman's activities and seek reassurances:

> **From:** Brian Ladin <brian@delosinv.com>
> **Subject: question**
> **Date:** June 10, 2014 at 8:49:59 AM CDT
> **To:** "'Steven Solomon' (ssolomon@palmazscientific.com)" <ssolomon@palmazscientific.com>
>
> Susan Harriman is calling my investors and claiming Palmaz is a fraud because there is no listing for the Colombian trial on clinicaltrails.gov. Can you walk me through the registration process for the Colombian trials?
>
> Sorry for the bother.
>
> Thanks,
>
> Brian

42.    In subsequent calls with Solomon after this e-mail, Ladin reported to Solomon that Harriman had also:

- Falsely accused Palmaz Scientific of having done no clinical trials at all;

- Falsely accused Palmaz Scientific of being a fraud; and

- Falsely claimed Palmaz Scientific was not conducting any activities in Colombia.

43.     Upon hearing these false and potentially devastating allegations, Solomon invited Ladin to Palmaz Scientific's Dallas office and provided objective facts demonstrating the falsity of Harriman's statements.  Solomon confirmed the existence of Palmaz Scientific's clinical trial in Colombia, the Company's ongoing research operations, and disclosed the Company's financial records.

44.     Despite Solomon's best efforts to mitigate the damage caused by Harriman's false statements to Ladin and the investors, Palmaz Scientific agreed to negotiate with them to repurchase their shares.

45.     Ladin directly attributed this decision to Harriman's actions:

> **From:** Brian Ladin <brian@delosinv.com>
> **Subject: Next steps**
> **Date:** June 11, 2014 at 4:08:21 PM CDT
> **To:** Steven Solomon <ssolomon@palmazscientific.com>
>
> Let's just rescind the investment. I apologize, but this is spiraling out of control on my side because of Susan.
>
> Thank you for understanding.
>
> Brian

46.     As a result of Harriman's false and malicious statements and conduct, Palmaz Scientific suffered irreparable harm in the form of lost research opportunities resulting from its repurchase of shares from Ladin's investors, and from damage to its reputation.

47.     Harriman also published false, defamatory and disparaging statements about Palmaz Scientific to Turner.  As mentioned, Turner previously worked at WFG Investments where he introduced Palmaz Scientific to the firm.  Turner contacted Solomon and stated that he was now

working for IMS on behalf and at the direction of Harriman.  Turner admitted that, at Harriman's

direction, he disseminated Harriman's false, defamatory statements regarding Palmaz Scientific to

individuals at WFG Investments and some other investors.  These statements included, among

others:

- The false allegation that Palmaz Scientific's clinical trials were not real;

- The false allegation that Palmaz Scientific had misrepresented its patent portfolio; and

- The false allegation that Dr. Palmaz was not active in Palmaz Scientific or its clinical trials.

48.     At Solomon's invitation, Turner visited Solomon on two occasions during which

Solomon directly refuted Harriman's allegations with objective facts that verified Palmaz

Scientific's clinical trial and patents.  During one of these visits, Turner stated that Harriman

instructed him to inspect Solomon's passport, as she had alleged that Solomon never traveled to

Colombia for any clinical trial.  After Turner's review, Turner acknowledged that Harriman's

allegations were false and that Harriman should apologize.  That apology from Harriman never

happened.

49.     Instead, Harriman continued her smear campaign.  On or about June 14, 2014,

Harriman contacted Dominic Baldini ("Baldini"), the founder of and Chief Executive Officer at

Emerson, Barton's current firm.  Harriman falsely stated to Baldini that Palmaz Scientific was a

fraud and did not have any clinical trials.  Harriman also tried emphatically to dissuade Baldini

and Emerson from conducting further business with Palmaz Scientific.

50.     Harriman also published false, defamatory and disparaging statements about

Palmaz Scientific to executives at WFG Investments.  In a June 25, 2014 e-mail, Harriman:

- Falsely accused Palmaz Scientific of misrepresenting the nature of its clinical trials;

- Falsely accused Palmaz Scientific of misrepresenting its patent portfolio;

- Falsely accused Solomon of never having traveled to Colombia in connection with Palmaz Scientific's clinical trials; and

- Falsely accused Dr. Palmaz of having nothing to do with Palmaz Scientific or the clinical trials.

51.     Harriman's conduct also interfered with Palmaz Scientific while the Company was involved in negotiations to form a strategic partnership with a Fortune 500 medical device company.

      *ii.     Harriman interferes with Palmaz Scientific's investor relationships.*

52.     Solomon was also informed by several Palmaz Scientific investors that Harriman had contacted them, as well as other parties, and had made the same false and defamatory statements.

53.     Harriman's actions have degraded investor relations and triggered mistrust among Palmaz Scientific's investors, many of whom reside in San Antonio.

54.     In July of 2014, a Palmaz Scientific investor from San Antonio, Alan Chesler ("Chesler"), sent Solomon a series of e-mails in which he expressed concerns about the Company's financials, and sought, among other things "a detailed accounting of all of the capital that [Palmaz Scientific] has taken in since inception and what it has been spent on to date."  On July 15, 2014, counsel for Chesler sent Palmaz Scientific a formal demand letter seeking an "inspection of corporate records" to allow Chesler to "determine if the corporation is being properly managed and if its funds are being appropriately utilized."  Ultimately, Palmaz Scientific entered into a non-

disclosure agreement with Chesler so the Company could send him certain Palmaz Scientific financial documents in an attempt to address Harriman's false claims. Further, Palmaz Scientific invited Chesler to meet with Company representatives to address his concerns, but Chesler declined to meet.

55.     Similarly, on August 2, 2014, Dr. Julio Palmaz received an e-mail from a Palmaz Scientific investor named Richard Benedikt ("Benedikt"). Benedikt seemed to parrot Harriman's talking points in e-mail correspondence with Dr. Palmaz in which the investor requested detailed information regarding:

- the Company's financials;

- any ongoing clinical trials; and

- Dr. Palmaz's current involvement in the Company's research.

56.      In an effort to stop Harriman from causing further damage, on June 26, 2014, counsel for Palmaz Scientific and Solomon sent Harriman a cease and desist letter. After the cease and desist letter was delivered, Harriman appeared for a time to stop her harassing activity.

**D.     August 2015 — Harriman resurrects her smear campaign against Palmaz Scientific.**

57.     Harriman simply will not stop her false malicious activities. In July 2015, Barton was contacted by others in the investment industry who stated that Harriman was once again spreading the same type of false information about Solomon and Palmaz Scientific. Her conduct continues to directly impugn Solomon and the activities of Palmaz Scientific, as she is making false allegations that Solomon and Palmaz Scientific have been involved in criminal conduct.

58.     Harriman has also attacked Solomon directly via stalking-like text messages to his phone in which she seems to revel in the fact that he is no longer CEO of Palmaz, and further states: "I feel sorry for your children because their Dad is going to prison."

59.    In addition to her personal attacks on Solomon, Harriman is once again attempting to stir up the Palmaz Scientific shareholders by spreading these damaging lies and defamatory communications.

60.    In response to receiving Harriman's defaming communications, one of the largest shareholders, John Foster, went in person to meet with Dr. Palmaz in California.  During his meeting with Dr. Palmaz, Foster confirmed that Harriman had contacted him and stated the same false information.  Even during the meeting, Foster received repeated calls from Harriman.  Foster showed Dr. Palmaz the caller identification on his phone that indicated that Harriman was calling.  Alarmed by the potentially false allegations, Dr. Palmaz took Foster to Palmaz Scientific's manufacturing facility in Fremont, California to refute Harriman's delusional claim that the Company has no operations.

61.    As a direct result of Harriman's renewed efforts, several of Palmaz Scientific's investors appear to be on the verge of suing the Company as they have recently sent the Company a demand letter.  The letter was sent by an attorney representing some of the Palmaz Scientific investors, including Chesler and Benedikt.  Not coincidentally, the law firm representing these investors is also the law firm that represented Harriman in a different proceeding.  It is believed that she is actively contacting and soliciting investors as potential new clients for the firm.

62.    Additionally, on August 15, 2015, Harriman e-mailed James Conaway, a well-known author.  In her e-mail, Harriman falsely alleges, among other things, the outrageous claim that Dr. Palmaz's "unlimited funds" flow from "securities fraud" involving "[t]ens and tens of millions—from accredited investors, your best victims . . . ."

63.    Harriman's statements and ongoing conduct against Palmaz Scientific is aimed at destroying Palmaz Scientific's reputation and business while furthering her own economic agenda.

Harriman purposefully targeted an audience known to her to have established or potential business relationships with Palmaz Scientific, and with whom she has or desires a business relationship. In other words, Harriman hopes to successfully dissuade brokers and investors from doing business with Palmaz Scientific and convince them to do business with her.

64.     Further, given Harriman's experience in the investment industry, she knew or should have known that her false and disparaging statements attacked the very core of Palmaz Scientific's reputation as a medical device research company. Harriman did not contact Solomon, Palmaz Scientific, or anyone at Palmaz Scientific, before making the false, defamatory and disparaging statements described above. Had she done so, the falsity of her statements could have been readily demonstrated by objective facts.

65.     Although Harriman's false, defamatory and disparaging statements are unfounded, they have nevertheless poisoned Palmaz Scientific's reputation.

66.     As a result of Harriman's statements, Palmaz Scientific has, at a minimum, repurchased shares from investors and been forced to waste time and resources addressing and refuting Harriman's statements, therein burdening its ability to manage its normal business operations.

67.     Her statements have caused serious disruptions, severely damaged shareholder relations and effectively devalued the Company.

68.     Harriman's ongoing statements have already caused substantial reputational and economic injury to Palmaz Scientific and threaten to cause imminent catastrophic damage that cannot be quantified.

**E.     Harriman's background and pattern of conduct.**

69.     Unbeknownst to Plaintiff at the time Solomon agreed to speak with Harriman

17

initially, Harriman has a long history of character assassination and litigious behavior. She uses harassment, threats, and even criminal behavior to intimidate and attack those who she apparently perceives have wronged her. Harriman's troubled background, when coupled with her vindictive and harassing behavior towards Palmaz Scientific, including references to the family members of Solomon and Barton, causes Palmaz Scientific to fear for their safety of its employees, agents, and representatives, and their families.

70.     Harriman has been a party to numerous legal proceedings, both criminal and civil in nature. Some of the more alarming matters include:



**Civil Cases**

- Cause No. 231-441177-08; *Howard Rosenstein v. Cheryl D. Smith and Susan Harriman*, In the 134th District Court of Tarrant County, filed June 4, 2008 (hereinafter the "Rosenstein Suit")

- Cause No. DC-13-02061; *Susan E. Harriman v. John Bender et al.*, In the 44th District Court of Dallas County, filed February 19, 2013 (hereinafter the

---

4       It appears that Harriman was originally charged with Felony Burglary of a Habitation that occurred on December 24, 2010. On October 27, 2011, Harriman pled guilty to the lesser included misdemeanor of criminal trespass, and received one year of deferred adjudication and was ordered to return any items taken that night.

"Bender Suit")

- Case No. 08-7-00228-CV, *In re PLH, SRH & CHH*, In the Court of Appeals for the Eighth District of Texas (El Paso), decided February 24, 2010

- Cause No. CV11-00766-V-292ND, *In re Michael Ben Zidell & Susan Elizabeth Harriman*, in the 292nd District Court of Dallas County, filed November 2, 2011

71.     The allegations in the Rosenstein Suit demonstrate Harriman's pattern of tortiously interfering with contracts.  In that case, the plaintiff brought suit against Harriman alleging that she gave false, defamatory testimony against him in his divorce trial and tortiously interfered with a post-nuptial agreement between Rosenstein and his wife.  Rosenstein brought claims against Harriman for fraud, conspiracy to commit fraud, intentional infliction of emotional distress, and tortious interference with contract.

72.     The allegations in the Bender Suit further illustrate Harriman's disturbing and vindictive pattern of behavior.  In that case, Harriman brought suit for defamation against multiple individuals, including Michael Zidell, a former boyfriend who resides in Dallas.  Zidell filed cross-claims against Harriman based on Harriman's harassing, threatening and defamatory conduct.  Specifically, Zidell alleged that after breaking up with Harriman she trespassed onto his property, stalked and harassed Zidell, his children, and his friends, and published false and defamatory statements about him.  Zidell provides details of nine incidents involving Harriman that resulted in the following police reports:

19

- ████████████████████████████████
- ████████████████████████████████
- ████████████████████████████████
- ████████████████████████████████████

73.     The Bender Suit also alleges that Harriman has engaged in harassing and stalking tactics, has created false e-mail and social media accounts to further her schemes, and has terrorized her target's family and friends.

74.     Zidell also filed an application for a temporary restraining order against Harriman, alleging that Harriman had engaged in family violence, behaved in a harassing and threatening manner, and stalked him at his personal residence. Zidell also alleged that Harriman hacked into his mobile phone, stole his personal information, and made numerous false and humiliating statements about Zidell to third parties. Such conduct is alleged to have occurred after only dating Harriman for three and half months. Zidell alleged that he continues to fear for his safety and requests, among other things, that Harriman not be allowed within 500 feet of him, his residence or place of employment.

75.     Harriman's propensity for deceit extends to her own professional duties. As a broker, Harriman is overseen by the Financial Industry Regulatory Authority ("FINRA"). Pursuant to FINRA regulations, she must file and routinely update a Uniform Application for Securities Industry Registration or Transfer ("Form U4"). The form requires self-reporting of certain behavior including criminal charges, SEC violations and bankruptcy filings. The information provided by a registered broker with FINRA on the Form U4 is uploaded to a publically available database maintained by FINRA where members of the public can conduct a broker check.

76.     As stated above, Harriman has been charged twice for felony burglary, and once for felony obstruction, but apparently failed to accurately report these felonies to FINRA as required by Question 14 on Form U4.[5]

77.     All of these referenced proceedings establish Harriman's pattern of criminal, litigious and vindictive conduct that now continues with Harriman's campaign against Plaintiff.

78.     Additionally, upon information and belief, Harriman has previously used the very same tactics she is using against Plaintiff, to harm other companies, in hopes of increasing her own level of business and commissions.  For instance, in 2014 Harriman allegedly tried to incite the minority shareholders of another company by spreading untrue, defamatory statements about its CEO and President.  Upon information and belief, Harriman's goal was to extort the CEO into selling the company's shares to Harriman's clients.

79.     Harriman's intentional and malicious conduct towards Plaintiff has caused, and continues to cause, irreparable injury to Plaintiff's reputation, and to its current and prospective business relationships.  In part because Harriman's statements are impossible to contain or control from further dissemination, the injury caused by the same is irreparable.  If not immediately stopped, Harriman's conduct will cause financial ruin to Palmaz Scientific and may even shut down the Company.

## V.     CAUSES OF ACTION

### COUNT ONE:
### Tortious Interference with Existing Contracts

80.     Pursuant to Fed. R. Civ. P. 10(c), Plaintiff incorporates by reference all of the allegations in each of the paragraphs above as if fully set forth herein.

---

[5]     Question 14A(1)(b) on Form U4 asks "Have you ever . . . been charged with any felony?"

81.     As described above, Plaintiff and its agents maintains or maintained at the relevant time the following contractual relationships, among others: (i) Palmaz Scientific and WFG Investments; (ii) Palmaz Scientific and Emerson; (iii) Palmaz Scientific and Delos; (iv) Palmaz Scientific and Barton; (v) Palmaz Scientific and Ladin; (vi) Palmaz Scientific and Baldini; (vii) Palmaz Scientific and Solomon; and (viii) Palmaz Scientific and its shareholders.  Harriman was not a party to any of these contracts.

82.     Harriman had actual knowledge of these contracts, or knowledge of facts and circumstances that would lead a reasonable person to believe these contracts existed and that Plaintiff had an interest in them.

83.     Harriman has willfully and intentionally interfered with Plaintiff's contracts by making statements about Plaintiff and its agents, which constituted defamation and business disparagement, as part of her campaign to discredit, defame and disparage the reputation of Plaintiff and its agents.

84.     Harriman's conduct was independently tortious because it is also actionable as claims for defamation and business disparagement.

85.     Harriman's interference with Plaintiff's contracts has proximately caused it injury, including lost contractual benefits, injury to reputation, lost profits, lost investment funds and lost research opportunities.

86.     As a result, Plaintiff is entitled to recover actual damages (general and special) from Harriman.

87.     Because Harriman acted with fraud, malice, or gross negligence, Plaintiff also seeks exemplary damages from Harriman.

## COUNT TWO:
### Tortious Interference with Prospective and Continuing Business Relations

88.    Pursuant to Fed. R. Civ. P. 10(c), Plaintiff incorporates by reference all of the allegations in each of the paragraphs above as if fully set forth herein.

89.    As described above, Plaintiff maintains the following prospective business relationships and continuing business relationships, among others: (i) Palmaz Scientific and WFG Investments; (ii) Palmaz Scientific and Emerson; (iii) Palmaz Scientific and Delos; (iv) Palmaz Scientific and Barton; (v) Palmaz Scientific and Ladin; (vi) Palmaz Scientific and Baldini; (vii) Palmaz Scientific and Solomon; (viii) Palmaz Scientific and its shareholders; and (ix) Palmaz Scientific and potential investors.

90.    Harriman had actual knowledge of these prospective and continuing business relationships.

91.    There was a reasonable probability that Plaintiff would have entered into additional contracts or continued business with these entities and individuals.

92.    Harriman intentionally interfered with Plaintiff's prospective and ongoing business relationships.  Specifically, Harriman desired to bring about the tortious interference, or she was substantially certain that the interference with these prospective business relationships would occur as a result of her conduct.

93.    Harriman has willfully and intentionally interfered with Plaintiff's contracts by making statements about Plaintiff and its agents, which constituted defamation and business disparagement, as part of her campaign to discredit, defame and disparage the reputation of Plaintiff and its agents.

94.    Harriman's conduct is independently tortious because it is also actionable as claims for defamation and business disparagement.

95.     Harriman's interference with Plaintiff's prospective business relationships has proximately caused injury to Plaintiff, including lost benefits from the prospective and ongoing business relationships, injury to reputation, lost profits, lost investment funds and lost research opportunities.

96.     As a result, Plaintiff is entitled to recover actual damages (general and specific) from Harriman.

97.     Because Harriman acted with fraud, malice, or gross negligence, Plaintiff also seeks exemplary damages from Harriman.

**COUNT THREE**:
**Defamation**

98.     Pursuant to Fed. R. Civ. P. 10(c), Plaintiff incorporates by reference all of the allegations in each of the paragraphs above as if fully set forth herein.

99.     As described above, Harriman has published statements of fact that referred to Palmaz Scientific and its agents.

100.     The statements published by Harriman were defamatory and false.

101.     Harriman is strictly liable without regard to fault.

102.     Harrison's written statements are libel *per se* as defined by the Texas Civil Practices & Remedies Code § 73.001.  Specifically, Harriman's statements were reasonably calculated to, and have in fact, injured Plaintiff's reputation, exposed it to financial injury, and impeached the honesty, integrity and reputation of its agents.

103.     Harriman's written statements were also libel *per quod* because their defamatory nature is characterized by innuendo and implication.

104.    Harriman's oral statements constitute slander *per se* because they have injured Plaintiff in its office, profession, or occupation, and falsely charged its agents with the commission of a crime.

105.    Harriman's oral statements were also slander *per quod* because their defamatory nature is characterized by innuendo and implication.

106.    Harriman made these statements with knowledge of or reckless disregard for their falsity, with ill will towards Plaintiff, and with the intention to interfere with Plaintiff's economic interests. Harriman's statements were made without privilege, justification, or excuse.

107.    As a result of Harriman's statements and actions, Plaintiff has suffered pecuniary and reputational injury as outlined above and is likely to continue to suffer further reputational and financial loss. Additionally, the financial loss experienced by Plaintiff has also resulted in lost research opportunities. The statements made by Harriman impeached Plaintiff's honesty, integrity, and other business character.

108.    Harriman has all but invited this action, and the requested injunctive relief, because she has ignored Palmaz Scientific's attempts to resolve the matter outside of litigation. Palmaz Scientific has contacted Harriman and sent a demand to cease and desist from the unlawful conduct described herein. Harriman has responded to these demands by purposefully avoiding a process server and reporting him to the police.

109.    As a result, Plaintiff is entitled to recover actual damages (general and special), including the expense to counteract the false publications.

110.    Because Harriman made the statements with malice, Plaintiff also seeks exemplary damages from Harriman.

## COUNT FOUR:
### Business Disparagement

111.    Pursuant to Fed. R. Civ. P. 10(c), Plaintiff incorporates by reference all of the allegations in each of the paragraphs above as if fully set forth herein.

112.    Harriman published false and disparaging statements about the character and economic interests of Plaintiff and its agents to third parties.  Harriman made these statements with knowledge of or reckless disregard for their falsity, with ill will towards Plaintiff, and with the intention to interfere with Plaintiff's economic interests.

113.    At the time that Harriman published the false and disparaging words, they were published with actual malice and without privilege, justification, or excuse.

114.    The statements made by Harriman impeached Plaintiff's honesty, integrity, and other business character.  Harriman's statements and conduct has directly and proximately caused Plaintiff to suffer actual damages, including damages for economic injury.

115.    As a result, Plaintiff is entitled to recover actual damages (general and special), including the expense to counteract the false publications.

116.    Because Harriman made the statements with malice, Plaintiff also seeks exemplary damages from Harriman.

## VI.    EXEMPLARY DAMAGES

117.    Pursuant to Fed. R. Civ. P. 10(c), Plaintiff incorporates by reference all of the allegations in each of the paragraphs above as if fully set forth herein.

118.    Plaintiff seeks recovery of exemplary damages from Harriman.  Harriman acted with malice in that Harriman's misconduct described above was of a wanton and malicious nature. Plaintiff is therefore entitled to an award of exemplary damages against Harriman in an amount to be determined by the jury at trial.

## VII.    INJUNCTIVE RELIEF

119.    Pursuant to Fed. R. Civ. P. 10(c), Plaintiff incorporates by reference all of the allegations in each of the paragraphs above as if fully set forth herein.

120.    The allegations above, and the declarations in support thereof, establish that Palmaz Scientific has a substantial likelihood of success on the merits on its causes of action against Harriman.  *See Janvey v. Alguire*, 647 F.3d 585, 595-96 (5th Cir. 2011) ("[I]n the preliminary injunction proceeding [the moving party] is not required to prove [his] entitlement to summary judgment.").

121.    Due to Harriman's conduct as described herein, Plaintiff has suffered, and is likely to imminently continue to suffer, an irreparable injury for which there is no adequate remedy at law.  If Harriman's conduct goes unchecked, Plaintiff faces the following forms of irreparable harm:

- lost research opportunities due to delayed or diverted funding; *Cmmw. Sci. & Indus. Research Organisation v. Buffalo Tech. Inc.*, 492 F. Supp. 2d 600, 604-05 (E.D. Tex. 2007);

- the crippling of Palmaz Scientific and its ability to operate due to the loss of either current or prospective investors; *See Bond Pharmacy, Inc. v. AnazoaHealth Corp.*, 815 F. Supp.2d 966, 974 (S.D. Miss. 2011) ("Monetary loss may constitute irreparable harm only where the movant's very existence is threatened, i.e., where an act threatens an ongoing business with destruction as opposed to mere disruption."); and

- loss of reputation and goodwill; *See Menna v. Romero*, 48 S.W.3d 247, 249-50, 253 (Tex. App.—San Antonio 2001, pet. dism'd w.o.j.) (". . . a probability of injury for

which there was no adequate remedy at law [includes] loss of business, loss of good will, loss of commissions, and loss of reputation.").

122.   Plaintiff's irreparable injuries outweigh any harm sustained to Harriman as a result of any injunctive relief awarded.   *See, e.g., Sun Water Sys., Inc. v. Vitasalus, Inc.*, No. 4:05-CV-574-Y, 2007 WL 820280, at \*5 (N.D. Tex. Mar. 8, 2007) ("Clearly Plaintiffs would not be harmed by an order that directs them to stop engaging in apparently anti-competitive behavior through the making of false statements that maliciously align Defendants' reputation, honesty, and integrity"); *see also Courtroom Sciences, Inc. v. Andrews*, No. 3:09-CV-251-0, 2009 WL 1313274, at \*15 (N.D. Tex. May 11, 2009) (finding, in a case involving tortious interference with contract, that the injury to the plaintiff outweighed any injury to the defendant where the defendant was still gainfully employed and earning a salary during period of injunction).

*123.*   Such injunctive relief would not adversely affect the public interest.  *See Sun Water Sys., Inc.,* 2007 WL 820280, at \*5 ("A[n] injunction would further the public interest by preventing consumers from being mislead [sic] by blatantly false statements made by a market competitor.").

124.   Accordingly, Plaintiff is submitting, simultaneously with this Original Complaint, an application for temporary restraining order and preliminary injunction pursuant to Fed. R. Civ. P. 65.

125.   Plaintiff also requests a permanent injunction following a trial on the merits.

## VIII.   DEMAND FOR JURY TRIAL

126.   Pursuant to Fed. R. Civ. P. 38, Plaintiff hereby requests a trial by jury on all issues so triable.

## IX.    PRAYER FOR RELIEF

For all of the foregoing reasons, Plaintiff respectfully requests that the Court award judgment in favor of Plaintiff and against Harriman for the following relief, collectively or in the alternative:

(a)    An award of actual damages, both general and special;

(b)    An award of exemplary damages;

(c)    Pre- and post-judgment interest pursuant to the maximum extent allowed by law or equity;

(d)    Injunctive relief; and

(e)    Such other and further relief at law or in equity to which Plaintiff may be justly entitled.

DATED this 27th day of August, 2015.

Respectfully submitted,

**DAVIS & SANTOS
ATTORNEYS & COUNSELORS, P.C.**

By:    */s/ Jason M. Davis*
        Jason M. Davis
        State Bar No. 00793592
        E-mail: *jdavis@dslawpc.com*
        Caroline Newman Small
        State Bar No. 24056037
        E-mail: *csmall@dslawpc.com*
        Aron Cooper
        State Bar No. 24050143
        E-mail: *acooper@dslawpc.com*
        The Weston Centre
        112 E. Pecan Street, Suite 900
        San Antonio, Texas 78205
        Tel:   (210) 853-5882
        Fax:  (210) 200-8395

**THOMPSON & KNIGHT, LLP**
Nicole L. Williams
State Bar No. 24041784
E-mail: *Nicole.Williams@tklaw.com*
One Arts Plaza
1722 Routh Street, Suite 1500
Dallas, Texas 75201
Tel:  (214) 969-1149
Fax:  (214) 999-1508

*Attorneys for Palmaz Scientific, Inc.*