FILED
DALLAS COUNTY
10/26/2015 4:20:21 PM
FELICIA PITRE
DISTRICT CLERK

David Hernandez

CAUSE NO. DC-15-12314

| | | |
|---|---|---|
| SUSAN E. HARRIMAN<br>*Plaintiff,* | §<br>§<br>§ | IN THE DISTRICT COURT |
| vs. | §<br>§ | |
| PALMAZ SCIENTIFIC, INC.,<br>JULIO CESAR PALMAZ,<br>STEVEN BRETT SOLOMON,<br>GARY ZIMPELMAN,<br>JOHN ASEL,<br>ET AL.,<br>*Defendants.* | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | 134TH JUDICIAL DISTRICT<br><br>DALLAS COUNTY, TEXAS |
| PALMAZ SCIENTIFIC, INC.,<br>DR. JULIO CESAR PALMAZ,<br>STEVEN BRETT SOLOMON,<br>*Counter-Plaintiffs, Third-Party Plaintiffs,* | §<br>§<br>§<br>§<br>§<br>§ | |
| vs. | §<br>§ | |
| SUSAN E. HARRIMAN,<br>*Counter-Defendant,* | §<br>§<br>§ | |
| ALAN CHESLER,<br>EHRENBERG CHESLER INTERESTS, LLC,<br>EHRENBERG CHESLER SECURITIES, INC.,<br>IMS SECURITIES, INC.,<br>*Third-Party Defendants.* | §<br>§<br>§<br>§<br>§ | |

**PALMAZ SCIENTIFIC, INC., JULIO CESAR PALMAZ, STEVEN BRETT SOLOMON
AND JOHN ASEL'S ORIGINAL ANSWER; AND
COUNTERCLAIMS AND THIRD-PARTY CLAIMS BY PALMAZ SCIENTIFIC, INC.,
DR. JULIO CESAR PALMAZ AND STEVEN BRETT SOLOMON
AND REQUEST FOR DISCLOSURE**

TO THE HONORABLE COURT:

Defendants Palmaz Scientific, Inc. ("**Palmaz Scientific**" or the "**Company**"), Julio Cesar

Palmaz ("**Dr. Palmaz**"), Steven Brett Solomon ("**Mr. Solomon**"), and John Asel ("**Mr. Asel**")

EXHIBIT
2

(collectively "**Defendants**") hereby file this Answer.[1] Palmaz Scientific, Dr. Palmaz and Mr. Solomon (collectively, "**Counter-Plaintiffs**") hereby file these Counterclaims against Susan E. Harriman ("**Harriman**") and Third-Party Claims against Alan Chesler ("**Mr. Chesler**"), Ehrenberg Chesler Interests, LLC ("**EC, LLC**"), Ehrenberg Chesler Securities, Inc. ("**EC, Inc.**"), and IMS Securities, Inc. ("**IMS**") and in support would respectfully show:

## I. ORIGINAL ANSWER

### A. GENERAL DENIAL

1. Defendants deny each and every allegation of Plaintiff's First Amended Petition, and demand strict proof thereof as required by the Texas Rules of Civil Procedure. Defendants reserve the right to amend this Answer upon completion of discovery.

### B. DEFENSES AND AFFIRMATIVE DEFENSES

2. Defendants assert the following defenses while reserving the right to raise additional defenses that become apparent through discovery:

3. Plaintiff's claims are barred, in whole or in part, by the First Amendment.

4. Plaintiff's claims are barred, in whole or in part, by absolute privilege.

5. Plaintiff's claims are barred, in whole or in part, by the Texas Citizens Participation Act.

6. Plaintiff's claims are barred, in whole or in part, because the alleged statements were true or substantially true.

---

[1] Defendants expressly reserve their right to file motions to dismiss pursuant to Tex. R. Civ. P. 91(a) and the Texas Citizens Participation Act, and any and all other appropriate dispositive motions, as well as motions for attorney's fees and costs incurred as a result of Harriman's frivolous pleading, and file this answer subject to the grounds raised in its motions to dismiss.

7. Plaintiff's claims are barred, in whole or in part, because she is a "libel-proof" plaintiff due to, at least, a previously diminished reputation.

8. Plaintiff's claims are barred, in whole or in part, by the doctrine of legal justification.

9. Plaintiff's claims are barred, in whole or in part, by the statute of limitations and/or laches.

10. Plaintiff's claims are barred, in whole or in part, by qualified privilege.

11. Plaintiff's claims are barred, in whole or in part, by immunity.

12. Plaintiff's claims are barred, in whole or in part, by consent.

13. Plaintiff's claims are barred, in whole or in part, by justification.

14. Plaintiff's claims are barred, in whole or in part, by Plaintiff's own fault, conduct, or actions and because Plaintiff has unclean hands.

15. Plaintiff's claims are barred, in whole or in part, because they have no basis in fact or law and fail to state a claim upon which relief can be granted.

16. Without conceding that Plaintiff's claims have merit or that Plaintiff has suffered any damages, Defendants affirmatively allege that Plaintiff failed to mitigate her damages.

17. Without conceding that Plaintiff's claims have merit or that Plaintiff has suffered any damages, Defendants affirmatively allege that Plaintiff's alleged damages are remote, contingent, speculative, and/or conjectural.

18. Defendants specifically deny that any conditions precedent have occurred or been performed including, among others, the conditions precedent required to bring defamation claims pursuant to the Defamation Mitigation Act, Chapter 73, Subchapter B, of the Texas Civil Practice and Remedies Code.

19.     Plaintiff's claim for punitive damages is barred by the Defamation Mitigation Act, Chapter 73, Subchapter B, or the Texas Civil Practice and Remedies Code. Further, any award of exemplary damages is controlled and limited by the Due Process Clause of the 14th Amendment of the United States Constitution, and by the Due Process clause of the Texas Constitution. Defendants affirmatively assert that Plaintiff's exemplary damages claim is limited by Texas Civil Practice and Remedies Code § 41.008.

## C.     PRAYER

WHEREFORE, premises considered, Defendants pray that the Court render judgment that Plaintiff take nothing against Defendants, dismiss Plaintiff's claims with prejudice, and award Defendants any and all such other relief to which they may be entitled at law or in equity.

## II.     COUNTERCLAIMS AND THIRD-PARTY CLAIMS

1.     Pursuant to Tex. R. Civ. P. 38, 39, 40, 97(a) and 97(f), Palmaz Scientific, Dr. Palmaz and Mr. Solomon file these counterclaims against Harriman and third-party claims against Alan Chesler, Ehrenberg Chesler Interests, LLC, Ehrenberg Chesler Securities, Inc., and IMS Securities, Inc.

## A.     INTRODUCTION

2.     Palmaz Scientific, Dr. Palmaz and Mr. Solomon (collectively, "**Counter-Plaintiffs**") are being victimized by a delusional and malicious campaign of economic terrorism by Harriman. Harriman's conduct—including the filing of her frivolous claims in this case—are unfortunately but the latest in her established pattern of obsessive, harassing, litigious and criminal behavior, as she has been involved over the last few years alone in no less than eight civil suits and charged in multiple criminal cases for offenses ranging from trespass and burglary to retaliation.

4

3.   Harriman, who was registered with IMS Securities, Inc. for the majority of the relevant time frame, has and continues to intentionally interfere with Counter-Plaintiffs' business and economic interests, including, among other ways, through the dissemination of false, defamatory and disparaging statements about them. During her smear campaign, Harriman enlisted the aid of Alan Chesler, who had assisted the Company in 2008-2009 fundraising efforts. Chesler, with, by, and through his entities, Ehrenberg Chesler Securities, Inc. and Ehrenberg Chesler Interests, LLC, disseminated the malicious and defamatory messages, causing severe harm to Counter-Plaintiffs.

4.   Based on the false statements and ongoing malicious conduct, Counter-Plaintiffs file these counterclaims and third-party claims of: (i) tortious interference with existing contracts; (ii) tortious interference with prospective business relations; (iii) defamation; (iv) business disparagement; (v) conspiracy; and (vi) assisting and encouraging; and (vii) assisting and participating. Counter-Plaintiffs seek damages and injunctive relief.

## B.   PARTIES

5.   Counter-Plaintiff Palmaz Scientific, Inc. ("**Palmaz Scientific**" or the "**Company**") is a Delaware corporation with its principal place of business in Texas.

6.   Counter-Plaintiff Julio Cesar Palmaz ("**Dr. Palmaz**") is an individual residing in Nevada.

7.   Counter-Plaintiff Steven Brett Solomon ("**Mr. Solomon**") is an individual residing in Texas.

8.   Counter-Defendant Susan E. Harriman ("**Harriman**") is an individual who has already appeared in this case though her counsel, Dalton Harris, THE HARRIS LAW FIRM, P.C., 5050 West Lovers Lane, Dallas, Texas 75209.

5

9. Third-Party Defendant Alan Chesler ("**Chesler**") is resident of Texas who may be served with process through his attorney, Mr. Justin Bryan, FEE, SMITH, SHARP & VITULO, LLP, 13155 Noel Road, Suite 1000, Dallas, Texas 75240, or at his office located at 7373 Broadway Street, Suite 108, San Antonio, Texas 78209.

10. Third-Party Defendant Ehrenberg Chesler Interests, LLC ("**EC Interests**") is a Texas limited liability company that may be served with process through its registered agent, Alan Chesler, at 7373 Broadway Street, Suite 108, San Antonio, Texas 78209. Chesler is EC Interests' managing member.

11. Third-Party Defendant Ehrenberg Chesler Securities, Inc. ("**EC Securities**") is a Texas corporation that may be served with process through its registered agent, Alan Chesler, at 7373 Broadway Street, Suite 108, San Antonio, Texas 78209. Chesler is EC Securities' co-founder, president and sole director.

12. Collectively, Mr. Chesler, EC Interests and EC Securities are referred to as the "**Chesler Parties**."

13. Third-Party Defendant IMS Securities, Inc. ("**IMS**") is a Texas Corporation that may be served with process through its registered agent, Corporation Service Company d/b/a CSC-Lawyers Incorporating Service Company, 211 E. 7th Street, Suite 620, Austin, Texas 78701, or through its President, Jackie Wadsworth, whose business address is 10205 Westheimer, Suite 500, Houston, Texas 77042.

### C.   JURISDICTION AND VENUE

14. This Court has subject matter jurisdiction because the amount at issue is in excess of the minimum jurisdictional limits of the Court. *See* Tex. Gov't Code §§ 24.007; 24.008.

15.     This Court has personal jurisdiction, both general and specific, over the parties in this case. The parties in this case either reside in Texas, do business in Texas and/or the claims in this action arise directly from Harriman's and the Chesler Parties' activities in this state and elsewhere.

16.     Venue of this action properly lies in Dallas County, Texas pursuant to Texas Civil Practice & Remedies Code § 15.002(a)(1), as all or a substantial part of the events and/or omissions giving rise to the Counter-Plaintiffs' claims occurred in Dallas County, Texas.

## D.     DISCOVERY CONTROL PLAN

17.     Counter-Plaintiffs intend that discovery be conducted under Level 3 and affirmatively plead that they seek monetary relief aggregating more than $1,000,000. *See* Tex. R. Civ. P. 47(c)(5).

## E.     FACTS

18.     Pursuant to Rule 58 of the Texas Rules of Civil Procedure, Counter-Plaintiffs incorporate by reference all of the allegations in each of the paragraphs above as if fully set forth herein.

### i.     *Palmaz Scientific.*

19.     Palmaz Scientific is a medical technology company dedicated to developing safer, more predictable implantable medical devices to improve the lives of patients. Dr. Palmaz, the Company's Chairman and Chief Scientific Officer, is a world-renowned physician and scientist who invented the first sucessful commercially available intravascular stent for coronary arteries. The Palmaz® Stent, as it became known, forever changed cardiac care, with more than a million people a year undergoing coronary artery stenting to repair clogged arteries. Mr. Solomon, the Company's Chief Executive Officer from its formation in 2008 until August of 2015, is a seasoned

7

executive with more than twenty years of experience with capital transactions including private placement offerings.

20. Palmaz Scientific, like many medical technology research companies, relies on financial investments from third parties to provide funding for its projects, including its clinical trials. In order to raise capital, Palmaz Scientific works with investment banks to structure private offerings of its securities to accredited investors. In this regard, Palmaz Scientific is able to raise capital by selling shares of stock without taking the Company public.

21. Typically, a brokerage firm will assist a company such as Palmaz Scientific with private placement offerings and market the offering to their network of elite and accredited investors. Palmaz Scientific engaged various firms to assist with its fundraising efforts.

22. In 2008, the Company, through Solomon, engaged EC Securities, through Chesler, to raise capital through a private offering of Palmaz Scientific securities to accredited investors. EC Securities, through Chesler, secured approximately five investors who became Palmaz Scientific shareholders.

23. In 2011, the Company, through Solomon, engaged WFG Investments, Inc. ("**WFG Investments**"), through its Senior Vice President Brent E. Barton, to assist with a private placement offering of Palmaz Scientific securities that ultimately generated millions of dollars in investment funds for the Company.

24. In 2014, the Company, through Solomon, engaged Emerson Equity, LLC ("**Emerson Equity**"), where Barton is now an Executive Vice President, to conduct another private offering of Palmaz Scientific securities to accredited investors.

25. The reputations of Palmaz Scientific, Dr. Palmaz and Mr. Solomon are critical to their relationships with not only these brokers, but other brokers, strategic business partners and

investors. Their stellar reputations earned them the trust and confidence that is fundamental, not only to a successful private offering, but to the overall success of the Company. Palmaz Scientific, Dr. Palmaz and Mr. Solomon value their reputations and business relationships and take active measures to protect their reputations and maintain these relationships.

     *ii.    Harriman meets Mr. Solomon.*

26. Harriman worked with Barton at WFG Investments. In 2011, Harriman resigned following concerns raised by investors and potential investors who claimed that Harriman was harassing them. Thereafter, Harriman became a registered agent with IMS Securities, Inc. ("**IMS" or "IMS Securities**"). At all times while Harriman was a registered agent with IMS, she was acting with actual or apparent authority from, and capacity as an agent of, IMS.

27. Around late 2011 or early 2012, Neal Turner ("**Turner**"), who also had worked with Harriman during her tenure at WFG Investments, contacted Mr. Solomon and requested that he take a meeting with Harriman about Palmaz Scientific. Out of professional courtesy, Mr. Solomon agreed. Harriman, Turner and Mr. Solomon were present at this meeting at Mr. Solomon's Palmaz Scientific office in Dallas. Harriman discussed the services and opportunities she and IMS Securities could allegedly offer to Palmaz Scientific, and she actively solicited involvement in Palmaz Scientific's current offering. Mr. Solomon declined Harriman's offers.

28. Following this meeting, Harriman continued to contact Mr. Solomon and present other investment opportunities. Harriman openly expressed to Mr. Solomon that she wanted him to share his network of contacts that he had worked hard to establish over many years. As Harriman knows, in the investment banking community access to such a rolodex can provide a significant economic opportunity.

29. In the fall of 2013, Harriman called Mr. Solomon requesting his assistance in

brokering some investment deals to his network of contacts. She praised Mr. Solomon's good reputation in the investment community and solicited his guidance. After asking a few questions, Mr. Solomon stated that he was not interested.

30. At this point, during what otherwise seemed to be a routine solicitation call, Harriman became enraged and started screaming and yelling in an alarming and unprofessional manner. Harriman told Mr. Solomon that she would never show him a "f***ing deal again" and further cursed at him. Harriman then abruptly hung up the phone. Mr. Solomon immediately contacted Turner and expressed his shock at Harriman's unprofessional behavior and asked that she not contact him again. Turner apologized.

31. Despite Mr. Solomon's request not to be contacted again, Harriman called Mr. Solomon in February or March of 2014. After apologizing for her earlier conduct, Harriman again solicited Mr. Solomon for business. Harriman introduced Mr. Solomon to some business owners in Denver, Colorado who were looking for investors. When the business later did not pay a commission to Harriman to which she claimed to be entitled, she became enraged and blamed Mr. Solomon.

32. At the end of May 2014, Harriman made her next call to Mr. Solomon from a blocked number. Harriman screamed and yelled at Mr. Solomon and made threatening statements, including that she had taped every conversation she ever had with Mr. Solomon, that Mr. Solomon "f***ed up," and that she would be "taking [Solomon] out." Harriman then hung up the phone.

33. Over the next year and a half, and as described below, Harriman developed an unwarranted and unhealthy obsession with Mr. Solomon, steadfast in her promise to "take him out." Harriman was apparently obsessed with the concept of "gas lighting" — a malicious form of psychological abuse involving the spreading of false information designed to alter the

perception of its victims. Using this gas lighting technique, Harriman embarked on a campaign of false and defamatory statements designed to destroy Mr. Solomon, as well as Dr. Palmaz and Palmaz Scientific, who were "guilty by association" in Harriman's mind.

       *iii.    June 2014 – Harriman begins her malicious smear campaign.*

    34.    Soon after Harriman's May 2014 threatening phone call to Mr. Solomon, he began receiving reports that she was making false, defamatory, and disparaging statements about him, Palmaz Scientific and Dr. Palmaz to the Company's current and potential investors and business partners.

    35.    For example, in early June 2014, Harriman contacted Brian Ladin ("**Ladin**"), a financial advisor with Delos Investment Management LLC ("**Delos Investment**") in Dallas, Texas, and investors associated with Delos Investment, for the purpose of interfering with Counter-Plaintiffs' fundraising efforts. Ladin, through Delos, represented accredited investors who had invested over $2 million in Palmaz Scientific through a private placement in March of 2014. On June 10, 2014, Ladin e-mailed Mr. Solomon to report Harriman's activities and seek reassurances:

---

**From:** Brian Ladin <brian@delosinv.com>
**Subject: question**
**Date:** June 10, 2014 at 8:49:59 AM CDT
**To:** "'Steven Solomon' (ssolomon@palmazscientific.com)" <ssolomon@palmazscientific.com>

Susan Harriman is calling my investors and claiming Palmaz is a fraud because there is no listing for the Colombian trial on clinicaltrials.gov. Can you walk me through the registration process for the Colombian trials?

Sorry for the bother.

Thanks,

Brian

---

    36.    In subsequent calls with Mr. Solomon after this e-mail, Ladin reported to Mr. Solomon that Harriman had also:

- Falsely accused Palmaz Scientific of having done no clinical trials at all;

- Falsely accused Palmaz Scientific of being a fraud; and

- Falsely claimed Palmaz Scientific was not conducting any activities in Colombia.

37.  Upon hearing these false and potentially devastating allegations, Mr. Solomon invited Ladin to Palmaz Scientific's Dallas office and provided objective facts demonstrating the falsity of Harriman's statements. For example, Mr. Solomon confirmed the existence of Palmaz Scientific's clinical trial in Colombia, the Company's ongoing research operations, and disclosed the Company's financial records.

38.  Despite Mr. Solomon's best efforts to mitigate the damage caused by Harriman's false statements to Ladin and the investors, Palmaz Scientific agreed to negotiate with them to repurchase their shares. Ladin directly attributed this decision to Harriman's actions:

> From: Brian Ladin <brian@delosinv.com>
> Subject: Next steps
> Date: June 11, 2014 at 4:08:21 PM CDT
> To: Steven Solomon <ssolomon@palmazscientific.com>
>
> Let's just rescind the investment. I apologize, but this is spiraling out of control on my side because of Susan.
>
> Thank you for understanding.
>
> Brian

39.  As a result of Harriman's false and malicious statements and conduct, Palmaz Scientific repurchased the Company's shares from Ladin's investors, thereby suffering irreparable harm from the diversion of funds from research opportunities and from damage to its reputation.

40.  During this same time frame, on June 8, 2014, Harriman made an unsolicited phone call to Chesler at his home. During this phone call, and subsequent conversations, Harriman made false and defamatory statements about Counter-Plaintiffs to Chesler, including, among others:

a.  False allegations that Mr. Solomon stole between $12-15 million and possibly as much as $17 million in investor funds;

12

b. False allegations that Mr. Solomon stole the money in $100,000 and $200,000 increments and used it to furnish his "lavish" lifestyle;

c. False allegations that the Company failed to comply with FDA regulations by not recording any of its clinical studies;

d. False allegations that the Company has not conducted any clinical trials;

e. False allegations that the Company has misrepresented its patent portfolio;

f. False allegations that the Company's former CFO, Richard Connelly, misrepresented to shareholders the amount of money the company has raised;

g. False allegations that Dr. Palmaz is not involved in the Company's clinical trials;

h. False allegations that the Company has misrepresented the nature of its research facilities; and

i. False allegations that Mr. Solomon misused Company funds for personal use.

41. Harriman made her false and disparaging statements to Chesler in order to damage the business relationship between the Company and the Chesler Parties and to create friction between the Company, Mr. Solomon, and its current and potential shareholders and business partners.

42. Chesler then, through his entities, repeated and published the unsubstantiated, false and disparaging allegations to other shareholders and other business partners of Counter-Plaintiffs. Chesler contacted the Company, which offered to share financial information via a non-disclosure agreement. The Company then provided Chesler with financial information that refuted some of his claims. The Company then invited Chesler to come visit the Company's facility and meet with Solomon and Dr. Palmaz to review information addressing any additional questions he had. Chesler refused.

13

43. Harriman also published false, defamatory and disparaging statements about Palmaz Scientific to Turner, who has previously worked with Harriman at WFG Investments. Eventually, Turner began working with and at the direction of Harriman at IMS Securities. In this capacity, Turner contacted Mr. Solomon and confirmed that he was working for IMS on behalf and at the direction of Harriman. Turner repeated Harriman's false, defamatory statements regarding Palmaz Scientific to Mr. Solomon, and admitted that she had done the same to individuals at WFG Investments and several Company investors. These statements included, among others:

- The false allegation that Palmaz Scientific's clinical trials were not real;

- The false allegation that Palmaz Scientific had misrepresented its patent portfolio; and

- The false allegation that Dr. Palmaz was not active in Palmaz Scientific or its clinical trials.

44. At Mr. Solomon's invitation, Turner visited the Company's Dallas office on two occasions during which Mr. Solomon directly refuted Harriman's allegations with objective facts and documents that verified Palmaz Scientific's clinical trial and patents. During one of these visits, Turner stated that Harriman instructed him to inspect Mr. Solomon's passport, as she had alleged that Mr. Solomon never traveled to Colombia for any clinical trial. After Turner's review of the information and documents supplied by Mr. Solomon,[2] Turner acknowledged that Harriman's allegations were false and that Harriman should apologize. That apology from Harriman never happened.

45. Instead, Harriman continued her smear campaign. For example, on or about June

---

[2] As mentioned, this same information was also made available to Chesler, who refused Mr. Solomon's invitation to review the same.

14, 2014, Harriman also contacted Dominic Baldini ("**Baldini**"), the founder of and Chief Executive Officer at Emerson, Barton's current firm. Harriman falsely stated to Baldini that Palmaz Scientific was a fraud and did not have any clinical trials. Harriman also tried emphatically to dissuade Baldini and Emerson from conducting further business with Palmaz Scientific.

46.     Harriman also published false, defamatory and disparaging statements about Counter-Plaintiffs to executives at WFG Investments. In a June 25, 2014 e-mail, Harriman:

- Falsely accused Palmaz Scientific of misrepresenting the nature of its clinical trials;

- Falsely accused Palmaz Scientific of misrepresenting its patent portfolio;

- Falsely accused Mr. Solomon of never having traveled to Colombia in connection with Palmaz Scientific's clinical trials; and

- Falsely accused Dr. Palmaz of having nothing to do with Palmaz Scientific or the clinical trials.

47.     Also in the summer of 2014, Harriman's conduct interfered with the Company's efforts to negotiate and form a strategic partnership with a Fortune 500 medical device company.

48.     Similarly, on August 2, 2014, Dr. Julio Palmaz received an e-mail from a Palmaz Scientific investor named Richard Benedikt ("**Benedikt**"). Benedikt is a client of Chesler's firm ECS. Benedikt seemed to parrot Harriman's (and the Chesler Parties') false claims about the Company and its executives in e-mail correspondence with Dr. Palmaz in which the investor requested detailed information regarding:

- the Company's financials;

- any ongoing clinical trials; and

- Dr. Palmaz's current involvement in the Company's research.

49.     In an effort to stop Harriman from causing further damage, on June 26, 2014,

counsel for Palmaz Scientific and Mr. Solomon sent Harriman and IMS, through its President Jackie Wadsworth, a cease and desist letter. After the cease and desist letters were delivered, it appeared to Counter-Plaintiffs that Harriman had abandoned her malicious campaign. They were wrong.

*iv.    August 2015 — Harriman resurrects her smear campaign.*

50.    In mid-2015, it became apparent that Harriman simply will not stop her malicious spreading of false information about Counter-Plaintiffs, and that IMS made no effort to ensure otherwise. Her conduct continues to directly impugn them and their economic interests, and she continues to make false allegations that they have been involved in criminal conduct.

51.    In July 2015, Barton was contacted by others in the investment industry who stated that Harriman was once again spreading the same type of false information about Counter-Plaintiffs.

52.    For example, John Foster, one of the Company's shareholders, received Harriman's false and defamatory allegations about Counter-Plaintiffs. Foster's investment was the result of fundraising efforts by Titan Securities ("**Titan**"), one of Palmaz Scientific's investment bankers. Defendant Gary Zimpelman is a managing partner at Titan. Counter-Plaintiffs had business relationships with Titan and Zimpelman.

53.    In response to receiving Harriman's allegations, Dr. Palmaz met with Foster in person, who confirmed that Harriman had contacted him and made allegations similar to those described above. During the meeting, Foster received repeated calls from Harriman. Foster showed Dr. Palmaz the caller identification on his phone that indicated that Harriman was calling. Alarmed by the false allegations and the wildfire-like nature with which they were spreading, Dr. Palmaz also took Foster to Palmaz Scientific's facility in Fremont, California to refute Harriman's

16

delusional claim that the Company has no operations there.

54.     Additionally, on August 15, 2015, Harriman e-mailed James Conaway, a well-known author, suggesting a "movie-deal story" about Counter-Plaintiffs' "securities fraud." In her e-mail, Harriman falsely alleges, among other things, the outrageous claim that Dr. Palmaz's "unlimited funds" flow from "securities fraud" involving "[t]ens and tens of millions—from accredited investors, your best victims . . . ."

55.     More recently, on August 19, 2015, Harriman's and Chesler's conduct, in whole or in part, caused Targeted Technology Fund ("**TTF**") to abandon its planned multi-million dollar investment in Palmaz Scientific, several days after the Company announced the investment to Palmaz Scientific shareholders. The loss of likely and expected funding from TTF and other potential investors has severely disrupted Palmaz Scientific's ongoing research and development activities and threatened the viability of the Company.

56.     In addition to these specific instances, upon information and belief, Harriman has also contacted the following individuals and entities in an attempt to further malign Counter-Plaintiffs and maliciously spread false information about them: (a) Dr. Juan Granada at the Cardiovascular Research Foundation, who was involved in the Company's clinical trials in Colombia; (b) Abbott Cardiovascular Systems, Inc., a strategic business partner of the Company; and (c) Stifel Financial Corporation, who was involved in the Company's fundraising efforts.

57.     Harriman's obsession with Mr. Solomon has also reached new lows. She has contacted his family members and sent Mr. Solomon stalking-like text messages to his cell phone in which she seems to revel in the fact that he is no longer CEO of the Company, and further states: "I feel sorry for your children because their Dad is going to prison."

17

*v.* *Palmaz Scientific sues Harriman.*

58.     In an effort to put an end to Harriman's malicious campaign, on August 27, 2015, Palmaz Scientific filed suit against Harriman in United States District Court for the Western District of Texas asserting claims of defamation, business disparagement, and tortious interference with current and prospective contracts. *Palmaz Scientific, Inc. v. Harriman*, No. SA-15-CA-734-FB (W.D. Tex. 2015). Although the case was ultimately dismissed for lack of subject matter jurisdiction, which had been alleged based on diversity, the Court entered an *ex parte* temporary restraining order. In that order, the Court made certain findings concerning Harriman's conduct against the Company, including:

   a.   that Harriman "is engaging in false and misleading commercial speech and harassing and threatening behavior;"

   b.   that "Harriman's conduct will cause [Palmaz Scientific] imminent and irreparable harm if she is not immediately restrained;" and

   c.   that "Harriman's conduct has already caused irreparable injury and continues to threaten irreparable injury by causing Palmaz Scientific to lose research funding an [sic] opportunities, suffer damages to its reputation, goodwill, and current, ongoing and prospective business relationships, lose investors and investment funding, and potentially close down its operations altogether." Id. at Doc. 8 (filed Aug. 28, 2015)

59.     With respect to Mr. Solomon, the Court found that "in light of Harriman's prior pattern of harassing and stalker-like conduct, Steve B. Solomon, and members of his immediate family, are justified in their fear for their safety and their physical and mental wellbeing." The Court further found that "the Solomon family will likely suffer imminent and irreparable physical and/or emotional harm if Harriman were allowed to contact Solomon or his family either in person, in writing, or other electronic/remote means." *Id.*

60.     Accordingly, the Court entered a restraining order prohibiting Harriman from, among other things, publishing any false, misleading or defamatory statements about the

Company, Dr. Palmaz and Mr. Solomon, and prohibiting her from coming within 500 feet of Solomon or his family, or contacting them by any means.

61.     In its order dismissing the case on jurisdictional grounds, the Court took note of Harriman's inappropriate behavior during the evidentiary hearing on her motion to dismiss:

> Before addressing the jurisdictional issue, the Court recalls the evasive and obstructionist behavior and answers of the defendant in the September 16 hearing. The record reflects the Court admonished defendant numerous times, threatened contempt sanction and requested the assistance of the United States Marshals Service to be prepared to place defendant in custody. Her behavior improved somewhat. Id. at Doc. 29 p. 1 (filed Oct. 7, 2015).

62.     Undeterred, and immediately following the dismissal of the federal case, upon information and belief, Harriman began posting defamatory statements on online message boards about Mr. Solomon and later filed this frivolous lawsuit on October 7, 2015.

*vi.     Harriman prompts shareholders to sue Palmaz Scientific.*

63.     Meanwhile, on September 29, 2015, a group of shareholders that had been fed false information by Harriman and her agents filed a lawsuit against the Company parroting the same false statements previously circulated by Harriman.

64.     Not coincidentally, the law firm representing these investors is also the law firm that represented Harriman in a different proceeding. It is believed that she has assisted the firm in contacting and soliciting investors as potential new clients for the firm. Such proceedings, based on Harriman's and the Chesler Parties' false allegations, and the mistrust that arose from their claims, is causing irreparable harm by diverting additional resources away from business operations and is causing the Company severe financial distress.

*vii.     Harriman's background and pattern of conduct.*

65.     At the time Mr. Solomon was first introduced to Harriman, Counter-Plaintiffs were unaware of Harriman's long history of character assassination and litigious behavior. Over the

last year and a half, Counter-Plaintiffs have discovered her pattern of using harassment, threats, and even criminal behavior to intimidate and attack those who she apparently perceives have wronged her. Harriman's troubled background, when coupled with her vindictive and harassing behavior towards Counter-Plaintiffs, including references to the family members of Mr. Solomon, Turner and Barton, causes Counter-Plaintiffs to fear for their safety and the safety of their employees, agents, representatives, and families.

66. Harriman has been a party to numerous legal proceedings, both criminal and civil in nature. Some of these matters include:



**Civil Cases**

- Cause No. 231-441177-08; *Howard Rosenstein v. Cheryl D. Smith and Susan Harriman*, In the 134th District Court of Tarrant County, filed June 4, 2008 (hereinafter the "Rosenstein Suit")

- Cause No. DC-13-02061; *Susan E. Harriman v. John Bender et al.*, In the 44th District Court of Dallas County, filed February 19, 2013 (hereinafter the "Bender Suit")

- Case No. 08-7-00228-CV, *In re PLH, SRH & CHH*, In the Court of Appeals for the Eighth District of Texas (El Paso), decided February 24, 2010

- Cause No. CV11-00766-V-292ND, *In re Michael Ben Zidell & Susan Elizabeth*

*Harriman*, in the 292nd District Court of Dallas County, filed November 2, 2011.

- Case No. 14-CV-76, *Harriman v. Sugarcat Hospitality, Inc. et al.*, in the District Court of Finney County, Kansas, filed on May 21, 2014

- Case No. 2:14-cv-00482-RJS, *Harriman v. Galbraith*, in the United States District Court for the District of Utah, filed on June 30, 2014

- Case No. 2014CV33390, *Harriman v. Kilts et al.*, in the District Court of Denver County, Colorado, filed on August 29, 2014

- Civil Case No. 150400951, *Harriman v. Beck*, in the 4th Judicial District of Utah County, Utah, filed on June 30, 2015

67.     The allegations in the Rosenstein Suit demonstrate Harriman's pattern of tortiously interfering with contracts. In that case, the plaintiff brought suit against Harriman alleging that she gave false, defamatory testimony against him in his divorce trial and tortiously interfered with a post-nuptial agreement between Rosenstein and his wife. Rosenstein brought claims against Harriman for fraud, conspiracy to commit fraud, intentional infliction of emotional distress, and tortious interference with contract.

68.     The allegations in the Bender Suit further illustrate Harriman's disturbing and vindictive pattern of behavior. In that case, Harriman brought suit for defamation against multiple individuals, including Michael Zidell, a former boyfriend who resides in Dallas. Zidell filed cross-claims against Harriman based on Harriman's harassing, threatening and defamatory conduct. Specifically, Zidell alleged that after breaking up with Harriman she trespassed onto his property, stalked and harassed Zidell, his children, and his friends, and published false and defamatory statements about him. Zidell provides details of nine incidents involving Harriman that resulted in the following police reports:





69.     The Bender Suit also alleges that Harriman has engaged in harassing and stalking tactics, has created false e-mail and social media accounts to further her schemes, and has terrorized her target's family and friends.

70.     Zidell also filed an application for a temporary restraining order against Harriman, alleging that Harriman had engaged in family violence, behaved in a harassing and threatening manner, and stalked him at his personal residence. Zidell also alleged that Harriman hacked into his mobile phone, stole his personal information, and made numerous false and humiliating statements about Zidell to third parties. Such conduct is alleged to have occurred after only dating Harriman for three and half months. Zidell alleged that he continues to fear for his safety and requests, among other things, that Harriman not be allowed within 500 feet of him, his residence or place of employment.

71.     More recently, Zidell's girlfriend after his relationship with Harriman—who was also a defendant in the Bender Suit—filed a defamation case against a media outlet for publishing an article based on false information provided by Harriman. *See D. Magazine Partners, LP v. Rosenthal*, --- S.W.3d ---, 2015 WL 5156908, at *1-*2 (Tex. App.—Dallas 2015, pet. filed.). The Dallas Court of Appeals' opinion described the allegations that Harriman was a stalker that

impersonated law enforcement and disease control representatives "in attempts to ruin appellee's reputation." *Id.* at *1; *see also D Magazine Partners, LP v. Rosenthal,* 2014 WL 5302564, at *2- *9 (Tex. App.—Dallas Oct. 10, 2014) (Brief of Appellee) (identifying Harriman as the source of the information for the defamatory article).

72.     All of these referenced proceedings establish Harriman's pattern of criminal, litigious and vindictive conduct that now continues with Harriman's campaign against Counter-Plaintiffs.

73.     Additionally, upon information and belief, Harriman has previously used the same gas-lighting technique she is using against Counter-Plaintiffs, to harm other companies, in hopes of increasing her own level of business and commissions. For instance, in 2014 Harriman allegedly tried to incite the minority shareholders of another company by spreading untrue, defamatory statements about its CEO and President. Upon information and belief, Harriman's goal was to benefit her own clients and her own economic agenda.

     *viii.     Harriman's and the Chesler Parties' impact on Counter-Plaintiffs and their reputation, economic interests and business relationships.*

74.     Harriman's and the Chesler Parties' intentional and malicious conduct towards Counter-Plaintiffs has caused, and continues to cause, irreparable injury to their reputations, economic interests, and their current and prospective business relationships. In part because the false statements are impossible to contain or control from further dissemination, the injury caused by the same is irreparable. If not immediately stopped, Harriman's and the Chesler Parties' conduct may cause financial ruin to Counter-Plaintiffs, destroy their well-earned reputations in the business community, and cause long-lasting and devastating damage.

75.     Harriman's and the Chesler Parties' false statements and Harriman's ongoing malicious campaign against Counter-Plaintiffs are aimed at destroying their reputation, business,

and economic interests while furthering their own economic agenda. Harriman and the Chesler Parties purposefully targeted, and continue to target, an audience known to have established or potential business relationships with Counter-Plaintiffs, and with whom they have or desire to have a business relationship. For example, Harriman hopes to successfully dissuade brokers and investors from doing business with Counter-Plaintiffs and convince them to do business with her.

76. Further, given Harriman's and the Chesler Parties' experience in the investment industry, they knew or should have known that their false and disparaging statements attacked the very core of Counter-Plaintiffs' reputation and business. Harriman did not contact Mr. Solomon, Palmaz Scientific, or anyone at Palmaz Scientific, before making the false, defamatory and disparaging statements described above. Had she done so, the falsity of her statements could have been readily demonstrated by objective facts. Similarly, although Chesler contacted the Company and even signed a non-disclosure agreement, he declined an invitation to review further information that would have refuted Harriman's allegations. Instead, he "drank the Kool-Aid" and joined the reckless and malicious defamatory campaign.

77. Although Harriman's and the Chesler Parties' false, defamatory and disparaging statements are unfounded and false, they have nevertheless poisoned Counter-Plaintiffs' reputation in the business community.

78. As a result of Harriman's and the Chesler Parties' statements, Palmaz Scientific has repurchased shares from investors and been forced to waste time and resources addressing and refuting Harriman's and the Chesler Parties' statements, thereby burdening its ability to manage and conduct its normal business operations.

79. Harriman's and the Chesler Parties' statements have caused serious disruptions, severely damaged shareholder relations and effectively devalued the Company.

80. Harriman's and the Chesler Parties' ongoing statements have already caused substantial reputational and economic injury to Palmaz Scientific and threaten to cause imminent catastrophic damage that cannot be quantified.

81. Likewise, Harriman's and the Chesler Parties' false, defamatory and disparaging statements have irreparably impugned Counter-Plaintiffs' reputation in a business community where reputation is everything.

### F. COUNTERCLAIMS & THIRD PARTY CLAIMS

### CAUSE OF ACTION ONE:
### Tortious Interference with Existing Contracts
### (By Palmaz Scientific Against Harriman, IMS, and the Chesler Parties)

82. Pursuant to Rule 58 of the Texas Rules of Civil Procedure, Palmaz Scientific incorporates by reference all of the allegations in each of the paragraphs above as if fully set forth herein.

83. As described above, Palmaz Scientific and its agents maintain, or maintained at the relevant time, contractual relationships with, among others: (1) WFG Investments; (2) Emerson; (3) Delos; (4) Barton; (5) Ladin; (6) Baldini; (7) Titan; (8) Zimpelman; (9) Mr. Solomon; (10) its shareholders; (11) EC Securities; (12) Abbott Cardiovascular Systems, Inc; (13) Dr. Juan Granada; and (14) the Cardiovascular Research Foundation. Harriman was not a party to any of these contracts, and the Chesler Parties were not a party to any of these contracts except the contract with EC Securities.

84. Harriman and the Chesler Parties had actual knowledge of these contracts, or knowledge of facts and circumstances that would lead a reasonable person to believe these contracts existed and that the Company had an interest in them.

85.   Harriman willfully and intentionally interfered with the Company's contracts by making false statements about the Company and its agents, which constituted defamation and business disparagement, as part of her campaign to discredit, defame and disparage the reputation of the Company and its agents.

86.   The Chesler Parties willfully and intentionally interfered with the Company's contracts (other than the EC Securities contract) by making statements about the Company and its agents, which constituted defamation and business disparagement, as part of his campaign to discredit, defame and disparage the reputation of the Company and its agents.

87.   Harriman's and the Chesler Parties' conduct was independently tortious because it is also actionable as claims for defamation and business disparagement.

88.   Harriman's and the Chesler Parties' interference with the Company's contracts has proximately caused it injury, including lost contractual benefits, injury to reputation, lost profits, lost investment funds and lost research opportunities.

89.   As a result, Palmaz Scientific is entitled to recover actual damages (general and special) from Harriman and the Chesler Parties.

90.   Because Harriman and the Chesler Parties acted with fraud, malice, or gross negligence, Palmaz Scientific also seeks exemplary damages from Harriman and the Chesler Parties.

**CAUSE OF ACTION TWO:**
**Tortious Interference with Prospective and Continuing Business Relations**
**(by Palmaz Scientific, Dr. Palmaz and Mr. Solomon Against Harriman, IMS,**
**and the Chesler Parties)**

91.   Pursuant to Rule 58 of the Texas Rules of Civil Procedure, Counter-Plaintiffs incorporate by reference all of the allegations in each of the paragraphs above as if fully set forth herein.

92.     Counter-Plaintiffs maintains prospective business relationships and continuing business relationships with, among others: (1) WFG Investments; (2) Emerson; (3) Delos; (4) Barton; (5) Ladin; (6) Baldini; (7) Titan; (8) Zimpelman (9) TTF; (10) Stifel; (11) Abbott Cardiovascular Systems, Inc.; (12) Cardiovascular Research Foundation; (13) Dr. Juan Granada; (14) the Company investors/shareholders; and (15) the Company's potential investors/shareholders.

93.     Harriman and the Chesler Parties had actual knowledge of these prospective and continuing business relationships.

94.     There was a reasonable probability that Counter-Plaintiffs would have entered into contracts or continued business with these entities and individuals.

95.     Harriman and the Chesler Parties intentionally interfered with Counter-Plaintiffs' prospective and ongoing business relationships. Specifically, Harriman and the Chesler Parties desired to bring about the tortious interference, or they were substantially certain that the interference with these prospective business relationships would occur as a result of their conduct.

96.     Harriman and the Chesler Parties have willfully and intentionally interfered with Counter-Plaintiffs ongoing and prospective relationships by making false and defamatory statements about them, which constituted defamation and business disparagement, as part of their campaign to discredit, defame and disparage the reputation of Counter-Plaintiffs.

97.     Harriman's and the Chesler Parties' conduct is independently tortious because it is also actionable as claims for defamation and business disparagement.

98.     Harriman's and the Chesler Parties' interference with Counter-Plaintiffs' prospective and ongoing business relationships has proximately caused them injury, including lost

benefits from the prospective and ongoing business relationships, injury to reputation, lost profits, lost investment funds and lost research opportunities.

99. As a result, Counter-Plaintiffs are entitled to recover actual damages (general and specific) from Harriman and the Chesler Parties.

100. Because Harriman and the Chesler Parties acted with fraud, malice, or gross negligence, Counter-Plaintiffs also seek exemplary damages.

### CAUSE OF ACTION THREE:
### Defamation
**(Palmaz Scientific, Dr. Palmaz and Mr. Solomon Against Harriman, IMS, and the Chesler Parties)**

101. Pursuant to Rule 58 of the Texas Rules of Civil Procedure, Palmaz Scientific, Dr. Palmaz and Mr. Solomon incorporate by reference all of the allegations in each of the paragraphs above as if fully set forth herein.

102. As described above, Harriman and the Chesler Parties have negligently published statements of fact that referred to Palmaz Scientific, Dr. Palmaz and Mr. Solomon.

103. The statements published by Harriman and the Chesler Parties were defamatory and false.

104. Harriman and the Chesler Parties are strictly liable without regard to fault.

105. Harriman's and the Chesler Parties' written statements are libel *per se* under the common law and as defined by the Texas Civil Practices & Remedies Code § 73.001. Specifically, Harriman's and the Chesler Parties' statements were reasonably calculated to, and have in fact, injured Counter-Plaintiffs' reputation, exposed them to financial injury, and impeached their honesty, integrity and reputation. Harriman's and the Chesler Parties' written statements have also injured Counter-Plaintiffs in their office, profession, or occupation, and falsely charged them with the commission of a crime.

106. Harriman's and the Chesler Parties' written statements were also libel *per quod* because their defamatory nature is characterized by innuendo and implication.

107. Harriman's and the Chesler Parties' oral statements constitute slander *per se* because they have injured Counter-Plaintiffs in their office, profession, or occupation, and falsely charged them with the commission of a crime. Further, their statements were reasonably calculated to, and have in fact, injured Counter-Plaintiffs' reputation, exposed them to financial injury, and impeached their honesty, integrity and reputation.

108. Harriman's and the Chesler Parties' oral statements were also slander *per quod* because their defamatory nature is characterized by innuendo and implication.

109. Harriman and the Chesler Parties' made these statements with knowledge of or reckless disregard for their falsity, with ill will towards Counter-Plaintiffs, and with the intention to interfere with their economic interests. Harriman's and the Chesler Parties' statements were made without privilege, justification, or excuse.

110. As a result of Harriman's and the Chesler Parties' statements and actions, Counter-Plaintiffs have suffered pecuniary and reputational injury as outlined above and are likely to continue to suffer further reputational and financial loss. Additionally, the financial loss experienced by the Company has also resulted in lost research opportunities. The statements made by Harriman and the Chesler Parties' has impeached Counter-Plaintiffs' honesty, integrity, and business character.

111. Harriman and the Chesler Parties have all but invited this action, and the requested damages and injunctive relief, because they have ignored Counter-Plaintiffs' attempts to resolve the matter outside of litigation. Counter-Plaintiffs have contacted Harriman and Chesler and sent them demands to cease and desist from their unlawful conduct described herein, and have therefore

complied with the Defamation Mitigation Act. However, neither Harriman nor the Chesler Parties' have made any attempt to retract or apologize for their defamatory statements.

112.    As a result, Counter-Plaintiffs are entitled to recover actual damages (general and special), including the expense to counteract the false publications.

113.    Because Harriman and the Chesler Parties made the statements with fraud, gross negligence and/or malice, Counter-Plaintiffs also seek exemplary damages from them.

### CAUSE OF ACTION FOUR:
### Business Disparagement
### (Palmaz Scientific, Dr. Palmaz and Mr. Solomon Against Harriman, IMS, and the Chesler Parties)

114.    Pursuant to Rule 58 of the Texas Rules of Civil Procedure, Palmaz Scientific, Dr. Palmaz and Mr. Solomon incorporate by reference all of the allegations in each of the paragraphs above as if fully set forth herein.

115.    Harriman and the Chesler Parties have published false and disparaging statements about the character and economic interests of Counter-Plaintiffs to third parties. Harriman and the Chesler Parties made these statements with knowledge of or reckless disregard for their falsity, with ill will, and with the intention to interfere with Counter-Plaintiffs' economic interests.

116.    At the time that Harriman and the Chesler Parties published the false and disparaging words, they were published with actual malice and without privilege, justification, or excuse.

117.    The statements made by Harriman and the Chesler Parties impeached Counter-Plaintiffs' honesty, integrity, and business character. Harriman's and the Chesler Parties' statements and conduct have directly and proximately caused Counter-Plaintiffs to suffer actual damages, including damages for economic injury.

118. As a result, Counter-Plaintiffs are entitled to recover actual damages (general and special), including the expense to counteract the false publications.

119. Because Harriman and the Chesler Parties made the statements with fraud, gross negligence and/or malice, Counter-Plaintiffs also seek exemplary damages from them.

## G. VICARIOUS LIABILITY / RESPONDEAT SUPERIOR

120. Pursuant to Rule 58 of the Texas Rules of Civil Procedure, Counter-Plaintiffs incorporate by reference all of the allegations in each of the paragraphs above as if fully set forth herein.

121. While Harriman was a registered agent with IMS, Harriman and IMS had an agent-principal relationship.

122. Harriman had actual or apparent authority from IMS.

123. Harriman's tortious conduct, as described herein, occurred while she was acting in the course and scope of, and in her capacity as, agent for IMS. Further, IMS was aware of her tortious conduct, and was served with a cease and desist letter in 2014, but allowed Harriman's conduct to continue.

124. Therefore, IMS is jointly and severally liable for all tortious acts done by Harriman as described herein.

## H. CONSPIRACY

125. Pursuant to Rule 58 of the Texas Rules of Civil Procedure, Counter-Plaintiffs incorporate by reference all of the allegations in each of the paragraphs above as if fully set forth herein.

126. Harriman and the Chesler Parties were members of a combination of two or more persons, the object of which was to accomplish an unlawful purpose or a lawful purpose by

unlawful means. Specifically, Harriman's and the Chesler Parties' combination accomplished tortious conduct against Counter-Plaintiffs (namely, tortious interference with contract, tortious interference with prospective and ongoing business relationships, defamation and business disparagement).

127. Harriman and the Chesler Parties had a meeting of the minds on the object of the combination and/or their course of action.

128. Harriman and/or the Chesler Parties committed unlawful, over acts in furtherance of the objection of the combination. Specifically, they committed tortious interference with contract, tortious interference with prospective and ongoing business relationships, defamation and business disparagement.

129. As a direct and proximate result of the combination and its object, Counter-Plaintiffs suffered injury.

130. Accordingly, Harriman and the Chesler Parties are jointly and severally liable for all acts done by any of them in furtherance of the conspiracy.

## I. ASSISTING & ENCOURAGING

131. Pursuant to Rule 58 of the Texas Rules of Civil Procedure, Counter-Plaintiffs incorporate by reference all of the allegations in each of the paragraphs above as if fully set forth herein.

132. As outlined herein, Harriman and the Chesler Parties each committed torts of defamation, business disparagement, tortious interference with existing contracts, and tortious interference with potential contracts and ongoing business relationships.

133. Harriman knew that the Chesler Parties' conduct constituted a tort(s), and the Chesler Parties knew that Harriman's conduct constitutes a tort(s).

134. Harriman had the intent to assist the Chesler Parties in committing their torts, and the Chesler Parties had the intent to assist Harriman in committing her torts.

135. Harriman and the Chesler Parties gave one another assistance and/or encouragement.

136. Harriman's assistance and/or encouragement to the Chesler Parties was a substantial factor in causing the Chesler Parties' torts. The Chesler Parties' assistance and/or encouragement to Harriman was a substantial factor in causing Harriman's torts.

137. Accordingly, Harriman and the Chesler Parties are jointly and severally liable for all torts alleged herein.

## J. ASSISTING & PARTICIPATING

138. Pursuant to Rule 58 of the Texas Rules of Civil Procedure, Counter-Plaintiffs incorporate by reference all of the allegations in each of the paragraphs above as if fully set forth herein.

139. As outlined herein, Harriman and the Chesler Parties each committed torts of defamation, business disparagement, tortious interference with existing contracts, and tortious interference with potential contracts and ongoing business relationships.

140. Harriman and the Chesler Parties gave one another substantial assistance in accomplishing their tortious results of their conduct.

141. Harriman's conduct, separate from the Chesler Parties' conduct, was independently tortious. The Chesler Parties' conduct, separate from Harriman's conduct, was independently tortious.

142. Harriman's participation was a substantial factor in causing the Chesler Parties' torts. The Chesler Parties' participation was a substantial factor in causing Harriman's torts.

143. Accordingly, Harriman and the Chesler Parties are jointly and severally liable for all torts alleged herein.

## K. EXEMPLARY DAMAGES

144. Pursuant to Rule 58 of the Texas Rules of Civil Procedure, Counter-Plaintiffs incorporate by reference all of the allegations in each of the paragraphs above as if fully set forth herein.

145. Counter-Plaintiffs seek recovery of exemplary damages from Harriman and the Chesler Parties. Harriman and the Chesler Parties acted with malice in that their misconduct described above was of a wanton and malicious nature. Counter-Plaintiffs are therefore entitled to an award of exemplary damages against Harriman and the Chesler Parties in an amount to be determined by the jury at trial.

## L. DISCOVERY RULE / LIMITATIONS TOLLING

146. Pursuant to Rule 58 of the Texas Rules of Civil Procedure, Counter-Plaintiffs incorporate by reference all of the allegations in each of the paragraphs above as if fully set forth herein.

147. Counter-Plaintiffs did not discover, and through the exercise of reasonable care and diligence would not have discovered, the existence of certain facts giving rise to its causes of action until recently. Counter-Plaintiffs plead the discovery rule because the injury was inherently undiscoverable and objectively verifiable. Counter-Plaintiffs further plead that any statutes of limitations are tolled by equitable doctrines including, but not limited to, equitable estoppel, continuing tort, and fraudulent concealment, as well as Tex. Civ. Prac. & Rem. Code § 16.069.

## M. REQUEST FOR INJUNCTIVE RELIEF

148. Pursuant to Rule 58 of the Texas Rules of Civil Procedure, Counter-Plaintiffs

incorporate by reference all of the allegations in each of the paragraphs above as if fully set forth herein.

149.     Counter-Plaintiffs are entitled a temporary and permanent injunction pursuant to Tex. Civ. Prac. & Rem. Code § 65.011. A separate application for a temporary injunction will be made. Counter-Plaintiffs request that its application for permanent injunction be set for a full trial on the merits and, after trial, that the Court issue a permanent injunction enjoining Harriman and the Chesler Parties from spreading false and defamatory allegations about Counter-Plaintiffs.

## N.     DEMAND FOR JURY TRIAL

150.     Counter-Plaintiffs hereby request a jury to be the trier of fact and tenders the appropriate jury fee.

## O.     REQUEST FOR DISCLOSURE

151.     Pursuant to Texas Rule of Civil Procedure 194, Harriman, IMS, and the Chesler Parties are requested to disclose to Counter-Plaintiffs, within 50 days of service of this request, the information or material described in Rule 194.2.

## P.     PRAYER FOR RELIEF

152.     For all of the foregoing reasons, Counter-Plaintiffs respectfully request that the Court award judgment in favor of Counter-Plaintiffs and against Harriman, IMS, and the Chesler Parties for the following relief, collectively or in the alternative:

    (a)     An award of actual damages, both general and special;

    (b)     An award of exemplary damages;

    (c)     Pre- and post-judgment interest pursuant to the maximum extent allowed by law or equity;

    (d)     Injunctive relief; and

(e)      Such other and further relief at law or in equity to which Counter-Plaintiffs

may be justly entitled.

DATED this 26th day of October, 2015.

Respectfully submitted,

**DAVIS & SANTOS**
**ATTORNEYS & COUNSELORS, P.C.**

By: _____

Jason M. Davis
State Bar No. 00793592
E-mail: *jdavis@dslawpc.com*
Caroline Newman Small
State Bar No. 24056037
E-mail: *csmall@dslawpc.com*
Aron Cooper
State Bar No. 24050143
E-mail: *acooper@dslawpc.com*
The Weston Centre
112 E. Pecan Street, Suite 900
San Antonio, Texas 78205
Tel:  (210) 853-5882
Fax:  (210) 200-8395


**THOMPSON & KNIGHT, LLP**
Nicole L. Williams
State Bar No. 24041784
E-mail: *Nicole.Williams@tklaw.com*
One Arts Plaza
1722 Routh Street, Suite 1500
Dallas, Texas 75201
Tel:  (214) 969-1149
Fax:  (214) 999-1508

*Attorneys for Palmaz Scientific, Inc. Dr.*
*Julio Palmaz, Steve B. Solomon and John*
*Asel*

## CERTIFICATE OF SERVICE

I certify that I electronically filed the foregoing with the Clerk of the Court and that a true and correct copy of this document will be sent to counsel of record, at the following addresses as follows:

Mr. Dalton D. Harris, III.
THE HARRIS FIRM
5050 West Lovers Lane
Dallas TX 75209
E-mail: *dalton@harrisfirmpc.com*
Fax: (214) 956-7405

_____ Overnight Mail
__X__ Certified Mail-RRR
_____ Facsimile
__X__ E-mail

*Attorney for Susan E. Harriman*

on October 26, 2015.

Jason Davis