# COMMERCIAL LINES POLICY

## Associated Industries Insurance Company, Inc.

Associated Industries Insurance Company, Inc.

P.O. Box 318004
Cleveland, OH 44131-0880

THIS POLICY CONSISTS OF:

- DECLARATIONS
- COMMON POLICY CONDITIONS
- COVERAGE FORMS
  APPLICABLE ENDORSEMENTS



EXHIBIT
3

Associated Industries Insurance Company, Inc.

In Witness Whereof, the Company has caused this policy to be executed and attested, and, if required by state law, this policy shall not be valid unless countersigned by a duly authorized representative of the Company.

President

Elissa Pacheco



Associated Industries Insurance Company, Inc.
Administered through: AmTrust E & S Insurance Services, Inc.
160 Federal Street, 3rd Floor
Boston, MA 02109

**Policy Number:**
AES1031127 04

**Named Insured:**
IMS Securities Inc.

## COMMON POLICY DECLARATIONS

| **Policy Number** | AES1031127 04 | **Policy Period:** | **From** | 7/15/2014 | **To** | 7/15/2015 |
|---|---|---|---|---|---|---|

12:01 a.m. Standard Time at the Named Insured's Address

| **Transaction** | New Business |
|---|---|

| **Named Insured and Address** | **Broker** |
|---|---|
| IMS Securities Inc. | AmWINS Brokerage of Texas (PROF) |
| 10205 Westheimer, Ste 500 | 5910 North Central Parkway, Suite 500 |
| Houston TX 77042 | Dallas TX 75206 |

| Business Description | Type of Business | Audit Period |
|---|---|---|
| Corporate Investment Advisory Firm | Organization Including a Corporation | |

In return for the payment of the premium, and subject to all the terms of this policy, we agree with you to provide the insurance as stated in this policy. This policy consists of the following coverage parts for which a premium is indicated. This premium may be subject to adjustment.

| **COVERAGE PART DESCRIPTION** | | **PREMIUM** |
|---|---|---|
| **POLICY PREMIUM** | $ | 204,750.00 |
| **DEPOSIT PREMIUM** | $ | 204,750.00 |
| **TERRORISM COVERAGE** | $ | **Excluded** |
| **POLICY FEE** | $ | 225.00 |
| **TOTAL DEPOSIT PREMIUM** | $ | 204,975.00 |

| **Minimum Retained Audit Premium** | $ 51,243.75 | **Minimum Retained Premium** | $ 51,243.75 |
|---|---|---|---|

| **Forms applicable to all Coverage Parts:** | See Forms and Endorsements schedule |
|---|---|

Countersigned this _____ By _____

Authorized Representative

Issued Date: 9/4/2014

INSURED COPY

CPPMDEC 0411

This page intentionally left blank

Associated Industries Insurance Company, Inc.
Administered through:

AmTrust E&S Insurance Services
160 Federal Street, 3rd Floor
Boston, MA 02110

Policy Number: AES1031127 04

Named Insured: IMS Securities Inc.

## PROFESSIONAL LIABILITY INSURANCE POLICY DECLARATIONS

| Renewal of: | N/A | Policy Period: | From | 7/15/2014 | To | 7/15/2015 |
|---|---|---|---|---|---|---|

| Retroactive Date: | 7/15/1995 | Prior and Pending Litigation Date: | 7/15/2014 |
|---|---|---|---|

| Named Insured and Address | Broker Name and Address |
|---|---|
| IMS Securities Inc. | Cindy Stowe |
| 10205 Westheimer, Ste 500 | 5910 N. Central Expressway, Suite 500 |
| Houston, TX 77042 | Dallas, TX 75206 |

**Professional Services Covered by this Policy:**     Per policy form

IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.

**LIMITS OF INSURANCE**
| | | |
|---|---|---|
| Each Claim | $ | 1,000,000 |
| Policy Period Aggregate | $ | 2,000,000 |

**DISCIPLINARY PROCEEDING COVERAGE**
| | | |
|---|---|---|
| Each Disciplinary Hearing | $ | 5,000 |
| Policy Period Aggregate | $ | 10,000 |

**RETENTION**                SELF-INSURED RETENTION
| | | |
|---|---|---|
| Each Claim | $ | 50,000 |
| Policy Period Aggregate | $ | None |

**MAXIMUM LIMIT**
| | | |
|---|---|---|
| Each Claim | $ | 1,000,000 |
| Policy Period Aggregate | $ | 2,000,000 |

**TOTAL PREMIUM FOR THIS COVERAGE**     $          204,975.00

Earned Minimum Premium shall be 25 percent of the Total Premium

| Forms and Endorsements Applicable |
|---|
| See Forms and Endorsements Schedule |

THIS IS A CLAIMS MADE AND REPORTED POLICY, EXCEPT AS OTHERWISE PROVIDED HEREIN, THIS POLICY COVERS ONLY CLAIMS FIRST MADE AGAINST THE INSURED DURING THE POLICY PERIOD AND REPORTED TO THE COMPANY DURING THE POLICY PERIOD OR EXTENDED REPORTING PERIOD, IF APPLICABLE.  PLEASE READ THE POLICY CAREFULLY.

THE LIMITS OF LIABILITY AVAILABLE TO PAY INSURED DAMAGES SHALL BE REDUCED BY AMOUNTS INCURRED FOR CLAIMS EPXENSES, UNLESS THE POLICY IS OTHERWISE ENDORSED.  AMOUNTS INCURRED FOR CLAIM EXPENSES AND DAMAGES SHALL ALSO BE APPLIED AGAINST THE SELF-INSURED RETENTION, UNLESS THE POLICY IS OTHERWISE ENDORSED.

TERMS THAT APPEAR IN BOLD TYPE, OTHER THAN THE CAPTION TITLES, HAVE SPECIAL MEANING.
PLEASE REFER TO SECTION II. DEFINITIONS.

These Declarations, the completed and signed **Application**, and this policy with endorsements shall constitute the full and complete contract between the Insured and the Company as of the effective date unless and until otherwise endorsed.

Issued Date:          9/4/2014

AESDEC PL 012 01 14


This page intentionally left blank



AmWINS Brokerage of Texas, Inc.
5910 North Central Expressway
Suite 500
Dallas, TX 75206

**T** 214.561.6842
**F** 214.528.9101

*amwins.com*

TX License #1338460

## POLICY PREMIUM AND SURPLUS LINES TAX SUMMARY

**Attached to and forming part of Policy Number: AES1031127**

| | | | |
|---|---|---|---|
| **Named Insured:** | IMS Securities, Inc.; IMS Insurance Agency, Inc.; IMS Financial Advisors, Inc. | **Policy Number:** | AES1031127 |
| **Coverage:** | E&O - Broker/Dealer | **Carrier:** | Associated Industries Insurance Co, Inc |
| **Agency:** | Wortham Insurance | **Policy Period:** | 07/15/2014 - 07/15/2015 |

| | |
|---|---|
| **Policy Premium:** | **$204,750.00** |
| **Fees:** | **$225.00** |
| **Surplus Lines Taxes:** | **$10,064.28** |
| **Total:** | **$215,039.28** |

**IMPORTANT NOTICE:** THE NONADMITTED & REINSURANCE REFORM ACT (NRRA) WENT INTO EFFECT ON JULY 21, 2011. ACCORDINGLY, SURPLUS LINES TAX RATES AND REGULATIONS ARE SUBJECT TO CHANGE WHICH COULD RESULT IN AN INCREASE OR DECREASE OF THE TOTAL SURPLUS TAXES AND FEES OWED ON THIS PLACEMENT. IF A CHANGE IS REQUIRED, WE WILL PROMPTLY NOTIFY YOU. ANY ADDITIONAL TAXES OWED MUST BE PROMPTLY REMITTED TO AMWINS.

FEES:

| Fee | Taxable | Amount |
|---|---|---|
| **Texas** | | |
| Market Policy Fee | Yes | $225.00 |
| | **Total** | **$225.00** |
| **Total Fees** | | **$225.00** |

SURPLUS LINES TAX CALCULATION:

| Description | Taxable Premium | Taxable Fee | Tax Basis | Rate | Tax |
|---|---|---|---|---|---|
| **Texas** | | | | | |
| Surplus Lines Tax | $204,750.00 | $225.00 | $204,975.00 | 4.85% | $9,941.29 |
| Stamping Fee | $204,750.00 | $225.00 | $204,975.00 | 0.06% | $122.99 |
| | | | | **Total** | **$10,064.28** |
| **Total Surplus Lines Taxes and Fees** | | | | | **$10,064.28** |

## SURPLUS LINES DISCLOSURE

### Texas

This insurance contract is with an insurer not licensed to transact insurance in this state and is issued and delivered as surplus line coverage under the Texas insurance statutes. The Texas Department of Insurance does not audit the finances or review the solvency of the surplus lines insurer providing this coverage, and the insurer is not a member of the property and casualty insurance guaranty association created under Chapter 462 Insurance Code. Chapter 225, Insurance Code, requires payment of a 4.85 percent tax on gross premium.

Surplus Lines Licensee Name: AmWINS Brokerage of Texas, Inc.

## IMPORTANT NOTICE

To obtain information or make a complaint:

You may contact the Texas Department of Insurance to obtain information on companies, coverages, rights or complaints at

**1-800-252-3439**

You may write the Texas Department of Insurance:
Post Office Box 149104
Austin, Texas 78714-9104
Fax: 512-475-1771
Web: http://www.tdi.texas.gov
E-mail: ConsumerProtection@tdi.state.tx.us

### PREMIUM OR CLAIM DISPUTES:
Should you have a dispute concerning your premium or about a claim you should contact the agent first. If the dispute is not resolved, you may contact the Texas Department of Insurance.

### ATTACH THIS NOTICE TO YOUR POLICY:
This notice is for information only and does not become a part or condition of the attached document.

## AVISO IMPORTANTE

Para obtener informacion o para someter una queja:

Puede comunicarse con el Departamento de Seguros de Texas para obtener informacion acerca de companias, coberturas, derechos o quejas al:

**1-800-252-3439**

Puede escribir al Departamento de Seguros de Texas:
Post Office Box 149104
Austin, Texas 78714-9104
Fax: 512-475-1771
Web: http://www.tdi.texas.gov
E-mail: ConsumerProtection@tdi.state.tx.us

### DISPUTAS SOBRE PRIMAS O RECLAMOS:
Si tiene una disputa concerniente a su prima o a un reclamo, debe comunicarse con el agente primero. Si no se resuelve la disputa, puede entonces comunicarse con el departamento (TDI).

**UNA ESTA AVISO A SU POLIZA:**

Este aviso es solo para proposito de informacion y no se convierte en parte o condicion del documento adjunto.

Associated Industries Insurance Company, Inc.
Administered through: AmTrust E & S Insurance Services, Inc.
160 Federal Street, 3rd Floor
Boston, MA 02109

Policy Number:
AES1031127 04
Named Insured:
IMS Securities Inc.

# FORMS AND ENDORSEMENTS SCHEDULE

| Coverage | Form | Ed. Date | Description |
|---|---|---|---|
| PROF | AESPL003 | (01/14) | SECURITIES BROKER/DEALER, REGISTERED REPRESENTATIVE AND REGISTERED INVESTMENT ADVISOR PROFESSIONAL LIABILITY POLICY |
| PROF | AESPL014 | (01/14) | POLICYHOLDERS GUIDE TO REPORTING A PROFESSIONAL LIABILITY CLAIM |
| PROF | AESPL017 | (01/14) | TOTAL TERRORISM EXCLUSION |
| PROF | AESPL027 | (01/14) | DISTRESSED INVESTMENTS EXCLUSION |
| PROF | AESPL031 | (01/14) | NUCLEAR ENERGY LIABILITY EXCLUSION |
| PROF | AESPL032 | (01/14) | UNDISCLOSED COMPENSATION EXCLUSION |
| PROF | AESPL050 | (01/14) | MINIMUM RETAINED PREMIUM ENDORSEMENT |
| PROF | AESPL064 | (01/14) | REGISTERED REPRESENTATIVE DEFINITION AMENDMENT TO INCLUDE PRIOR ACTS COVERAGE |
| PROF | AESPL074 | (01/14) | AMENDED COMMODITIES AND FUTURES EXCLUSION |
| PROF | AESPL086 | (01/14) | NAMED INSURED AMENDMENT ENDORSEMENT |
| PROF | AESPL095 | (01/14) | ADDITIONAL INSURED ENDORSEMENT |
| PROF | AESPL097 | (01/14) | DIFFERENCES IN CONDITIONS COVERAGE ENDORSEMENT |
| PROF | AESPL098 | (01/14) | PROFESSIONAL SERVICES DEFINITION AMENDMENT ENDORSEMENT |
| PROF | AESPN | (08/11) | ASSOCIATED INDUSTRIES INSURANCE COMPANY PRIVACY POLICY |
| PROF | IL1201 | (11/85) | POLICY CHANGES |
| PROF | AESPL060 | (01/14) | TRADING ERRORS EXTENSION FOR BROKER DEALERS |


This page intentionally left blank

# POLICYHOLDER NOTICE – SERVICE OF PROCESS

Service of process for any suit instituted against Associated Industries Insurance Company concerning this Policy may be made upon the Superintendent, Commissioner, or Director of Insurance or other person specified for that purpose in the statute or his/her successor or successors in office as their true and lawful attorney upon whom may be served any lawful process in any action, suit, or proceeding instituted by or on behalf of the Insured or any beneficiary hereunder and arising out of this Policy.

Associated Industries Insurance Company has designated:

> Mr. Stephen Ungar, Secretary
> Associated Industries Insurance Company
> 59 Maiden Lane, 6th Floor
> New York, NY 10038

as the person(s)/organization to whom the Superintendent, Commissioner, or Director of Insurance or other specified person is authorized to mail such process or a true copy thereof, in compliance with the applicable statutes governing said service of process in the state or jurisdiction in which a cause of action under this Policy arises.

Associated Industries Insurance Company


This page intentionally left blank

![AmTrust E&S Insurance Services logo — An AmTrust Financial Company]

# SECURITIES BROKER/DEALER, REGISTERED REPRESENTATIVE AND REGISTERED INVESTMENT ADVISOR PROFESSIONAL LIABILITY POLICY

## THIS IS A CLAIMS MADE AND REPORTED POLICY

**THIS POLICY IS LIMITED TO LIABILITY FOR ONLY THOSE CLAIMS THAT ARE FIRST MADE AGAINST THE INSURED DURING THE POLICY PERIOD AND REPORTED TO THE COMPANY IN ACCORDANCE WITH THE TERMS OF THIS POLICY. CLAIM EXPENSES REDUCE THE LIMIT OF LIABILITY. PLEASE REVIEW THIS POLICY CAREFULLY.**

————————————

In consideration of the payment of the premium, and the undertaking of the **Insured** to pay the **Retention** herein, and in reliance upon all statements made and information contained in the **Application**, which is attached hereto and made a part hereof, and subject to the Declarations, limitations, conditions, provisions and other terms of this Policy, the **Company** and the **Insured** agree as follows:

## I. INSURING AGREEMENTS

A. On behalf of the **Broker/Dealer**, the **Company** shall pay **Damages** and **Claim Expenses,** in excess of the Self-Insured Retention identified in the Declarations, if applicable,and subject to the Policy's Limit of Liability, that the **Broker/Dealer** shall become legally obligated to pay as a result of a **Claim** made against the **Broker/Dealer** for a **Wrongful Act**, provided that (i) the **Claim** is first made against the **Broker/Dealer** and reported to the Company, in writing, during the **Policy Period** or the Extended Reporting Period, if applicable; (ii) the **Broker/Dealer** had no knowledge of such **Wrongful Act** prior to the Inception Date of this Policy; and (iii) such **Wrongful Act** took place on or after the **Retroactive Date** set forth in the Declarations Page of this Policy and prior to the end of the **Policy Period**.

B. On behalf of the **Registerted Representative**, the **Company** shall pay **Damages** and **Claim Expenses,** in excess of the applicable **Retention** and subject to the Policy's Limit of Liability, that the **Registered Representative** shall become legally obligated to pay as a result of a **Claim** made against the **Registered Representative** for a **Wrongful Act**, provided that (a) the **Claim** is first made against the **Registered Representative** and reported to the Company, in writing, during the **Policy Period** or the Extended Reporting Period, if applicable; (b) the **Registered Representative** had no knowledge of such **Wrongful Act** prior to the Inception Date of this Policy; (c) such **Wrongful Act** took place on or after the **Retroactive Date** set forth in the Declarations Page of this Policy and prior to the end of the **Policy Period**; and (d) such **Wrongful Act** was committed in the rendering or failing to render **Professional Services** on behalf of the **Broker/Dealer**.

C. On behalf of the **Registered Investment Adviser**, the **Company** shall pay **Damages** and **Claim Expenses,** in excess of the applicable **Retention** and subject to the Policy's Limit of Liability, that the **Registered Investment Adviser** shall become legally obligated to pay as a result of a **Claim** made against the **Registered Investment Adviser** for a **Wrongful Act**, provided that (i) the **Claim** is first made against the **Registered Investment Adviser** and reported to the Company, in writing, during the **Policy Period** or the Extended Reporting Period, if applicable; (ii) the **Registered Investment Adviser** had no knowledge of such **Wrongful Act** prior to the Inception Date of this Policy; (iii) such **Wrongful Act** took place on or after the **Retroactive Date** set forth in the Declarations Page of this Policy and prior to the end of the **Policy Period**; and (iv) such **Wrongful Act** was committed in the rendering or failing to render **Professional Services** on behalf of the **Broker/Dealer**.

D. **Defense.**  As part of and subject to the Policy's Limit of Liability, the **Company** shall have the right and duty to defend any **Claim** against the **Insured** to which this Policy applies, even if the allegations of the **Claim** are groundless, false, or fraudulent.  However, the **Company's** duty to defend shall terminate upon exhaustion of the applicable Limit of Liability by the payment of **Damages** and/or **Claim Expenses.**.

E. **Settlement of Claims.**  The **Company** shall have the right to make such investigation, negotiation or settlement of a covered **Claim** that it deems expedient; provided, however, that the **Company** shall not settle any **Claim** without the consent of the **Insured**, which shall not be unreasonably withheld.  If the **Company** recommends a settlement and the **Insured** refuses to give written consent to such settlement as recommended by the **Company**, then the **Company's** liability shall not exceed the amount which the **Company** would have paid for **Damages** and **Claim Expenses** at the time the **Claim** could have been settled or compromised.

F. **Disciplinary Proceedings.**  If an Each Disciplinary Hearing limit is listed under "**Disciplinary Proceeding Coverage**" on the Declarations Page, the Company will reimburse any "**Insured**" for reasonable      attorneys' fees, costs and expenses incurred in responding to a "**Disciplinary Proceeding**" provided:

   1. The "**Disciplinary Proceeding**" arises out of a "**Wrongful Act**" committed on or subsequent to the "**Retroactive Date**" and before the end of the "**Policy Period**" and is reported to the Company during the "**Policy Period**"; and

   2. The "**Disciplinary Proceeding**" commences against any "**Insured**" on or after the effective date and prior to the expiration of the "**Policy Period**" or any "**Extended Reporting Period**."

## II.  DEFINITIONS

Wherever used in this Policy:

A. **"Application"** means all signed applications, including attachments and other materials submitted therewith or incorporated therein, submitted by the **Insured** to the **Company** for this Policy or for any policy of which this Policy is a direct or indirect renewal or replacement.  **"Application"** shall also include all documents provided by the **Insured** to the **Company** in connection with the underwriting or issuance of this Policy and any information contained on the Website(s) of the **Insured**, whether provided to the **Company** directly or indirectly through the use of public databases or similar sources.

B. **"Broker/Dealer"** means:

   1. the **Named Insured**; and

   2. any past, present or future director, officer, partner or employee of the **Named Insured**.

   However, "**Broker/Dealer**" does not include a **Registered Representative** or **Registered Investment Adviser**.

C. **"Churning"** means the actual or alleged excessive buying and selling of securities or other investments for the purpose of generating commissions and without regard to the client's investment objectives.

D. **"Claim"** means a written demand for monetary **Damages** received by the **Insured** and alleging a **Wrongful Act,** including:

   1. the service of suit or any civil proceeding in a court of law or equity, including any appeal therefrom, which is commenced by the filing of a complaint, motion for judgment, or similar pleading;

   2. institution of arbitration, mediation or other formal alternative dispute resolution proceeding; and

   3. any written request to toll or waive a statute of limitations.

**"Claim"** does not include the following:

1. a demand for declaratory, injunctive or other non-monetary relief;

2. any form of criminal proceeding;

3. any demand by a governmental or quasi-governmental official or agency or any self-regulatory official or agency except if the agency or official is a client of the **Insured** in connection with the rendering of **Professional Services**; or

4. a **Cost of Corrections Claim** unless such coverage is specifically added to this Policy by endorsement.

A demand for non-monetary relief alleging a **Wrongful Act** for which insurance would have been provided under this Policy if **Damages** had been sought, will be considered a **Claim** for the purposes of this Policy, but only the **Claim Expenses** arising therefrom will be covered by this Policy**.**

E. **"Claim Expenses"** means:

1. reasonable and necessary fees charged by an attorney designated by the **Company**;

2. all other reasonable fees, costs and expenses resulting from the investigation, adjustment, defense and appeal of a **Claim**, if incurred by the **Company** or by the **Insured** with the written consent of the **Company**.

**"Claim Expenses"** shall not include (i) salary expenses or wages of any employee or officer of the **Company** or any supervisory counsel retained by the **Company;** (ii) salary expenses or wages of the **Insureds**; or (iii) any fees, costs or expenses incurred in connection with any criminal proceedings or actions against an **Insured**. The determination by the **Company** as to the reasonableness of **Claim Expenses** shall be conclusive on the **Insured**.

F. **"Company"** means the insurer named in the Declarations.

G. **"Cost of Corrections Claim"** means any costs incurred by the **Insured** to correct the erroneous execution and/or settlement of a transaction or the failure to execute a transaction.

H. **"Damages"** means monetary judgments, awards or settlements that an **Insured** is legally obligated to pay on account of a covered **Claim**, including pre-judgment and post-judgment interest.

**"Damages"** shall not include:

1. Punitive and/or exemplary damages to the extent that such damages are not insurable under the law of the State in which the **Named Insured** maintains its principal place of business;

2. taxes, fines, statutory penalties and/or sanctions, whether imposed by law or otherwise;

3. the return, reduction or restitution of fees, expenses or costs for **Professional Services** performed or to be performed by the **Insured**, or disgorgement by any **Insured**;

4. matters uninsurable under the law pursuant to which this Policy is construed; or

5. future profits, future royalties, costs of licensing, or other costs of obtaining future use; or

6. the costs to comply with orders granting injunctive relief or non-monetary relief, including specific performance, or any agreement to provide such relief.

I. **"Insured"** means the **Broker/Dealer, Registered Representatives** and **Registered Investment Advisers.**

J. **"Investment Advisory Services"** means advisory services provided by a **Registered Investment Adviser** pursuant to the Investment Advisors Act of 1940 with respect to **Securities** approved by and processed or approved for processing by the **Broker/Dealer,** provided that, prior to providing such

services, the **Registered Investment Adviser** gave written notice of such services to the **Broker/Dealer** and received written approval from the **Broker/Dealer** to conduct such services.

K.  **"Late Trading"** means placing orders to buy or redeem mutual fund shares after the time as of which a mutual fund has calculated its net asset value (NAV), but receiving the price based on the prior NAV already determined as of that day.

L.  **"Market Timing"** means the making of short term purchases or sales of mutual fund shares contrary to or in violation of the mutual fund's prospectus or other representations to investors, or any policy, limitation, agreement or procedure of the mutual fund, or contrary to or in violation of any state or federal statute or regulation.

M.  **"Named Insured"** means the entity identified in the Declarations as such.

N.  **"Policy Period"** means the period from the inception date of this Policy to the Policy expiration date stated in the Declarations or its earlier cancellation date, if any.

O.  **"Professional Services"** means the following services which are provided by the **Insured** to others, including such services that are performed electronically:

1.  the sale and/or servicing of **Securities** approved by and processed or approved for processing by the **Broker/Dealer**;

2.  the sale and/or servicing of life, health, annuity, accident and disability products, but only with respect to **Registered Representatives** who are duly licensed to do so and only with respect to products that have been approved by the **Broker/Dealer**;

3.  the administration of individual retirement accounts, Keogh retirement plans, qualified 401(K) plans, and employee benefit plans (other than multiple employer or multiple employee welfare arrangements) but only with respect to **Securities** approved by the **Broker/Dealer**;

4.  **Investment Advisory Services** but solely to the extent that such services are rendered by a **Registered Investment Adviser** affiliated with the **Broker/Dealer;**

5.  solely in connection with the activities or services described in 1 - 4 above, financial planning and advice;

6.  **Professional Supervision.**

P.  **"Professional Supervision"** means the **Broker/Dealer's** oversight and direction of the performance of its **Registered Representatives,** and/or its creation, implementation, enactment and enforcement of supervisory procedures required by law, regulation, governmental or regulatory authority, self regulatory authority, including but not limited to, FINRA and the Securities and Exchange Commission.

Q.  **"Registered Investment Adviser"** means a **Registered Representative,** or any corporation, partnership or other business entity owned or controlled by a **Registered Representative,** providing **Investment Advisory Services** in its capacity as an investment adviser registered as such under the Investment Advisers Act of 1940, as amended, provided that such individual or entity will be deemed a **Registered Investment Adviser** only with respect to his, her or its rendering of **Professional Services** on behalf of the **Broker/Dealer**.

R.  **"Registered Representative"** means:

1.  any individual who is registered and in good standing with FINRA as a registered representative or registered principal and who is an independent contractor with, or is employed by, the **Broker/Dealer**; and

2. the heirs, executors, administrators, or legal representatives of any individual described in (1) above, in the event of death, incapacity or bankruptcy of the individual;

provided, that an individual will be deemed a **Registered Representative** only with respect to his or her rendering of **Professional Services** on behalf of the **Broker/Dealer**.

S. **"Retroactive Date"** means the date stated in the Declarations as such.

T. **"Securities"** means common and preferred stocks, bonds, mutual fund shares, variable annuities, and any other instrument that is a "security" as that term is defined in the Securities Act of 1933, the Securities Exchange Act of 1934, the Investment Company Act of 1940, or any rules or regulations promulgated thereunder.

U. **"Selling Away"** means the offering for sale or sale of **Securities** or other investment products that are not approved by or offered by the **Broker/Dealer**.

V. **"Soft Dollar Activities"** means paying or providing or receiving or accepting fees, commissions, bonuses, gratuities, services or any other form of compensation or benefit in exchange for preferential treatment by or recommendation of or purchase of a particular **Security** (including, without limitation, a mutual fund or particular class of mutual fund shares, or a particular separate account or sub account of a life insurance company), including, without limitation: (i) the payment of higher commissions for directing **Securities** trades to a **Broker/Dealer** in return for investment research, advice, subscriptions, professional development programs, computer hardware or software; (ii) payment for "shelf space" defined to be the payment of monetary or other forms of compensation or other benefits to **Broker/Dealers**, **Registered Representatives**, **Registered Investment Advisers**, "associated persons" (defined as having the same meaning as the term "affiliated person" or "person associated with an investment advisor" as those terms are defined in the Investment Company Act of 1940 or the Investment Advisers Act of 1940) or other solicitors in return for steering their clients to the purchase of particular **Securities**; or (iii) "directed commissions" (sometimes referred to as "directed brokerage") defined to be when a mutual fund, life insurance company or **Registered Investment Adviser** chooses a **Broker/Dealer** to execute its **Securities** trades in consideration of the sales volume by the **Broker/Dealer** or its associated **Registered Investment Advisers**, **Registered Representatives** or "associated persons" of the mutual fund's shares or the life insurance company's variable products or other **Securities**.

W. **"Wrongful Act"** means any actual or alleged negligent act, error, omission, misstatement, misrepresentation or breach of duty by an **Insured**, or by any person other than an **Insured** for whose actions the **Insured** is legally responsible, in rendering or in failing to render **Professional Services** for clients of the **Broker/Dealer.**

X. **"Disciplinary Proceeding"** means a proceeding alleging violation of any disciplinary rule or other professional misconduct before an administrative, regulatory or disciplinary board, or agency with authority to render a determination as to whether such alleged professional misconduct is to be subject to discipline. However, **Disciplinary Proceeding** shall not include a criminal proceeding or an Organizational Peer Review.

Y. **"Retention"** means the Self-Insured Retention identified in the Declarations or the Deductible identified in the Declarations, whichever the **Named Insured** has opted to purchase, as indicated in the Declarations.

## III. EXCLUSIONS

This Policy shall not apply:

A. to any **Claim** based upon, arising from, or in consequence of any any intentional, dishonest, fraudulent, criminal, malicious or purposeful act or omission or any willful violation of any statute, rule or law by any **Insured,** as evidenced by any final adjudication, judgment, order, alternative dispute resolution proceeding, or adverse admission or finding of fact against such **Insured.**

B.  to any **Claim** based upon, arising out of or attributable to any bodily injury, sickness, disease or death of any person, emotional distress, mental anguish, discrimination, sexual harassment or damage to or destruction of any tangible property including loss of use thereof or for libel, slander, disparagement, defamation or violation of a person's right of privacy;

C.  to any **Claim** based upon, arising out of or attributable to any **Insured** serving as a member, partner, principal, director, officer, trustee, or employee of:

1.  any entity that is not an **Insured**, even if such service is directed or requested by an **Insured**; or

2.  any entity acquired by an **Insured**, whether by merger, consolidation or otherwise, at any time prior to the **Insured's** acquisition of such entity;

D.  to any **Claim** brought by, on behalf of, or in the name or right of any **Insured**, any affiliate of any **Insured**, any employer or employee of any **Insured**, or any entity through which an **Insured** has sold any investment or insurance product; provided, that this Exclusion will not apply to any **Claim** by an **Insured** in the form of a crossclaim, third party claim or otherwise for contribution or indemnity which is part of and results directly from a **Claim** which is not otherwise excluded under this Policy;

E.  to any **Claim** based upon, arising out of or attributable to:

1.  any written demand, litigation, proceeding, administrative action or hearing brought prior     to or pending as of the Prior and Pending Litigation Date stated in the Declarations as well as any future litigation, proceeding, administrative action or hearing based upon any such pending or prior litigation, proceeding, administrative action or hearing or derived from the same essential facts or circumstances underlying or alleged in any such pending or prior litigation, proceeding, administrative action or hearing; or

2.  any circumstance, if written notice of such circumstance has been given under any policy of which this Policy is a direct or indirect renewal or replacement and if such prior policy affords coverage (or would afford such coverage except for the exhaustion of its limits of liability) for such **Claim**, in whole or in part, as a result of such notice;

F.  to any **Claim** based upon, arising out of or attributable to the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon the land, the atmosphere or any watercourse or body of water, including an aquifer or groundwater;

G.  to any **Claim** based upon, arising out of or attributable to the management, operation, condition or activities of any pension, profit sharing, health and welfare or other employee benefit plan or trust sponsored by an **Insured** or any entity owned or controlled by the **Insured** or in which the **Insured** is a participant, trustee or named fiduciary, as defined under the Employee Retirement Income Security Act of 1974 or amendments thereto, or similar provisions of any federal, state or local statute or common law;

H.  to any **Claim** based upon or arising out of the **Insured** gaining in fact any personal profit or advantage to which such **Insured** was not legally entitled, including, without limitation, any **Insured's** use of, aiding or abetting the use of, or participation after the fact in the use of non-public information in violation of any law, rule or regulation if a final and non-appealable judgment or adjudication adverse to such **Insured** establishes such conduct;

I.  to any **Claim** based upon, arising out of or attributable to a dispute over fees commissions, charges or other compensation actually or allegedly earned by, billed by, or due to an **Insured** or the structure or reasonableness of any compensation, including without limitation, any **Claim** alleging **Churning**;

J.  to any **Claim** based upon, arising out of or attributable to liability assumed by the **Insured** in a contract or agreement, but this exclusion shall not apply to liability of the **Insured** which would exist in the absence of such contract or agreement;

K.  to any **Claim** based upon, arising out of or attributable to any express or implied warranty or guarantee of performance of any investment;

L.  to any **Claim** based upon, arising out of or attributable to any actual or alleged infringement of copyright, patent, trademark, trade name, service mark, trade dress, title or slogan or misappropriation of trade secrets;

M.  to any **Claim** based upon, arising out of or attributable to false advertising or misrepresentation in advertising, or unfair competition based thereon;

N.  to any **Claim** brought by, on behalf of, or in the name or right of any governmental, quasi-governmental, regulatory or self-regulatory entity, whether directly or indirectly, in any capacity other than its capacity as a direct client of an **Insured**;

O.  to any **Claim** based upon, arising out of or attributable to any failure, malfunction or breakdown of any computer system, database or component (hardware or software); any other communications or information transmission system; or any digital, electronic or mechanical system or unit;

P.  to any **Claim** based upon, arising out of or attributable to unsolicited electronic dissemination of faxes or e-mails to multiple actual or prospective customers of the **Insured** or any other third party, including but not limited to actions brought under the Telephone Consumer Protection Act, any federal or state anti-spam statutes, and/or any federal or state statute, law or regulation relating to a person's or entity's right of seclusion;

Q.  to any **Claim** based upon, arising out of or attributable to the insolvency of any bank, banking firm, broker or dealer in securities, clearing agency, insurance or reinsurance company; or the inability of any such entity or person to make any payment or settle or effect any transaction of any kind;

R.  to any **Claim** brought by or on behalf of, or in the name or right of, any person or entity with a legal or equitable interest in any form of security of, or other ownership interest in, the **Broker/Dealer**, except to the extent such **Claim** is brought in such person's or entity's capacity as a client or customer of the **Broker/Dealer** and is brought and maintained independently of, and without the solicitation, assistance, participation or intervention of, any other **Insured**;

S.  to any **Claim** based upon, arising out of or attributable to any **Insured** acting or serving as a clearing agent, specialist or market maker for any **Securities** or failing to clear or make a market for any **Securities**;

T.  to any **Claim** based upon, arising out of or attributable to an **Insured's** provision of investment banking services, including, without limitation, any of the following: service as an underwriter, consultant, adviser, or specialist; the giving of financial, economic or investment advice relating to or in connection with any actual or contemplated merger, acquisition, syndication, securities offering (regardless of whether the offering is primary or secondary, or public or private), restructuring, divestiture, proxy contest, or other form of investment banking; and/or services performed by an investment banking department in the ordinary course of business;

U.  to any **Claim** based upon, arising out of or attributable to any transaction involving any of the following:

1.  Commodities, any type of futures contract, any type of option contract or derivative. However, this exclusion shall not apply to fully covered options;

2.  Any equity security priced under five dollars ($5.00) at the time of any transaction, unless the security is (i) traded on a national securities exchange, (ii) NASDAQ approved or authorized, or (iii) part of a mutual fund;

3.  Any collectible, including, but not limited to, stamps, art, sports, or other cards, jewelry, coins, antiques or any other tangible personal property;

4. Any security in any market outside the United States of America and its territories and possessions and Canada;

5. Annuities used in connection with any structured settlement;

6. Corporate Owned Life Insurance (COLI), Stranger Owned Life Insurance or any other types of policies where the purchaser of the life product does not have a direct interest in the beneficiary under the life policy;

7. Limited Partnerships, Real Estate Investment Trusts ("REITS"), promissory notes, debentures, issuer callable certificates of deposit and/or equipment sale-lease-buy-back transactions of any kind;

8. Viatical settlements, life settlements, reverse mortgages or similar transactions in which the present value of a conditional contract is exchanged or sold; and/or

9. Transactions involving the use of, or investment in, hedge funds of any kind.

V. to any **Claim** based upon, arising out of or attributable to investment products partially or totally owned or controlled by any **Insured**, or to **Securities** for which the **Insured** acts as a market maker; or to the **Insured** failing to disclose its status as a market maker in connection with any research or recommendations provided to a customer or client of the **Broker/Dealer**;

W. to any **Claim** based upon, arising out of or attributable to any activities of or services provided by a **Registered Representative** and/or **Registered Investment Adviser** which is not a **Professional Service** rendered on behalf of the **Broker/Dealer**, including without limitation **Selling Away** by a **Registered Representative**;

X. to any **Claim** based upon, arising out of or attributable to the **Insured's** rendering or failure to render services as an actuary, accountant, including tax preparation, attorney, real estate agent, real estate broker, property and/or casualty insurance agent, third party claims administrator, trustee, fiduciary, escrow agent, notary public or mortgage banker or broker;

Y. to any **Claim** based upon, arising out of or attributable to actual or alleged **Late Trading, Soft Dollar Activities** or **Market Timing**.

Severability of Exclusions

With respect to Exclusions III.A. and III.H. of this Policy, it is understood and agreed that the **Wrongful Act** of any **Insured Person** shall not be imputed to any other **Insured Person** to determine if coverage is available.

## IV. TERRITORY

This Policy applies to any **Wrongful Act** committed by the **Insured** anywhere in the world, provided that suit is brought or **Claim** is made within the United States, its territories and possessions.

## V. LIMITS OF LIABILITY

A. The liability of the **Company** for all **Claim Expenses** and **Damages** for each **Claim** first made against the Insured and reported to the Company during the **Policy Period**, the Automatic Extended Reporting Period or the Optional Extended Reporting Period, if purchased, shall not exceed the amount stated in the Declarations for each **Claim**.

B. The total liability of the **Company** for all **Claim Expenses** and **Damages** for all **Claims** first made against the Insured and reported to the Company during the **Policy Period**, the Automatic Extended Reporting Period or the Optional Extended Reporting Period, if purchased, shall not exceed the amount stated in the Declarations as **Policy Period** Aggregate.

C. The Limit of Liability for **Claims** first made and reported during the Automatic Extended Reporting Period or the Optional Extended Reporting Period shall be part of, and not in addition to the Limit of Liability as stated in the Declarations and as stated above. If any **Insured** has purchased or does purchase other insurance covering **Claims** first made and reported during the Automatic Extended Reporting Period or the Optional Extended Reporting Period, the coverage provided under this Policy for such **Claims** shall apply in excess of such insurance.

D. The amount shown as Each Claim under Retention shall be applicable to all **Claim Expenses** and **Damages** for each and every **Claim** and shall remain the responsibility of the **Insured** subject to the amount shown as Policy Period Aggregate under Retention on the Declarations. A single Each Claim **Retention** shall apply to **Claims** arising from the same or related **Wrongful Acts.**

If Deductible is shown as Type on the Declarations, the **Insured** will pay to the **Company** all **Claim Expenses** and **Damages** up to the Each Claim amount or Policy Period Aggregate amount, as applicable. Such amount shall be paid by the **Insured** within thirty (30) days of written demand by the **Company**. The Each Claim and Policy Period Aggregate Limits of Insurance shall be reduced by the amount of such deductibles incurred and such deductibles are a part of, and not in addition to, the Limits of Insurance.

If Self-Insured Retention is shown as Type on the Declarations, the **Insured** will pay all **Claim Expenses** and **Damages** up to the Each Claim amount or Policy Period Aggregate amount, as applicable, as a condition precedent to payment of any **Claim Expenses** or **Damages** by the **Company** hereunder. The Each Claim and Policy Period Aggregate shown under Retention for Self-Insured Retention on the Declarations are in addition to the Each Claim and Policy Period Aggregates Limits of Insurance, respectively.

E. **Multiple Insureds, Claims and Claimants.** The inclusion herein of more than one **Insured** shall not operate to increase the **Company's** Limit of Liability. **Claims** alleging, based upon, arising out of or attributable to the same or related **Wrongful Act(s)** shall be treated as a single **Claim** regardless of whether made against one or more than one **Insured**. All such **Claims**, whenever made, shall be considered first made during the **Policy Period**, the Automatic Extended Reporting Period, or Optional Extended Reporting Period, if purchased, in which the earliest **Claim** arising out of such **Wrongful Act(s)** was first made, and all such **Claims** shall be subject to the Limit of Liability and Retention set forth in such Policy.

F. **Disciplinary Proceedings**. The liability of the **Company** for all attorneys' fees, costs, and expenses for each **Disciplinary Proceeding** incurred during the **Policy Period** and reported to the **Company** during the **Policy Period,** the Automatic Extended Reporting Period, or the Optional Extended Reporting Period, if purchased, shall not exceed the amount stated in the Declarations as Each Disciplinary Hearing.

The total amount of attorneys' fees, costs, and expenses for all such **Disciplinary Proceedings** shall not exceed the amount shown in the Declarations as Policy Period Aggregate under Disciplinary Proceedings Coverage.

G. Subject to all limits of liability described in A., B., C., E., and F., above, the total liability of the **Company** under any policy or policies not specifically issued as an excess policy for each **Claim** to which this Policy applies shall not exceed the amount stated in the Declarations under Maximum Limit as each **Claim** regardless as to the number or type(s) of coverages or policies, whether issued by the **Company** or any of its affiliates, that apply.

Subject to all limits of liability described in A., B., C., E., and F., above, the total liability of the **Company** under any policy or policies not specifically issued as an excess policy for all **Claims** to which this Policy applies shall not exceed the amount stated in the Declarations under Maximum Limit as Policy Period Aggregate regardless as to the number or type(s) of coverages or policies, whether issued by the **Company** or any of its affiliates, that apply.

## VI.  DUTIES IN THE EVENT OF A CLAIM

A.  **Notice of Claims.**  As a condition precedent to coverage under this Policy, the **Insured** shall provide the **Company** written notice of any **Claim** made against any **Insured** as soon as practicable, but in no event later than: (1) the expiration date of this Policy; (2) the expiration of the Automatic Extended Reporting Period; or (3) the expiration of the Optional Extended Reporting Period, if purchased.

In the event a **Claim** is brought against any **Insured**, the **Insured** shall forward to the **Company** every demand, notice, summons, complaint or other process or any threat of an intention to hold the **Insured** responsible for any **Wrongful Act** received directly by the **Insured** or by the **Insured's** representatives. Written notice of any **Claim** against any **Insured**, as well as of each demand on or suit against the **Insured**, shall be delivered to the **Company** as follows:

1.  **By Mail:**  AmTrust North America
P.O. Box 650767
Dallas, TX 75265-0767

2.  **By Fax:**  (877) 669-9140

3.  **By Electronic Mail:**  professionalclaims@amtrustes.com

B.  **Assistance and Cooperation of the Insured.**  The **Insured** shall cooperate with the **Company** and upon the **Company's** request shall (i) provide to the **Company** copies of documents and such other things held by or available to the **Insured** which relate to any **Claim** or to the **Wrongful Act**, transactions or other events which shall have given rise to such **Claim**, (ii) submit to examination and interview by a representative of the **Company**, under oath if required, (iii) attend hearings, depositions and trials, and (iv) assist in effecting settlement, securing and giving evidence, obtaining the attendance of witnesses and in the conduct of suits and other proceedings, as well as in the giving of a written statement or statements to the **Company's** representatives and meeting with such representatives for the purpose of investigation and/or defense.

The **Insured** shall further cooperate with the **Company** and do whatever is necessary to secure and affect any rights of indemnity, contribution or apportionment which any **Insured** may have.  The **Insured** shall exercise the right to either reject or demand the arbitration of any **Claim** made against the **Insured** in accordance with the written instructions of the **Company**.  The **Insured** shall not, except at the **Insured's** own cost, make any payment, admit any liability, settle any **Claims**, or assume any obligation, provided, however, if this Policy is subject to a Self-Insured Retention, the **Insured** shall have the right to make any settlement of any **Claim** covered by the terms of this Policy subject to the condition that the aggregate amount of such settlement and of the **Claim Expenses** incurred in connection with such **Claim** shall not exceed the Self-Insured Retention identified in the Declarations.

## VII.  NOTICE OF CIRCUMSTANCE/CLAIMS MADE EXTENSION

If during the **Policy Period** any **Insured** first becomes aware or has reasonable grounds to suspect that an **Insured** has committed or may have committed a specific **Wrongful Act** for which coverage is otherwise provided hereunder, and provided the **Insured** during the **Policy Period** gives notice to the **Company** of:

1.  the specific **Wrongful Act**;

2.  the injury or damage which has resulted or may result from such **Wrongful Act**; and

3.  the circumstances by which the **Insured** first became aware of or suspected such  **Wrongful Act**;

then any **Claim** that may subsequently be made against any **Insured** arising out of such **Wrongful Act** shall be deemed for the purposes of this insurance to have been made during the **Policy Period**.

## VIII. EXTENDED REPORTING PERIODS

A. **Automatic Extended Reporting Period.** If the **Company** or the **Named Insured** shall cancel or refuse to renew this Policy, then the **Company** shall provide the **Named Insured** an automatic and noncancellable extension of this Policy, subject otherwise to its terms, Limits of Liability, exclusions and conditions, to apply to **Claims** first made against the **Insured** during the ninety (90) days immediately following the effective date of such nonrenewal or cancellation, for any **Wrongful Act** committed before the effective date of such nonrenewal or cancellation and after the **Retroactive Date**, and otherwise covered by this insurance. This Automatic Extended Reporting Period shall terminate after ninety (90) days from the effective date of such nonrenewal or cancellation.

B. **Optional Extended Reporting Period.** If the **Company** or the **Named Insured** shall cancel or refuse to renew this Policy, then the **Named Insured**, upon payment of an additional premium as set forth herein, shall have the option to extend this Policy, subject otherwise to its terms, Limit of Liability, exclusions and conditions, to apply to **Claims** first made against the **Insured** during the Optional Extended Reporting Period as purchased immediately following the effective date of such nonrenewal or cancellation, for any **Wrongful Act** committed before the effective date of such nonrenewal or cancellation and after the **Retroactive Date**, and otherwise covered by this insurance. The extension, if purchased, shall be endorsed hereto and shall be referred to as the "Optional Extended Reporting Period." The premium and the extension period for the Optional Extended Reporting Period, if purchased, shall be determined by the Company to be agreed to by the Insured.

C. The **Named Insured's** option to elect the Optional Extended Reporting Period must be exercised by notice in writing to the **Company** not later than thirty (30) days after the effective date of the nonrenewal or cancellation of this Policy. If the premium for the Optional Extended Reporting Period is not paid within thirty (30) days of the effective date of the nonrenewal or cancellation of this Policy, the option to elect the Optional Extended Reported Period shall be void.

D. At the commencement of the Optional Extended Reporting Period, the entire premium shall be deemed fully earned, and in the event the **Named Insured** terminates the Optional Extended Reporting Period for any reason, the **Company** shall not be liable to return to the **Named Insured** any portion of the premium for the Optional Extended Reporting Period.

E. Unless expressly waived by the **Company**, As a condition precedent to the **Named Insured's** option to elect the Optional Extended Reporting Period, any and all premiums and **Retentions** that are due must have been paid and the **Named Insured** must have complied with all other terms and conditions of this Policy. If such conditions precedent are not satisfied or if the notice required under this Section VII. C. is not timely given to the **Company**, the **Named Insured** shall not at a later date be able to exercise such option.

F. If this Policy is cancelled or nonrenewed due to the nonpayment of premium, the Automatic Extended Reporting Period or Optional Extended Reporting Period shall not be available to any **Insured**. The Automatic Extended Reporting Period or Optional Extended Reporting Period shall not be available to any **Insured**: (1) whose fraud causes this Policy to be cancelled or nonrenewed, or (2) whose license, right to practice, or right to conduct business has been revoked, suspended by, or surrendered at the request of, any regulating authority.

G. The fact that the period during which **Claims** must first be made against the **Insured** and reported to the **Company** under this Policy is extended by virtue of any Automatic Extended Reporting Period or Optional Extended Reporting Period shall not in any way increase the Limits of Liability of this Policy.

H. The first ninety (90) days of the Optional Extended Reporting Period, if purchased, shall run concurrently with the Automatic Extended Reporting Period.

## IX.  GENERAL CONDITIONS

A.  **Subrogation.**  In the event of any payment under this Policy, the **Company** shall be subrogated to all the **Insured's** rights of recovery therefore against any person or organization.  The **Insured** shall execute and deliver instruments and papers and do whatever else is necessary to secure such rights and the **Insured** shall do nothing to prejudice such rights.  Any amount recovered upon the exercise of such rights of subrogation shall be applied as follows: first, to the repayment of expenses incurred toward subrogation; second, to **Damages** and/or **Claim Expenses** paid by the **Insured** in excess of the Limits of Liability hereunder; third, to **Damages** and/or **Claim Expenses** paid by the **Company**; fourth, to **Damages** and **Claim Expenses** paid by the **Insured** in excess of the retention; and last, to repayment of the retention.

B.  **Action Against the Company.**  No action shall lie against the **Company** unless, as a condition precedent thereto, the **Insured** shall have fully complied with all the terms of this Policy, nor until the amount of the obligation of the **Insured** to pay shall have been fully and finally determined either by judgment against the **Insured** after actual trial or by written agreement of the **Insured**, the claimant and the **Company**.  In the event any person or organization or the legal representative thereof has secured a judgment against an **Insured** and such judgment remains unsatisfied after the expiration of thirty (30) days from the service of notice of entry of the judgment upon the attorney for the **Insured**, or upon the **Insured**, and upon the **Company**, then an action may, except during a stay or limited stay of execution against the **Insured** on such judgment, be maintained against the **Company** under this Policy for the amount of such judgment to the extent of the insurance afforded by this Policy.  Nothing contained in this Policy shall give any person or organization the right to join the **Company** as a party in any action against any insured to determine the **Insured's** liability.  Bankruptcy or insolvency of any **Insured** or of the **Insured's** estate shall not relieve the **Company** of any of its obligations hereunder.

C.  **Application.**  In issuing this Policy, the **Company** has relied upon the statements, representations and information contained in the **Application**.  Every **Insured** acknowledges and agrees that all such statements, representations and information (i) are true and accurate, (ii) were made or provided in order to induce the **Company** to issue this Policy, and (iii) are material to the **Company's** acceptance of the risk to which this Policy applies.  If any of the statements, representations or information in the **Application** are not true and accurate, there shall be no coverage for any **Claim** under this Policy with respect to any **Insured Person** who knew, as of the effective date of the **Policy Period**, of such information that was not truthfully and accurately disclosed in the **Application**.  The knowledge of any **Insured Person** shall not be imputed to any other **Insured Person** for the purposes of determining coverage.

D.  **False or Fraudulent Claims**.  If any **Insured** shall commit fraud in proffering any **Claim,** whether as to the amount of the **Claim** or otherwise, this insurance shall be void as to such **Insured** from the date such fraudulent **Claim** is proffered.

E.  **Other Insurance.**  This insurance shall be excess over any other valid and collectable insurance available to the **Insured** whether such other insurance is stated to be primary, contributory, excess, contingent or otherwise, unless such other insurance is written only as specific excess insurance over the Limit of Liability provided in this Policy.

F.  **Changes.**  Notice to any agent or knowledge possessed by any agent or other person acting on behalf of the **Company** shall not affect a waiver or a change in any part of this Policy or estop the **Company** from asserting any right under the terms of this Policy, nor shall the terms of this Policy be waived or changed, except by written endorsement issued to form a part of this Policy.

G.  **Assignment.**  Assignment of interest under this Policy shall not bind the **Company** unless its consent is endorsed in writing hereon.

H.  **Cancellation.**  This Policy may be canceled by the **Named Insured** by mailing or delivering prior written notice to the **Company** or by surrender of this Policy to the **Company**.  If this Policy is canceled by the **Named Insured**, the **Company** shall retain the greater of the customary short rate proportion of the

premium hereon or the Earned Minimum Premium set forth in the Declarations.  This Policy may also be canceled by or on behalf of the **Company** by delivering to the **Named Insured** by registered, certified or other first class mail, or by electronic means, written notice stating when not less than ninety (90) days after the date of such notice the cancellation shall be effective.  The proof of delivery of such notice shall be sufficient proof of notice.  If this Policy is canceled by or on behalf of the **Company**, the **Company** shall retain the pro rata proportion of the premium hereon.  The **Company** may cancel this Policy on ten (10) days notice for nonpayment of premium due.

I.  **Conformity to Statute.**  Any terms of this Policy which are in conflict with the terms of any applicable laws construing this Policy are hereby amended to conform to such laws.

J.  **Singular Form of a Word.**  Whenever the singular form of a defined word is used herein, the same shall include the plural when required by context.

K.  **Named Insured Authorization.**  By acceptance of this Policy, the **Named Insured** agrees to act on behalf of every **Insured** with respect to the payment or return of premium, the receipt and acceptance of any endorsements, the cancellation of the Policy, the negotiation of renewal, and the giving and receiving of any notice provided for by the terms and conditions of this Policy.

L.  **Mergers and Acquisitions.**

1.  If, during the **Policy Period**, the **Named Insured** acquires a majority of the assets of another entity, creates another entity, or acquires any entity by merger into or consolidation with the **Named Insured**, such entity shall not be covered under this Policy unless the **Insured**, prior to such acquisition or creation:

   a.  gives written notice of such acquisition or creation to the **Company**;

   b.  pays any additional premium required by the **Company**; and

   c.  agrees to any additional terms and conditions of this Policy as required by the **Company**.

2.  If, during the **Policy Period**, any of the following events occur:

   a.  the acquisition of the **Named Insured**, or all of or substantially all of its assets, by another entity, or the merger or consolidation of the **Named Insured** into or with another entity such that the **Named Insured** is not the surviving entity; or

   b.  the obtaining by any person, entity or affiliated group of persons or entities of the right to elect, appoint or designate at least 50% of the partners, principals, or directors of the **Named Insured**,

   then, coverage under this Policy will continue in full force and effect until the termination of this Policy, but only with respect to **Claims** for **Wrongful Acts** taking place before such event.  Coverage under this Policy will cease as of the effective date of such event with respect to **Claims** for **Wrongful Acts** taking place after such event.

M.  **Bankruptcy.**  The bankruptcy or insolvency of the **Insured s**hall not relieve the **Company** of its obligations nor deprive the **Company** of its rights or defenses under this Policy.

This page intentionally left blank

# POLICYHOLDER'S GUIDE TO REPORTING A PROFESSIONAL LIABILITY CLAIM

A.  As soon as you are aware of an event that will give rise to a claim being made against you, please be sure to immediately report the matter to AmTrust North America.  Be sure to include your policy number and the name of the insured as it is stated on the policy.

B.  New claims may be reported 24/7 to **AmTrust North America** as follows:

    1.  **By Mail:**                        AmTrust North America
                                            P.O. Box 650767
                                            Dallas, TX 75265-0767

    2.  **By Fax:**                         (877) 669-9140

    3.  **By Electronic Mail:**       professionalclaims@amtrustes.com

    4.  **By Telephone:**           (866) 272-9767

C.  **AmTrust North America** Claim Office may be reached as follows:

    1.  **By Mail:**                        AmTrust North America
                                            135 S. LaSalle St. Suite 1925
                                          Chicago, IL. 60603

    2.  **By Telephone:**           Jay Fenton       312-803-6083
                                            Paul Poppish   312-803-4630

    3.  **By Fax:**                         312-781-0423


This page intentionally left blank

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# TOTAL TERRORISM EXCLUSION

In consideration of the premium charged, it is hereby understood and agreed that this Policy does not apply to any **Claim** based upon, arising out of, or involving in any way "an act of terrorism" as defined in the "U.S. Terrorism Risk Insurance Act of 2002" as amended.

All other terms and conditions remain unchanged.

This page intentionally left blank

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# DISTRESSED INVESTMENTS EXCLUSION

In consideration of the premium charged, it is hereby understood and agreed that this Policy and all Coverage Parts shall not apply to any **Claim** based upon, arising out of,  attributable to or in any way involving the actual or alleged sale, attempted sale, solicitation or servicing of any registered or unregistered Security, financial product, participation agreement, fund, pool and/or investment of any type or nature; actual or alleged advice, recommendations, consultation or financial or investment planning with respect to any registered or unregistered Security, financial product, participation agreement, fund, pool and/or investment of any type or nature; actual or alleged direct or indirect placement, or recommendation for placement, of funds, assets, liabilities or monies; actual or alleged management of funds, assets, liabilities or monies; or any actual or alleged transactions, undertakings or services of any kind, type or nature, in connection or associated with the following:

1. Bernard L. Madoff, and/or any company, corporation, parent, subsidiary, partnership or other business entity directly or Indirectly owned or controlled by or associated or affiliated with Bernard L. Madoff, including, but not limited to Bernard L. Madoff Investment Securities, LLC, or any employee, partner, officer, director, agent, representative or other person associated with any of the foregoing;

2. DBSI, Inc. and/or any company, corporation, parent, subsidiary, partnership or other business entity directly or indirectly owned or controlled by or associated or affiliated with DBSI, Inc. or any employee, partner, officer, director, agent or representative or other person associated with any of the foregoing;

3. LandAmerica Financial Group, Inc. and/or any company, corporation, parent, subsidiary, partnership or other business entity directly or indirectly owned or controlled by or associated or affiliated with LandAmerica Financial Group, Inc. or any employee, partner, officer, director, agent or representative or other person associated with any of the foregoing;

4. Stanford Financial Group and/or any company, corporation, parent, subsidiary, partnership or other business entity directly or indirectly owned or controlled by or associated or affiliated with Stanford Financial Group, or any employee, partner, officer, director, agent or representative or other person associated with any of the foregoing;

5. Edward Okun and/or any company, corporation, parent, subsidiary, partnership or other business entity directly or indirectly owned or controlled by or associated or affiliated with Edward Okun or any employee, partner, officer, director, agent or representative or other person associated with any of the foregoing;

6. Medical Capital Holdings and/or any company, corporation, parent, subsidiary, partnership or other business entity directly or indirectly owned or controlled by or associated or affiliated with Medical Capital Holdings or any employee, partner, officer, director, agent or representative or other person associated with any of the foregoing; and

7. Provident Royalties, LLC and/or any company, corporation, parent, subsidiary, partnership or other business entity directly or indirectly owned or controlled by or associated or affiliated with Provident Royalties, LLC or any employee, partner, officer, director, agent or representative or other person associated with any of the foregoing.

All other terms and conditions remain unchanged.

This page intentionally left blank

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# NUCLEAR ENERGY LIABILITY EXCLUSION

In consideration of the premium charged it is hereby understood and agreed that:

I.   This Policy does not apply:

   A.  Under any coverage part, to **Bodily Injury** or **Property Damage**

   1.  with respect to which an **Insured** under this Policy is also an insured under a nuclear liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters or Nuclear Insurance Association of Canada, or would be an Insured under any such policy but for its termination upon exhaustion of its limit of liability; or

   2.  resulting from the hazardous properties of nuclear material and with respect to which (a) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (b) the **Insured** is, or had this Policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

   B.  Under any Medical Payments Coverage, or any Supplementary Payments Provision relating to first aid, to expenses incurred with respect to **Bodily Injury** resulting from the hazardous properties of nuclear material and arising out of the operation of a nuclear facility by any person or organization.

   C.  Under any Liability Coverage, to **Bodily Injury** or **Property Damage** resulting from the hazardous properties of nuclear material, if

   1.  the nuclear material (a) is at any nuclear facility owned by, or operated by or on behalf of, an **Insured** or (b) has been discharged or dispersed therefrom;

   2.  the nuclear material is contained in spent fuel or waste at any time possessed, handled, use, processed, stored, transported or disposed of by or on behalf of an **Insured**; or

   3.  the **Bodily Injury** or **Property Damage** arises out of the furnishing by an **Insured** of **Professional Services**, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any nuclear facility, but if such facility is located within the United States of America, its territories or possessions or Canada, this Exclusion (3) applies only to property damage to such nuclear facility and any property threat

II.  As used in this endorsement:

   "hazardous properties"  include radioactive, toxic or explosive properties;

   "nuclear material" means source material, special nuclear material or by-product material;

"source material," "special nuclear material," and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof,

"spent fuel"  means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a nuclear reactor;

"waste"  means any waste material (1) containing by-product material and (2) resulting from the operation by any person or organization of any nuclear facility included within the definition of nuclear facility under Paragraph (a) or (b) thereof,

"nuclear facility" means:

1. any nuclear reactor,

2. any equipment or device designed or used for (a) separating the isotopes of uranium or plutonium, (b) processing or utilizing spent fuel, or (c) handling, processing or packaging waste,

3. any equipment or device used for the processing, fabricating or alloying of special nuclear material if at any time the total amount of such material in the custody of the **Insured** at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235,

4. any structure, basin, excavation, premises or place prepared or used for the storage or disposal of waste, and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations;

"nuclear reactor"  means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material;

**"Property Damage"** is amended to include all forms of radioactive contamination of property.

All other terms and conditions remain unchanged.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# UNDISCLOSED COMPENSATION
# EXCLUSION

In consideration of the premium charged, it is hereby understood and agreed that this Policy does not apply to any **Claim** alleging, based upon, arising out of, or attributable to allegations that any **Insured** or any **Related Party** intentionally or negligently permitted, or aided or abetted others in using, was aware of others using, or was a participant or connected in any way in the use of an agreement or other arrangement between an insurance broker or insurance agent and an insurance carrier involving the payment of increased fees, commissions or other compensation based on the volume, profitability or type of business referred to the insurance carrier, whether referred to as a Market Placement Agreement, Market Service Agreement, Placement Services Agreement or Contingent Commission Agreement or similar agreement or arrangement, however named.

It is further understood and agreed that this Exclusion shall apply to any such **Claim** regardless of the form, style or denomination of any such **Claim**, regardless of whether the **Claim** is criminal, administrative or civil, and shall specifically apply but not limited to **Claims** alleging bid rigging, bribes or kickbacks, schemes to provide fictitious quotes, conflict of interest, breach of contract, failure to supervise, negligent supervision or negligence of any contract, controlling person liability, breach of fiduciary duty, personal profiting, improper, undisclosed or unlawful fees, commissions or charges of any kind, criminal activity, market manipulation, violation of any law related to the insurance industry, misrepresentation, estoppel or repudiation of any commitment and any other theory of liability.

For the purposes of this Endorsement, the term "**Related Party**" shall mean any Entity:

1.  which is owned by, operated by or controlled by any **Insured**; or

2.  which owns, operates or controls any **Insured**; or

3.  in which any **Insured** is a director, officer, partner or principal stockholder; or

4.  any entity under common ownership or control with any **Insured**.

All other terms and conditions remain unchanged.

This page intentionally left blank

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# MINIMUM RETAINED PREMIUM

It is hereby understood and agreed that paragraph IX.H. is deleted in its entirety and replace with the following:

**Section IX.  GENERAL CONDITIONS**

**H.  Cancellation.**  This Policy may be canceled by the **Named Insured** by mailing or delivering prior written notice to the **Company** or by surrender of this Policy to the **Company**.  If this Policy is canceled by the **Named Insured**, the **Company** shall retain the greater of the customary short rate proportion of the premium hereon or $51,244_____.  This Policy may also be canceled by or on behalf of the **Company** by delivering to the **Named Insured** by registered, certified or other first class mail, or by electronic means, written notice stating when not less than ninety (90) days after the date of such notice the cancellation shall be effective.  The proof of delivery of such notice shall be sufficient proof of notice.  If this Policy is canceled by or on behalf of the **Company**, the **Company** shall retain the pro rata proportion of the premium hereon.  The **Company** may cancel this Policy on ten (10) days notice for nonpayment of premium due.

All other terms and conditions remain unchanged.

This page intentionally left blank

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# REGISTERED REPRESENTATIVE DEFINITION AMENDMENT TO INCLUDE PRIOR ACTS COVERAGE

In consideration of the premium charged, it is hereby understood and agreed that Section II.R. of this Policy shall be amended to read as follows:

**Section II.**        **DEFINITIONS**

**R.**      **"Registered Representative"** means:

1. any individual who is licensed as a registered representative or registered principal by the National Association of Securities Dealers, Inc., and who is or was an independent contractor with, or is or was employed by the **Broker/Dealer;**

2. the heirs, executors, administrators, or legal representatives of any individual described in 1. above, in the event of death, incapacity or bankruptcy of the individual;

3. any entity owned in its entirety by one or more individual(s) described in 1. above; and

4. employees of any individual described in 1. above or any of any entity described in 3. above,

provided, that any individual or entity will be deemed a **Registered Representative** only with respect to his, her or its rendering of **Professional Services** on behalf of the **Broker/Dealer**.

All other terms and conditions remain unchanged.

This page intentionally left blank

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# AMENDED COMMODITIES AND FUTURES EXCLUSION

In consideration of the premium charged, it is hereby understood and agreed that Exclusion U is deleted and replaced with the following:

**U**.   to any **Claim** on or directly or indirectly arising out of or resulting from any transaction involving any of the following:  commodities; any type of futures contract; any equity security priced under five dollars ($5.00) at the time of any transaction, unless the security is (i) traded on a national securities exchange, (ii) NASDAQ approved or authorized, or (iii) part of a mutual fund;

All other terms and conditions remain unchanged.

This page intentionally left blank

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# NAMED INSURED AMENDMENT ENDORSEMENT

In consideration of the premium charged, it is hereby understood and agreed that the Declarations shall be amended to include the following additional **Named Insured**:

**Named Insured(s):**

| Name of Person or Organization: |
|---|
| IMS Financial Advisors, Inc. |
| IMS Insurance Agency, Inc. |
| |

All other terms and conditions remain unchanged.

This page intentionally left blank

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# ADDITIONAL INSURED ENDORSEMENT

In consideration of the premium charged, it is hereby understood and agreed that the coverage provided by this Policy shall extend to **Claims** brought against the following Additional Insured(s) solely because of the **Wrongful Acts** of any **Insured**:

**Schedule**

Name of Person or Organization:
Information Management Services

All other terms and conditions remain unchanged.


This page intentionally left blank

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# DIFFERENCES IN CONDITIONS COVERAGE ENDORSEMENT

In consideration for the premium charged, it is hereby understood and agreed that this Policy shall be amended as follows:

1.  The term **"Expiring Policy"**, whenever used in this Policy, shall mean:

    Policy Number: PPL 10002187603

    Issuing Carrier: Endurance

2.  In the event that the terms, conditions, or exclusions of the Expiring Policy would grant coverage for a **Claim** that is not covered under the terms, conditions or exclusions of this Policy, then the terms, conditions and exclusions of the Expiring Policy will apply to such **Claim.**

    However, the coverage granted by this Endorsement will not apply if such **Claim** is not covered under this Policy by virtue of the **Policy Period**, Limits of Liability, **Retention**, Policy **Retroactive Date,** Extended Reporting Period or the name of the Court Notice the **Named Insured** shown in the Declarations of this Policy.

3.  As a condition precedent to invoking the coverage granted by this Endorsement, the **Company** shall receive a completed, certified copy of the Expiring Policy (including, but not limited to, the declarations page, policy form, endorsements and application(s) which apply to the Expiring Policy) no later than: (a) sixty (60) days subsequent to the Inception Date of this Policy; or (b) five (5) days after the **Company's** receipt of notice of a **Claim** under this Policy, whichever is earlier.

All other terms and conditions remain unchanged.

This page intentionally left blank

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# PROFESSIONAL SERVICES DEFINITION AMENDMENT ENDORSEMENT

In consideration of the premium charged, it is hereby understood and agreed that the definition of **"Professional Services"** as stated in Section II. O.2 of this Policy shall be deleted in its entirety and replaced with the following:

**Section II.  O.2      DEFINITIONS**

**"Professional Services"** means:

The sale and/or servicing of life, health, annuities, accident and disability products, life settlement contracts, but only with respects to Registered Representative who are duly licensed to do so.

All other terms and conditions remain unchanged.

# Privacy Policy
## Associated Industries Insurance Company, Inc.

We value your business and trust in us and respect the privacy and confidentiality of your nonpublic personal information.

## Our Practices Regarding Privacy and Confidentiality

We are committed to keeping your information secure and confidential, regardless of whether information is received by mail, telephone, Internet or in person.

The nonpublic personal information about you that is collected is utilized only to the extent necessary to effect, deliver, administer or enforce insurance service to you and is disclosed only as permitted by law. We may also disclose certain information to nonaffiliated third parties.

If you prefer that we not disclose nonpublic personal information about you to third parties, you may opt out of those disclosures, that is, you may direct us not to make those disclosures by contacting us at the address and phone number listed below.

Likewise, to the extent we utilize other organizations, such as general agents and third party administrators, to support our business; we require them to abide by the requirements of the applicable privacy laws and by our privacy policy.

## Information We Collect

We gather information about you in connection with providing our products and services to you and to support our business operations. This includes information you may provide to us, such as from your insurance application, and information about you from another source, such as a credit bureau.

## Information We May Disclose To Affiliates or Third Parties

Except as noted herein, we do not disclose nonpublic personal information unless authorized by you. We may, without authorization but only as permitted or required by law, provide nonpublic personal information about you to persons or organizations both inside and outside of Associated Industries Insurance Company, Inc. in order to fulfill a transaction requested, service policies, investigate and/or handle claims, detect and/or prevent fraud, participate in insurance support organizations, or comply with lawful requests from regulatory or law enforcement authorities or a court of law. These include, for example: affiliated companies, claims adjusters or administrators, insurance agents or brokers, medical providers, program managers, consumer reporting agencies, governmental agencies, auditors, lienholders, mortgagees, and assignees.

## Information Confidentiality and Security

We restrict access to nonpublic personal information about you to those employees who need to know that information in order to provide products or services to you. We maintain physical, electronic, and procedural safeguards that comply with federal regulations to guard your nonpublic personal information.

## Access to Your Information

You have the right to know what kind of information we keep in our files about you, to have the reasonable access to it and receive a copy. Contact us at the address noted below should you have questions about what information we may have on file. All written requests must include your name, address, telephone number, and a photocopy of a picture ID for identification purposes. We are dedicated to maintaining accurate customer records and shall strive to correct any inaccurate information noted in a timely manner.

## Associated Industries Insurance Company, Inc.
Associated Industries Insurance Company, Inc.
P.O. Box 318004
Cleveland, OH 44131-0880
Attention: Privacy Manager

This page intentionally left blank

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# POLICY CHANGES

Policy Change
Number 0

| POLICY NUMBER<br>AES1031127 04 | POLICY CHANGES EFFECTIVE<br>7/15/2014 | COMPANY<br>Associated Industries Insurance Company, Inc. |
|---|---|---|
| NAMED INSURED<br>IMS Securities Inc. | | AUTHORIZED REPRESENTATIVE<br>Barry Zyskind |

| COVERAGE PARTS AFFECTED |
|---|
| |

| CHANGE |
|---|
| Exclusion T is deleted in its entirety; Self-Insured Retention is amended to read $75,000 each claim applicable to trading errors: "Match Making" and consulting advisory services relating to M&A services/activities: REIT services/activities; $50,000 each claim all other; $5,000 per Registered Representative each claim; None aggregate. |

_____
Authorized Representative Signature

This page intentionally left blank

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# TRADING ERRORS EXTENSION FOR BROKER DEALERS

In consideration of the premium charged, it is hereby understood and agreed that the Company shall reimburse the Insured for all Damages and Claim Expenses paid by the Insured in excess of any applicable Self Insured Retention in the amount set forth below for Costs of Correction, but only if:

1. written notice of the Cost of Correction is given to the Company within 60 days of the Trade Error and/or within 60 days of an actual rendering or failure to render Professional Services, but in no event after the Policy Period; and

2. such Cost of Correction arose in the ordinary course of the Insured's operations and, if not corrected, would result directly in a financial loss to the customer of the Insured; and

3. the Insured requests prior written approval from the Company to incur any such Cost of Correction.

The Insured and the Company agree that it is their intention that such reimbursement operates to reduce or avoid in an expeditious and economic fashion monetary liability from a Claim which would have been made against the Insured and that such reimbursement does not afford any coverage to the extent that any sum paid by the Insured constitutes an ex-gratia settlement or a commercial settlement to support the Insured's reputation or business relationships.

It is further understood and agreed that solely with respect to coverage afforded under this Endorsement, this Policy shall be amended as follows:

1. Section II.D. shall be amended to read as follows:

   D. "Claim" means a demand received by the Insured for money or services and alleging a Wrongful Act including:

      1. the service of suit or any civil proceeding in a court of law or equity, including any appeal therefrom, which is commenced by the filing of a complaint, motion for judgment, or similar proceeding;
      2. institution of arbitration, mediation or other formal alternative dispute resolution proceeding;

      3. any prosecution or governmental action related to breach of privacy;

      4. any written request to toll or waive a statute of limitations;

      5. a request by the Insured for approval to incur any Cost Of Correction. A Claim for injunctive relief alleging any Wrongful Act for which insurance would have been granted under this Policy if Damages had been sought, will be considered a Claim for the purposes of this Policy, but only the Claim Expenses arising therefrom will be covered by this Policy.

"Claim" does not include the following:

1. a demand for declaratory, injunctive or other non-monetary relief;

2. any form of criminal proceeding; or

3. any demand by a governmental or quasi-governmental official or agency or any self-regulatory official or agency except if the agency or official is a client of the Insured in connection with the rendering of Professional Services;

A demand for non-monetary relief alleging a Wrongful Act for which insurance would have been provided under this Policy if Damages had been sought, will be considered a Claim for the purposes of this Policy, but only the Claim Expenses arising therefrom will be covered by this Policy.

2. Section II is amended by adding the following Definitions:

"Costs of Correction" shall mean payments made to a customer to avoid or reduce financial loss to a customer resulting from any Trade Error and/or an actual rendering or failure to render Professional Services; provided, however, that in no event shall "Costs of Correction" include payments made to a customer to avoid or reduce financial loss to a customer resulting from any Late Trading, Market Timing, Short-Term Trading or Soft Dollar Activities.

"Market Timing" means the making of short term purchases or sales of mutual fund shares or the separate accounts or sub accounts of a life insurance company contrary to or in violation of the mutual fund's or life insurance company's prospectus or ether representation to investors, or any policy, limitation, agreement or procedure of the mutual fund or life insurance company, or contrary to or in violation of any state or federal statute or regulation; and any conduct associated with any of the above, including, without limitation: (1) the waiver of redemption fees associated with Short-Term Trading; (2) the failure to abide by written representations regarding the permissibility of Short-Term Trading or the mutual fund's or life insurance company's efforts to monitor or prevent Short-Term Trading; (3) the receipt of fees or any other form of compensation from certain investors in exchange for providing such investors with Short-Term Trading privileges not available to other investors.

"Short-Term Trading" means the purchase or sale of shares of a mutual fund or the separate accounts or sub accounts of a life insurance company in a time period less than that provided in the mutual fund's or life insurance company's prospectus or other agreement or in violation of the policies, limitation, agreements or procedures of the mutual fund or life insurance company, or as required by federal or state law or regulation, including, without limitation, any "in-and-out" trading of mutual fund shares or the separate accounts or sub accounts of a life insurance company or any other trade of mutual fund shares or the separate accounts or sub accounts of a life insurance company designed to take advantage of the inefficiencies in the methods used by the mutual fund or life insurance company to price its shares or sub accounts.

"Late Trading" means: (1) any transaction involving mutual fund shares or the separate account or sub accounts of a life insurance company (including, without limitation, the placement or confirmation or cancellation of trades or orders for, or the purchase or redemption of mutual fund shares by the mutual fund or an intermediary) made after the mutual fund's or separate account's or sub account's net asset value (as defined in Rule 2a-4 of the Investment Company Act of 1940, as amended, in the case of the mutual fund) for a particular date has been made, or should have been made, but which transaction is made at a price based upon said mutual fund's or account's net asset value for that date; or (2) any transaction defined as late trading by any federal or state statute or regulation, or any prospectus, policy, limitation, agreement or procedure of the mutual fund or life insurance company.

"Soft Dollar Activities" means paying or providing or receiving or accepting fees, commissions, bonuses, gratuities, services or any other form of compensation or benefit in exchange for preferential treatment by or - recommendation of or purchase of a particular "security" (including, without limitation, a mutual fund or particular class of ,mutual fund shares or a particular separate account or sub account of a life insurance company), including, without limitation: (1) the payment of higher commissions for directing "securities" trades to a "broker"-"dealer" in return for investment research, advice, subscriptions, professional development programs, computer hardware or software; or (2) "payment for shelf space" defined to be the payment of monetary or other forms of compensation or other benefits to ""broker"-"dealers", "registered representatives", "registered investment advisers", "associated persons" or other solicitors in return for steering their clients to the purchase of particular "securities"; (3) "directed commissions" (sometimes referred to as "directed brokerage") defined to be when a mutual fund or life insurance company or "registered investment adviser" chooses a "broker"-"dealer" to execute its "securities" trades in consideration of the sales volume by the "broker"-"dealer" or its associated "registered investment advisers", "registered representatives" or "associated persons" of the mutual fund's shares or the life insurance company's variable products or other "securities".

"Trade Error" shall mean any trades performed by an Insured: (1) that were incorrectly executed: (a) in the wrong security, (b) on the wrong side of the market, (c) for a quantity different than specified in the instructions, and/or (d) duplicating a prior execution of the same original order; or 2) where the Insured failed to execute a written order that was executable when rendered.

3. Section III. is amended by adding the following additional Exclusions:

    Z.    to any Claim based upon, arising from, or in any way related to diminution in value or damages resulting from the diminution in value of money, securities, property or any other item of value, unless caused by Professional Services of any person or entity insured under this Policy in the execution or implementation of investment advice or any investment decision or any other activity covered under this Policy;

    AA. to any Claim based upon, arising from, or in any way related to loss of the actual money, securities or other property in the custody or control of the Insured;

    BB. to any Claim based upon, arising from, or in any way related to any Cost Of Correction that is not approved in writing by the Company.

It is further understood and agreed that solely for the purposes of any Cost of Correction Claim to which this Endorsement may in whole or in part apply, the Declarations shall be amended to read as follows:

Limits of Insurance

Each Claim:             $ 500,000

Policy Period Aggregate:    $ 500,000

All other terms and conditions remain unchanged.