# U. S. TREASURY DEPARTMENT'S OFFICE OF FOREIGN ASSETS CONTROL ("OFAC") NOTICE TO POLICYHOLDERS

No coverage is provided by this Policyholder Notice nor can it be construed to replace any provisions of your policy. You should read your policy and review your Declarations page for complete information on the coverages you are provided.

This Notice provides information concerning possible impact on your insurance coverage due to directives issued by OFAC. **Please read this Notice carefully.**

The Office of Foreign Assets Control (OFAC) administers and enforces sanctions policy, based on Presidential declarations of "national emergency". OFAC has identified and listed numerous:

- Foreign agents;

- Front organizations;

- Terrorists;

- Terrorist organizations; and

- Narcotics traffickers;

as "Specially Designated Nationals and Blocked Persons". This list can be located on the United States Treasury's website – http//www.treas.gov/ofac.

In accordance with OFAC regulations, if it is determined that you or any other insured, or any person or entity claiming the benefits of this insurance has violated U.S. sanctions law or is a Specially Designated National and Blocked Person, as identified by OFAC, this insurance will be considered a blocked or frozen contract and all provisions of this insurance are immediately subject to OFAC. When an insurance policy is considered to be such a blocked or frozen contract, no payments nor premium refunds may be made without authorization from OFAC. Other limitations on the premiums and payments also apply.



EXHIBIT
4

Endurance American Specialty Insurance Company          PN 0001 0407

Copyright, Insurance Services, Inc., 2004



**Endurance American Specialty Insurance Company**
**(Wilmington, Delaware)**

## PROFESSIONAL LIABILITY INSURANCE POLICY DECLARATIONS

**THIS IS A CLAIMS MADE POLICY, EXCEPT AS OTHERWISE PROVIDED HEREIN, THIS POLICY COVERS ONLY CLAIMS MADE FIRST AGAINST THE INSURED DURING THE POLICY PERIOD. PLEASE READ THE POLICY CAREFULLY.**

**THE LIMITS OF LIABILITY AVAILABLE TO PAY INSURED DAMAGES SHALL BE REDUCED BY AMOUNTS INCURRED FOR CLAIM EXPENSES, UNLESS THE POLICY IS OTHERWISE ENDORSED. AMOUNTS INCURRED FOR CLAIM EXPENSES AND DAMAGES SHALL ALSO BE APPLIED AGAINST THE SELF-INSURED RETENTION, UNLESS THE POLICY IS OTHERWISE ENDORSED.**

**TERMS THAT APPEAR IN BOLD FACE TYPE, OTHER THAN THE CAPTION TITLES, HAVE SPECIAL MEANING. PLEASE REFER TO SECTION II. DEFINITIONS.**

| | | |
|---|---|---|
| **Policy No.** PPL10002187602 | | **Renewal of:** PPL10002187601 |

| | |
|---|---|
| Producer Name and Address: | Amwins of Texas<br>5910 North Central Expressway<br>Dallas, TX 75206 |

| | | |
|---|---|---|
| Item 1. | **Company:** | Endurance American Specialty Insurance Company |

| | | |
|---|---|---|
| Item 2. | **Named Insured** and Principal Address:<br>**(A) Named Insured:**<br>(B) Principal Address: | <br>IMS Securities, Inc.; IMS Insurance Agency, Inc.; IMS Financial Advisors, Inc.<br>10205 Westheimer, Ste 500; West 8 Tower<br>Houston, TX 77042 |

| | | |
|---|---|---|
| Item 3. | **Policy Period:** | Inception: July 15, 2012          Expiration: July 15, 2013<br>(12:01 a.m. Standard Time on both dates, at the address of the Named Insured noted above) |

| | | |
|---|---|---|
| Item 4. | Limits of Liability (Including **Claim Expenses**, unless the Policy is otherwise endorsed): | |
| | **(A) Each Claim:** | $  1,000,000 |
| | **(B) Policy Period** Aggregate: | $  2,000,000 |

| | | |
|---|---|---|
| Item 5. | Self-Insured Retention: | |
| | **(A) Each Claim:** | $  50,000 |
| | **(B) Policy Period** Aggregate: | $  Not Applicable |

Endurance American Specialty Insurance Company                                        PL 0001 0108

| | | |
|---|---|---|
| Item 6. | Premium: | |
| | (A) Premium: | $ 210,000 |
| | (B) Earned Minimum Premium: | $ 52,500 |

| | | |
|---|---|---|
| Item 7. | Prior/Pending Litigation Date: | 07-15-1995 |

| | | |
|---|---|---|
| Item 8. | **Retroactive Date:** | 07-15-1995 |

Item 9.  **Professional Services** Covered By This Policy:
See Definition II.Z. of the Premier Securities Broker/Dealer and Investment Advisers Professional Liability Insurance Policy

Item 10.  Forms/Endorsements Applicable to Coverage at Inception of Policy:

SUBJECT TO FORM(S) AND ENDORSEMENTS SCHEDULE PL 0101 0407 ATTACHED

Item 11.  Address Notice of Claims To:    Endurance U.S. Insurance
725 South Figueroa Street, Suite 2100
Los Angeles, CA 90017
Attention: Senior Vice President of Claims

| | | |
|---|---|---|
| Item 12. | **Disciplinary Proceeding** Coverage: | |
| | **(A) Each Disciplinary Proceeding:** | $ 0 |
| | **(B) Policy Period** Aggregate: | $ 0 |

These Declarations, the completed and signed **Application**, and this Policy with Endorsements shall constitute the contract between the **Insured** and the **Company.**

Endurance American Specialty Insurance Company                                      PL 0001 0108

IN WITNESS THEREOF, the **Company** has caused this Policy to be countersigned by a duly authorized representative of the **Company**.

NOTE - SEE ENCLOSED NOTICE FOR "SURPLUS LINES NOTIFICATION"

_____
(AUTHORIZED REPRESENTATIVE)
Issuing Office : Stamford, CT

Endurance American Specialty Insurance Company                    PL 0001 0108



AmWINS Brokerage of Texas, Inc.
5910 North Central Expressway
Suite 500
Dallas, TX 75206

**T** 214.561.6842
**F** 214.528.9101

*amwins.com*

TX License #1338460

## POLICY PREMIUM AND SURPLUS LINES TAX SUMMARY

**Attached to and forming part of Policy Number:** PPL10002187602

| | | | |
|---|---|---|---|
| **Named Insured:** | IMS Securities, Inc.; IMS Insurance Agency, Inc.; IMS Financial Advisors, Inc. | **Policy Number:** | PPL10002187602 |
| **Coverage:** | E&O - Broker/Dealer | **Carrier:** | Endurance American Specialty Insurance Company |
| **Agency:** | John L. Wortham & Son, L.P. | **Policy Period:** | 07/15/2012 - 07/15/2013 |

| | |
|---|---|
| **Policy Premium:** | **$210,000.00** |
| **Fees:** | **$0.00** |
| **Surplus Lines Taxes:** | **$10,311.00** |
| **Total:** | **$220,311.00** |

**IMPORTANT NOTICE:** THE NONADMITTED & REINSURANCE REFORM ACT (NRRA) WENT INTO EFFECT ON JULY 21, 2011. ACCORDINGLY, SURPLUS LINES TAX RATES AND REGULATIONS ARE SUBJECT TO CHANGE WHICH COULD RESULT IN AN INCREASE OR DECREASE OF THE TOTAL SURPLUS TAXES AND FEES OWED ON THIS PLACEMENT. IF A CHANGE IS REQUIRED, WE WILL PROMPTLY NOTIFY YOU. ANY ADDITIONAL TAXES OWED MUST BE PROMPTLY REMITTED TO AMWINS.

SURPLUS LINES TAX CALCULATION:

| Description | Taxable Premium | Taxable Fee | Tax Basis | Rate | Tax |
|---|---|---|---|---|---|
| **Texas** | | | | | |
| Surplus Lines Tax | $210,000.00 | $0.00 | $210,000.00 | 4.85% | $10,185.00 |
| Stamping Fee | $210,000.00 | $0.00 | $210,000.00 | 0.06% | $126.00 |
| | | | | **Total** | **$10,311.00** |
| **Total Surplus Lines Taxes and Fees** | | | | | **$10,311.00** |

## SURPLUS LINES DISCLOSURE

### Texas

   This insurance contract is with an insurer not licensed to transact insurance in this state and is issued and delivered as surplus line coverage under the Texas insurance statutes. The Texas Department of Insurance does not audit the finances or review the solvency of the surplus lines insurer providing this coverage, and the insurer is not a member of the property and casualty insurance guaranty association created under Chapter 462 Insurance Code. Chapter 225, Insurance Code, requires payment of a 4.85 percent tax on gross premium.

Surplus Lines Licensee Name: AmWINS Brokerage of Texas, Inc.

IMPORTANT NOTICE

To obtain information or make a complaint:may contact the Texas Department of Insurance to obtain information on companies, coverages, rights or complaints at:

1-800-252-3439

You may write the Texas Department of Insurance:

Post Office Box 149104
Austin, Texas 78714-9104
Fax # 512-475-1771
Web: http://www.tdi.texas.gov
E-mail: ConsumerProtection@tdi.state.tx.us

OR CLAIM DISPUTES

Should you have a dispute concerning your premium or about a claim you should contact the agent first. If the dispute is not resolved, you may contact the Texas Department of Insurance.

ATTACH THIS NOTICE TO YOUR POLICY

This notice is for information only and does not become a part or condition of the attached document.

AVISO IMPORTANTE

Para obtener informacion o para someter una queja:

Puede comunicarse con el Departmento de Seguros de Texas para obtener informacion acerca de companieas, coberturas, derechos o quejas al:

1-800-252-3439

Puede escribir al Departmento de Seguros de Texas:
Post Office Box 149104
Austin, Texas 78714-9104
Fax # 512-475-1771
Web: http://www.tdi.texas.gov
E-mail: ConsumerProtection@tdi.state.tx.us

DISPUTAS SOBRE PRIMAS O RECLAMOS

Si tiene una disputa concerniente a su prima o a un reclamo, debe comunicarse con el agente primero. Si no se resuleva la disputa, puede entonces comunicarse con el departmento (TDI).
UNA ESTA AVISO A SU POLIZA

Esta aviso es solo para proposito de informacion y no se convierte en parte o condicion del documento adjunto.

# FORMS AND ENDORSEMENT SCHEDULE

It is hereby understood and agreed the following forms and endorsements are attached to and are a part of this policy:

| # | Form/Endorsement Number | Form/Endorsement Name |
|---|---|---|
| 1 | PN_0001_0407 | OFAC Notice |
| 2 | PL_0001_0108 | Professional Liability Dec |
| 3 | PL_0503_0407 | Nuclear Energy Liability Exclusion |
| 4 | PL_0502_0407 | Undisclosed Compensation Exclusion |
| 5 | PL_0104_0407 | Additional Insured |
| 6 | PL_1001_0107 | Market Timing/Late Trading/Soft Dollar Activities Exclusion |
| 7 | PL_1001_0107 | Professional Services Definition Amendment for IMS Securities |
| 8 | PL_1001_0107 | Amendment for IMS Securities |
| 9 | PL_1001_0107 | Non-Cancellation Except for Nonpayment of Premium – Version 04/07 |
| 10 | PL_1001_0107 | Distressed Investments Exclusion |
| 11 | PL_1001_0107 | Registered Representative Definition Amendment |
| 12 | PL_1001_0107 | Trading Errors Extension - 50% Coinsurance |
| 13 | PL_0255_0407 | Manuscript Policy Form - Premier Securities Broker/Dealer and Investment Advisers Professional Liability Insurance Policy for IMS Securities |
| 14 | SN_TX_1109 | Surplus Lines Notice |
| 15 | SN-TX-12-10 | TX Important Notice |
| 16 | PL_1301_0606 | Service of Suit Endorsement |

**THIS ENDORSEMENT AMENDS THE POLICY. PLEASE READ IT CAREFULLY**

# NUCLEAR ENERGY LIABILITY EXCLUSION ENDORSEMENT

In consideration of the premium charged it is hereby understood and agreed that:

I.  This Policy does not apply:

   A. Under any Liability Coverage, to **Bodily Injury** or property damage

      1.  with respect to which an **Insured** under this Policy is also an insured under a nuclear liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters or Nuclear Insurance Association of Canada, or would be an Insured under any such policy but for its termination upon exhaustion of its limit of liability; or

      2.  resulting from the hazardous properties of nuclear material and with respect to which (a) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (b) the **Insured** is, or had this Policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

   B. Under any Medical Payments Coverage, or any Supplementary Payments Provision relating to first aid, to expenses incurred with respect to **Bodily Injury** resulting from the hazardous properties of nuclear material and arising out of the operation of a nuclear facility by any person or organization.

   C. Under any Liability Coverage, to **Bodily Injury** or property damage resulting from the hazardous properties of nuclear material, if

      1. the nuclear material (a) is at any nuclear facility owned by, or operated by or on behalf of, an **Insured** or (b) has been discharged or dispersed therefrom;

      2. the nuclear material is contained in spent fuel or waste at any time possessed, handled, use, processed, stored, transported or disposed of by or on behalf of an **Insured**; or

      3. the **Bodily Injury** or property damage arises out of the furnishing by an **Insured** of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any nuclear facility, but if such facility is located within the United States of America, its territories or possessions or Canada, this Exclusion (3) applies only to property damage to such nuclear facility and any property threat.

II. As used in this endorsement:

   "hazardous properties"  include radioactive, toxic or explosive properties;

   "nuclear material" means source material, special nuclear material or by-product material;

"source material," "special nuclear material," and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof,

"spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a nuclear reactor;

"waste" means any waste material (1) containing by-product material and (2) resulting from the operation by any person or organization of any nuclear facility included within the definition of nuclear facility under Paragraph (a) or (b) thereof,

"nuclear facility" means:

1. any nuclear reactor,

2. any equipment or device designed or used for (a) separating the isotopes of uranium or plutonium, (b) processing or utilizing spent fuel, or (c) handling, processing or packaging waste,

3. any equipment or device used for the processing, fabricating or alloying of special nuclear material if at any time the total amount of such material in the custody of the **Insured** at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235,

4. any structure, basin, excavation, premises or place prepared or used for the storage or disposal of waste, and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations;

"nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material;

"property damage" includes all forms of radioactive contamination of property.

All other terms remain unchanged.

**THIS ENDORSEMENT AMENDS THE POLICY. PLEASE READ IT CAREFULLY**

# UNDISCLOSED COMPENSATION EXCLUSION ENDORSEMENT (VERSION 11/06)

In consideration of the premium charged, it is hereby understood and agreed that this Policy does not apply to any **Claim** alleging, based upon, arising out of, or attributable to any actual or alleged undisclosed compensation or benefit paid or extended to any **Insured** or any **Related Party** or to any other party as a result of, as a consequence of, or in furtherance of, **Professional Services** provided by any **Insured**.

For the purposes of this exclusion, the term "**Related Party**" shall mean any Entity:

(i) which is owned by, operated by or controlled by any **Insured**; or
(ii) which owns, operates or controls any **Insured**; or
(iii) in which any **Insured** is a director, officer, partner or principal stockholder; or
(iv) under common ownership or control with any **Insured**.

All other terms and conditions remain unchanged

Endurance American Specialty Insurance Company          PL 0502 0407

**THIS ENDORSEMENT AMENDS THE POLICY. PLEASE READ IT CAREFULLY**

## ADDITIONAL INSURED ENDORSEMENT
## (VERSION 11/06)

In consideration of the premium charged, it is hereby understood and agreed that the coverage provided by this Policy shall extend to **Claims** brought against the following Additional Insured(s) solely because of the **Wrongful Acts** of any **Insured**:

Additional Insured(s):

Information Management Services

It is further understood and agreed that:

(a) this Policy shall not apply to any **Claim** based upon, arising out of, due to, contributed by, or involving directly or indirectly any actual or alleged negligent act, error or omission committed or attempted by any Additional Insured;

(b) Exclusion III. D. of the Policy shall not apply to any **Claim** by, on behalf of, or in the right of any Additional Insured(s).

All other terms and conditions remain unchanged

Endurance American Specialty Insurance Company            PL 0104 0407

**THIS ENDORSEMENT AMENDS THE POLICY. PLEASE READ IT CAREFULLY**

# GENERAL CHANGE ENDORSEMENT
### (MARKET TIMING/LATE TRADING/SOFT DOLLAR ACTIVITIES EXCLUSION
### - VERSION 5/08)

In consideration of the premium charged, it is hereby understood and agreed that this Policy does not apply to any **Claim** based upon, arising out of or related in any way to actual or alleged:

1) **Market Timing**, **Late Trading** or **Soft Dollar Activities**;

2) the failure to provide a discount on volume purchases of mutual funds (i.e., breakpoint discounts); or

3) providing fictitious or collusive bids.

This exclusion applies regardless of the form, style or denomination of any such claim of **Market Timing**, **Late Trading** or **Soft Dollar Activities**, and regardless of whether such claim is criminal, administrative or civil, including, without limitation, claims alleging breach of contract, failure to supervise, negligent supervision or negligence of any kind, controlling person liability, breach of fiduciary duty, personal profiting, criminal activity, market manipulation, violation of any law related to mutual funds or variable life insurance or variable annuities, misrepresentation, estoppel, repudiation of any commitment, the failure to monitor, detect, identify or remediate **Market Timing**, **Late Trading** or **Soft Dollar Activities** or any other theory of liability.

It is further understood and agreed that the following definitions shall be added to this Policy:

i) **"Market Timing"** means the making of short term purchases or sales of mutual fund shares or the separate accounts or sub accounts of a life insurance company contrary to or in violation of the mutual fund's or life insurance company's prospectus or ether representation to investors, or any policy, limitation, agreement or procedure of the mutual fund or life insurance company, or contrary to or in violation of any state or federal statute or regulation; and any conduct associated with any of the above, including, without limitation: (1) the waiver of redemption fees associated with **Short-Term Trading**; (2) the failure to abide by written representations regarding the permissibility of **Short-Term Trading** or the mutual fund's or life insurance company's efforts to monitor or prevent **Short-Term Trading**; (3) the receipt of fees or any other form of compensation from certain investors in exchange for providing such investors with **Short-Term Trading** privileges not available to other investors;

ii) **"Short-Term Trading"** means the purchase or sale of shares of a mutual fund or the separate accounts or sub accounts of a life insurance company in a time period less than that provided in the mutual fund's or life insurance company's prospectus or other agreement or in violation of the policies, limitation, agreements or procedures of the mutual fund or life insurance company, or as required by federal or state law or regulation, including, without limitation, any "in-and-out" trading of mutual fund shares or the separate accounts or sub accounts of a life insurance company or any other trade of mutual fund shares or the separate accounts or sub accounts of a life insurance company designed to take advantage of the inefficiencies in the methods used by the mutual fund or life insurance company to price its shares or sub accounts.

Endurance American Specialty Insurance Company                    PL 1001 0107

iii) **"Late Trading"** means: (1) any transaction involving mutual fund shares or the separate account or sub accounts of a life insurance company (including, without limitation, the placement or confirmation or cancellation of trades or orders for, or the purchase or redemption of mutual fund shares by the mutual fund or an intermediary) made after the mutual fund's or separate account's or sub account's net asset value (as defined in Rule 2a-4 of the Investment Company Act of 1940, as amended, in the case of the mutual fund) for a particular date has been made, or should have been made, but which transaction is made at a price based upon said mutual fund's or account's net asset value for that date; or (2) any transaction defined as late trading by any federal or state statute or regulation, or any prospectus, policy, limitation, agreement or procedure of the mutual fund or life insurance company;

iv) **"Soft Dollar Activities"** means paying or providing or receiving or accepting fees, commissions, bonuses, gratuities, services or any other form of compensation or benefit in exchange for preferential treatment by or -recommendation of or purchase of a particular "security" (including, without limitation, a mutual fund or particular class of ,mutual fund shares or a particular separate account or sub account of a life insurance company), including, without limitation: (1) the payment of higher commissions for directing "securities" trades to a "broker"-"dealer" in return for investment research, advice, subscriptions, professional development programs, computer hardware or software; or (2) "payment for shelf space" defined to be the payment of monetary or other forms of compensation or other benefits to ""broker"-"dealers", "registered representatives", "registered investment advisers", "associated persons" or other solicitors in return for steering their clients to the purchase of particular "securities"; (3) "directed commissions" (sometimes referred to as "directed brokerage") defined to be when a mutual fund or life insurance company or "registered investment adviser" chooses a "broker"-"dealer" to execute its "securities" trades in consideration of the sales volume by the "broker"-"dealer" or its associated "registered investment advisers", "registered representatives" or "associated persons" of the mutual fund's shares or the life insurance company's variable products or other "securities".

All other terms and conditions remain unchanged

**THIS ENDORSEMENT AMENDS THE POLICY. PLEASE READ IT CAREFULLY.**

# GENERAL CHANGE ENDORSEMENT
### (PROFESSIONAL SERVICES DEFINITION AMENDMENT FOR IMS SECURITIES)

In consideration of the premium charged, it is hereby understood and agreed that Section II.Z.(3) of this Policy shall be deleted and replaced with the following:

**Section II.**

   (3)  the sale and/or servicing of life, health, annuities, accident and disability products and life settlement contracts, but only with respect to **Registered Representatives** who are duly licensed to do so;

All other terms and conditions remain unchanged.

Endurance American Specialty Insurance Company         PL 1001 0107

**THIS ENDORSEMENT AMENDS THE POLICY. PLEASE READ IT CAREFULLY.**

# GENERAL CHANGE ENDORSEMENT
## (AMENDMENTS FOR IMS SECURITIES)

In consideration of the premium charged, it is hereby understood and agreed that Section III.Q and Section III.R. of this Policy shall be deleted in their entirety.

It is further understood and agreed that Section III.S. shall be deleted and replaced with the following:

**S.**   to any **Claim** based on or directly or indirectly arising out of or resulting from any transaction involving any of the following: commodities; any commodity futures contract; or any equity security priced under five dollars ($5.00) at the time of any transaction, unless the security is (i) traded on a national securities exchange, (ii) NASDAQ approved or authorized, or (iii) part of a mutual fund;

All other terms and conditions remain unchanged.

Endurance American Specialty Insurance Company                    PL 1001 0107

**THIS ENDORSEMENT AMENDS THE POLICY. PLEASE READ IT CAREFULLY**

# GENERAL CHANGE ENDORSEMENT
### (NON-CANCELLATION EXCEPT FOR NONPAYMENT OF PREMIUM – VERSION 4/07)

In consideration of the premium charged, it is hereby understood and agreed that Section VIII.G. of this Policy shall be deleted and replaced with the following:

**Section VIII.**

**G.  Cancellation.**  This Policy may be canceled by the **Named Insured** by mailing or delivering prior written notice to the **Company** or by surrender of this Policy to the **Company**.  If this Policy is canceled by the **Named Insured**, the **Company** shall retain the greater of the customary short rate proportion of the premium hereon or the Earned Minimum Premium set forth in Item 6(B) of the Declarations.  This Policy may also be canceled by or on behalf of the **Company** for nonpayment of premium due by delivering to the **Named Insured** by electronic means or by mailing to the **Named Insured** by registered, certified or other first class mail, at the address of the **Named Insured** as stated in Item 2(B) of the Declarations, written notice stating when not less than ten (10) days after the date of such notice the cancellation shall be effective.  The proof of mailing of such notice as aforesaid shall be sufficient proof of notice.  If this Policy is canceled by or on behalf of the **Company**, the **Company** shall retain the pro-rata proportion of the premium hereon.

All other terms and conditions remain unchanged

**THIS ENDORSEMENT AMENDS THE POLICY. PLEASE READ IT CAREFULLY**

# GENERAL CHANGE ENDORSEMENT
### (DISTRESSED INVESTMENTS EXCLUSION)

In consideration of the premium charged, it is hereby understood and agreed that this Policy and all Coverage Parts shall not apply to any **Claim** arising out of, based upon or In consequence of, directly or indirectly resulting from or in any way involving the actual or alleged sale, attempted sale, solicitation or servicing of any registered or unregistered Security, financial product, participation agreement, fund, pool and/or investment of any type or nature; actual or alleged advice, recommendations, consultation or financial or investment planning with respect to any registered or unregistered Security, financial product, participation agreement, fund, pool and/or investment of any type or nature; actual or alleged direct or indirect placement, or recommendation for placement, of funds, assets, liabilities or monies; actual or alleged management of funds, assets, liabilities or monies; or any actual or alleged transactions, undertakings or services of any kind, type or nature, in connection or associated with the following:

1.  Bernard L. Madoff, and/or any company, corporation, parent, subsidiary, partnership or other business entity directly or Indirectly owned or controlled by or associated or affiliated with Bernard L. Madoff, including, but not limited to Bernard L. Madoff Investment Securities, LLC, or any employee, partner, officer, director, agent, representative or other person associated with any of the foregoing;

2.  DBSI, Inc. and/or any company, corporation, parent, subsidiary, partnership or other business entity directly or indirectly owned or controlled by or associated or affiliated with DBSI, Inc. or any employee, partner, officer, director, agent or representative or other person associated with any of the foregoing; and

3.  LandAmerica Financial Group, Inc. and/or any company, corporation, parent, subsidiary, partnership or other business entity directly or indirectly owned or controlled by or associated or affiliated with LandAmerica Financial Group, Inc. or any employee, partner, officer, director, agent or representative or other person associated with any of the foregoing;

4.  Stanford Financial Group and/or any company, corporation, parent, subsidiary, partnership or other business entity directly or Indirectly owned or controlled by or associated or affiliated with Stanford Financial Group, or any employee, partner, officer, director, agent or representative or other person associated with any of the foregoing.

5.  Edward Okun and/or any company, corporation, parent, subsidiary, partnership or other business entity directly or indirectly owned or controlled by or associated or affiliated with Edward Okun or any employee, partner, officer, director, agent or representative or other person associated with any of the foregoing;

6.  Medical Capital Holdings and/or any company, corporation, parent, subsidiary, partnership or other business entity directly or indirectly owned or controlled by or associated or affiliated with Medical Capital Holdings or any employee, partner, officer, director, agent or representative or other person associated with any of the foregoing;

Endurance American Specialty Insurance Company                    PL 1001 0107

7.  Provident Royalties, LLC and/or any company, corporation, parent, subsidiary, partnership or other business entity directly or indirectly owned or controlled by or associated or affiliated with Provident Royalties, LLC or any employee, partner, officer, director, agent or representative or other person associated with any of the foregoing;

All other terms and conditions remain unchanged

**THIS ENDORSEMENT AMENDS THE POLICY. PLEASE READ IT CAREFULLY**

# GENERAL CHANGE ENDORSEMENT
**(REGISTERED REPRESENTATIVE DEFINITION AMENDMENT TO INCLUDE
PRIOR ACTS COVERAGE FOR FORMER REGISTERED REPRESENTATIVES)**

In consideration of the premium charged, it is hereby understood and agreed that Section II.DD. of this Policy shall be deleted in its entirety and replaced with the following:

**Section II.**

**DD.** **"Registered Representative"** means:

    **1.** any individual who is licensed as a registered representative or registered principal by the National Association of Securities Dealers, Inc., and who is or was an independent contractor with, or is or was employed by, the **Broker/Dealer**;

    **2.** the heirs, executors, administrators, or legal representatives of any individual described in (1) above, in the event of death, incapacity or bankruptcy of the individual;

    **3.** any entity owned in its entirety by one or more individual(s) described in (1) above; and

    **4.** employees of any individual described in (1) above or of any entity described in (3) above;

    provided, that an individual or entity will be deemed a **Registered Representative** only with respect to his, her or its rendering of **Professional Services** on behalf of the **Broker/Dealer**.

All other terms and conditions remain unchanged

Endurance American Specialty Insurance Company            PL 1001 0107

**THIS ENDORSEMENT AMENDS THE POLICY. PLEASE READ IT CAREFULLY**

# GENERAL CHANGE ENDORSEMENT
## (TRADING ERRORS EXTENSION)

In consideration of the premium charged, it is hereby understood and agreed that the **Company** shall reimburse the **Insured** for all **Damages** and **Claim Expenses** paid by the **Insured** in excess of the applicable self-insured retention in the amount set forth below for **Costs of Correction**, but only if:

(1) written notice of the **Cost of Correction** is given to the **Company** within 60 days of the **Trade Error** and/or within 60 days of an actual rendering or failure to render **Professional Services**, but in no event after the **Policy Period**; and

(2) such **Cost of Correction** arose in the ordinary course of the **Insureds** operations and, if not corrected, would result directly in a financial loss to the customer of the **Insured**; and

(3) the **Insured** requests and obtains prior written approval from the **Company** to incur any such **Cost of Correction.**

The **Insureds** and the **Company** agree that it is their intention that such reimbursement operates to reduce or avoid in an expeditious and economic fashion monetary liability from a **Claim** which would have been made against the **Insureds** and that such reimbursement does not afford any coverage to the extent that any sum paid by the **Insured** constitutes an ex-gratia settlement or a commercial settlement to support the **Insured's** reputation or business relationships.

It is further understood and agreed that solely with respect to coverage afforded under this Endorsement, this Policy shall be amended as follows:

1) Section II.H. shall be amended to read as follows:

**H. "Claim"** means a demand received by the **Insured** for money or services and alleging a **Wrongful Act** including:

**1.** the service of suit or any civil proceeding in a court of law or equity, including any appeal therefrom, which is commenced by the filing of a complaint, motion for judgment, or similar proceeding;

**2.** institution of arbitration, mediation or other formal alternative dispute resolution proceeding;

**3.** any prosecution or governmental action related to **Breach of Privacy**;

**4.** any written request to toll or waive a statute of limitations;

**5.** a request by the **Insured** for approval to incur any **Cost Of Correction**. A **Claim** for injunctive relief alleging any **Wrongful Act** for which insurance would have been granted under this Policy if **Damages** had been sought, will be considered a **Claim** for the purposes of this Policy, but only the **Claim Expenses** arising therefrom will be covered by this Policy.

2) Section II is amended by adding the following Definitions:

**"Costs of Correction"** shall solely mean payments made to a customer to avoid or mitigate  financial loss to a customer resulting from any **Trade Error** and/or an actual rendering or failure to render **Professional Services**; provided, however, that in no event shall "Costs of Correction" include (1) payments made to a customer to avoid or reduce financial loss to a customer resulting from any **Late Trading, Market Timing, Short-Term Trading** or **Soft Dollar Activities**; and (2) any ancilliary charges based upon, arising out of or in any way related to a **Cost of Correction** or **Trading Error**, including but not limited to forsenic accounting, experts, attorneys' fees and legal costs..

**"Market Timing"** means the making of short term purchases or sales of mutual fund shares or the separate accounts or sub accounts of a life insurance company contrary to or in violation of the mutual fund's or life insurance company's prospectus or ether representation to investors, or any policy, limitation, agreement or procedure of the mutual fund or life insurance company, or contrary to or in violation of any state or federal statute or regulation; and any conduct associated with any of the above, including, without limitation: (1) the waiver of redemption fees associated with **Short-Term Trading**; (2) the failure to abide by written representations regarding the permissibility of **Short-Term Trading** or the mutual fund's or life insurance company's efforts to monitor or prevent **Short-Term Trading**; (3) the receipt of fees or any other form of compensation from certain investors in exchange for providing such investors with **Short-Term Trading** privileges not available to other investors.

**"Short-Term Trading"** means the purchase or sale of shares of a mutual fund or the separate accounts or sub accounts of a life insurance company in a time period less than that provided in the mutual fund's or life insurance company's prospectus or other agreement or in violation of the policies, limitation, agreements or procedures of the mutual fund or life insurance company, or as required by federal or state law or regulation, including, without limitation, any "in-and-out" trading of mutual fund shares or the separate accounts or sub accounts of a life insurance company or any other trade of mutual fund shares or the separate accounts or sub accounts of a life insurance company designed to take advantage of the inefficiencies in the methods used by the mutual fund or life insurance company to price its shares or sub accounts.

 **"Late Trading"** means: (1) any transaction involving mutual fund shares or the separate account or sub accounts of a life insurance company (including, without limitation, the placement or confirmation or cancellation of trades or orders for, or the purchase or redemption of mutual fund shares by the mutual fund or an intermediary) made after the mutual fund's or separate account's or sub account's net asset value (as defined in Rule 2a-4 of the Investment Company Act of 1940, as amended, in the case of the mutual fund) for a particular date has been made, or should have been made, but which transaction is made at a price based upon said mutual fund's or account's net asset value for that date; or (2) any transaction defined as late trading by any federal or state statute or regulation, or any prospectus, policy, limitation, agreement or procedure of the mutual fund or life insurance company.

**"Soft Dollar Activities"** means paying or providing or receiving or accepting fees, commissions, bonuses, gratuities, services or any other form of compensation or benefit in exchange for preferential treatment by or -recommendation of or purchase of a particular "security" (including, without limitation, a mutual fund or particular class of ,mutual fund shares or a particular separate account or sub account of a

life insurance company), including, without limitation: (1) the payment of higher commissions for directing "securities" trades to a "broker"-"dealer" in return for investment research, advice, subscriptions, professional development programs, computer hardware or software; or (2) "payment for shelf space" defined to be the payment of monetary or other forms of compensation or other benefits to ""broker"-"dealers", "registered representatives", "registered investment advisers", "associated persons" or other solicitors in return for steering their clients to the purchase of particular "securities"; (3) "directed commissions" (sometimes referred to as "directed brokerage") defined to be when a mutual fund or life insurance company or "registered investment adviser" chooses a "broker"-"dealer" to execute its "securities" trades in consideration of the sales volume by the "broker"-"dealer" or its associated "registered investment advisers", "registered representatives" or "associated persons" of the mutual fund's shares or the life insurance company's variable products or other "securities".

**"Trade Error"** shall mean any trades performed by an **Insured**: (1) that were incorrectly executed: (a) in the wrong security, (b) on the wrong side of the market, (c) for a quantity different than specified in the instructions, and/or (d) duplicating a prior execution of the same original order; or 2) where the **Insured** failed to execute a written order that was executable when rendered.

3) Section III. is amended by adding the following additional Exclusions:

• to any **Claim** based upon, arising from, or in any way related to diminution in value or damages resulting from the diminution in value of money, securities, property or any other item of value, unless caused by **Professional Services** of any person or entity insured under this Policy in the execution or implementation of investment advice or any investment decision or any other activity covered under this Policy;

• to any **Claim** based upon, arising from, or in any way related to loss of the actual money, securities or other property in the custody or control of the **Insured**;

• to any **Claim** based upon, arising from, or in any way related to any **Cost Of Correction** that is not approved in writing by the **Company**.

It is further understood and agreed that solely for the purposes of any **Cost of Correction Claim** to which this Endorsement may in whole or in part apply, Item 4. of the Declarations shall be amended to read as follows:

Item 4. Limits of Liability (Including **Claim Expenses**, unless the Policy is otherwise endorsed):

(A) Each **Claim**: $500,000
(B) **Policy Period** Aggregate: $500,000

A 50% coinsurance provision shall also apply to the maximum Each **Claim** Limit of Liability of $500,000.  In no event shall the **Company** be liable in excess of its: (i) 50% share of the Each **Claim** Limit of Liability for a maximum Each **Claim** Limit of Liability to the **Company** of $250,000; or (ii) 50% share of the **Policy Period** Aggregate Limit of Liability for a maximum **Policy Period** Aggregate Limit of Liability to the **Company** of $250,000.

The extension of coverage provided by this Endorsement shall in no way serve to increase the Limits of Liability of the **Company** as shown in Item 4. of the Declarations. Such Limits of Liability are part of and not in addition to the Limits of Liability set forth in Item 4. of the Declarations.

It is further understood and agreed that solely for the purposes of any **Cost of Correction Claim** to which this Endorsement may in whole or in part apply, Item 5. of the Declarations shall be amended to read as follows:

Item 5. Self-Insured Retention:

   (A) Each **Claim**: NIL
   (B) **Policy Period** Aggregate: Not Applicable

All other terms and conditions remain unchanged.

# SERVICE OF SUIT ENDORSEMENT

**THIS ENDORSEMENT CHANGES THE POLICY, PLEASE READ IT CAREFULLY.**

In the event of failure of the Company to pay any amount claimed to be due under the terms of this policy, the Company, at the request of the **Insured,** will submit to the jurisdiction of a court of competent jurisdiction within the United States. Nothing in this condition constitutes or should be understood to constitute a waiver of the Company's rights to commence an action in any court of competent jurisdiction in the United States to remove an action to a United States District Court or to seek a transfer of a case to another court as permitted by the laws of the United States or of any state in the United States. In any suit instituted against the Company upon this policy, the Company will abide by the final decision of such court or of any appellate court in the event of appeal.

It is further agreed that service of process in such suit may be made upon the Senior Vice President - Claims, Endurance American Specialty Insurance Company C/O Endurance Specialty Insurance Marketing Corp., 725 South Figueroa Street, Suite 2100, Los Angeles, California 90017.

Further, pursuant to any statute of any state, territory, or district of the United States which makes provision therefore, the Company hereby designates the Superintendent, Commissioner or Director of Insurance, or other officer specified for that purpose in the statute, as its true and lawful attorney upon whom service may be made of any lawful process in any action, suit, or proceeding instituted by or on behalf of the **Insured** or any beneficiary hereunder arising out of this policy of insurance and hereby designates the above named Senior Vice President – Claims as the person to whom the said officer is authorized to mail such process or a true copy thereof.

This endorsement does not change any other provision of the policy.

Endurance American Specialty Insurance Company          PL 1301 0606



# PREMIER SECURITIES BROKER/DEALER
# AND INVESTMENT ADVISERS
# PROFESSIONAL LIABILITY INSURANCE POLICY FOR
# IMS SECURITIES

**This is a Claims Made and Reported Policy. Please Read It Carefully.**

In consideration of the payment of premium and subject to the Declarations, limitations, conditions, provisions and other terms of this Policy, the **Company** and the **Insured** agree as follows:

## I.     INSURING AGREEMENTS

**A.**  The **Company** shall pay **Damages** and **Claim Expenses** on behalf of the **Insured** resulting from any **Claim** first made against the **Insured** and reported to the **Company** in writing during the **Policy Period** or any applicable Extended Reporting Period for any **Wrongful Act** committed on or after the **Retroactive Date** and before the Policy terminates.

**B.**  **Defense.**  As part of and subject to the Limits of Liability, the **Company** shall have the right and duty to defend, any **Claim** against the **Insured**, to which this Policy applies, even if any of the allegations of the **Claim** are groundless, false, or fraudulent.  However, the **Company** shall have no duty to defend any **Claim**, and may withdraw from the defense of any **Claim**, after the applicable Limits of Liability have been exhausted by **Damages** and/or **Claim Expenses**.

**C.**  **Consent to Settle.**  The **Company** shall have the right to make any investigation it deems necessary and, with the written consent of the **Insured**, make any settlement of a **Claim** covered by this Policy.  If the **Company** recommends settlement or compromise of a **Claim**, and the **Insured** refuses to give written consent to settlement as recommended by the **Company**, then the **Insured** thereafter shall negotiate or defend such **Claim** independently of the **Company** and on the **Insured's** own behalf.  In such event, the **Insured** shall be solely responsible for fifty percent (50%) of all **Claim Expenses** incurred or paid by the **Insured** after the date the **Insured** refused to consent to settlement as recommended by the **Company**, and the **Insured** shall also be responsible for fifty percent (50%) of all **Damages** in excess of the amount for which settlement could have been made as recommended by the **Company**; provided that the **Company's** liability under this Policy for such **Claim** shall not exceed the remaining portion of the applicable Limits of Liability.

## II.     DEFINITIONS

Whenever used in this Policy:

**A.**  **"Advertisement"** means a notice that is broadcast or published to the general public or specific market segments about the goods, products or services of the **Named Insured** for the purpose of attracting customers or supporters.  **Advertisement** shall include electronic promotional material and media, publicly disseminated on any **Internet Website** either on

behalf of the **Named Insured** or by the **Named Insured** on behalf of others, including banner and buttons, beacons and tracking, branding, click tags and cookies, co-branding, directory listings, flash sites, metatags and coded media, rectangles and pop-ups, search engine endorsements, sponsorships, skyscrapers, and/or endorsements.

**B.** **"Application"** means all signed applications, including attachments and other materials submitted therewith or incorporated therein, submitted by the **Insured** to the **Company** for this Policy or for any policy of which this Policy is a direct or indirect renewal or replacement. **Application** shall also include all documents provided by the **Insured** to the **Company** in connection with the underwriting or issuance of this Policy and any information contained on the **Website(s)** of the **Insured**, whether provided to the **Company** directly or indirectly through the use of public databases or similar sources.

**C.** **"Assumed Under Contract"** means liability assumed by the **Named Insured** under a written hold harmless or indemnity agreement regarding the content of **Media Material** used in **Media Communications**.

**D.** **"Bodily Injury"** means physical injury, sickness, disease or death of any person, and includes emotional distress or mental anguish whether or not accompanied by physical injury, sickness or disease.

**E.** **"Breach of Privacy"** means:

**1.** wrongful entry or eviction, trespass, eavesdropping, false arrest or malicious prosecution;

**2.** invasion, infringement, interference with the right to privacy or of publicity, including false light, public disclosure of private facts, intrusion or commercial appropriation of name or likeness;

**3.** any breach or violation of U.S. federal, state and local statutes and regulations associated with the control and use of personally identifiable financial or medical information including but not limited to:

**a.** Health Insurance Portability and Accountability Act of 1996 (Public Law 104-191) ("HIPAA"), including Title II that required protection of confidentiality and security of electronic protected health information and the rules and regulations promulgated thereunder as they currently exist and as amended;

**b.** Gramm-Leach-Bliley of 1999 ("G-L-B"), also known as the Financial Services Modernization Act of 1999, including sections concerning security protection and standards for customer records maintained by financial services companies, and the rules and regulations promulgated thereunder as they currently exist and as amended;

**c.** State privacy protection laws, such as California Database Protection Act of 2003 (Cal. SB 1386) and California A.B. 1950, as they currently exist now or in the future, that require commercial **Internet** sites or on-line services that collect personal information or medical information (as defined by such laws or acts) to post privacy policies and adopt specific privacy controls or to notify those impacted by identity or data theft, abuse or misuse;

**d.** Federal and state consumer credit reporting laws, such as the Federal Fair Credit

Reporting Act (FCRA) and the California Consumer Credit Reporting Agencies Act (CCCRAA).

F.  **"Breach of Security"** means a breach of security which results in the **Unauthorized Access** or **Unauthorized Use** of any **Computer System**, the consequences of which include, but are not limited to the:

    **1.**  failure to prevent **Unauthorized Access** to, use of or tampering with a third party's **Computer System**;

    **2.**  inability of an authorized third party to gain access to the **Professional Services** of the **Named Insured**;

    **3.**  failure to prevent denial or disruption of **Internet** service to an authorized third party;

    **4.**  failure to prevent identity theft or credit/debit card fraud;

    **5.**  inadvertent transmission of **Malicious Code**.

G.  **"Broker/Dealer"** means the **Named Insured** and any **Subsidiary**.

H.  **"Claim"** means a demand received by the **Insured** for money or services and alleging a **Wrongful Act** including:

    **1.**  the service of suit or any civil proceeding in a court of law or equity, including any appeal therefrom, which is commenced by the filing of a complaint, motion for judgment, or similar proceeding;

    **2.**  institution of arbitration, mediation or other formal alternative dispute resolution proceeding;

    **3.**  any prosecution or governmental action related to **Breach of Privacy**;

    **4.**  any written request to toll or waive a statute of limitations.

A **Claim** for injunctive relief alleging any **Wrongful Act** for which insurance would have been granted under this Policy if **Damages** had been sought, will be considered a **Claim** for the purposes of this Policy, but only the **Claim Expenses** arising therefrom will be covered by this Policy**.**

I.  **"Claim Expenses"** means:

    **1.**  fees charged by any lawyer selected by mutual agreement between the **Company** and the **Insured**.  However, if after a good faith attempt by the **Company**, the **Company** and the **Insured** cannot agree on the selection of the lawyer, the **Company** shall select the lawyer;

    **2.**  all other reasonable fees, costs and expenses resulting from the investigation and defense of a **Claim**, if incurred by the **Company** or by the **Insured** with the written consent of the **Company**.

**"Claim Expenses"** shall not include salary charges of any employee or officer of the **Company** or any supervisory counsel retained by the **Company**. The determination by the **Company** as to the reasonableness of **Claim Expenses** shall be conclusive on the **Insured**.

**J.**    **"Company"** means the insurer named in Item 1 of the Declarations.

**K.**    **"Computer System"** means computers and associated input and output devices, data storage devices, networking equipment, and back up facilities:

    **1.**    operated by and either owned by or leased to the **Named Insured**;

    **2.**    operated by a third party service provider and used for the purpose of providing hosted computer application services to the **Named Insured** or for processing, maintaining, hosting or storing the electronic data of the **Named Insured**, pursuant to a written contract with the **Named Insured** for such services.

    **"Computer System"** shall include: the **Websites** of the **Named Insured** and the **Media Material** stored thereon; and call centers associated with any **Computer System**.

**L.**    **"Damages"** means any compensatory sum and includes:

    **1.**    monetary judgments or settlements;

    **2.**    punitive or exemplary damages to the extent such damages are insurable under the law most favorable to the insurability of such damages of any jurisdiction which has a substantial relationship to the **Insured**, the **Company**, this Policy or the **Claim**;

    **3.**    pre-judgment and post-judgment interest.

    **"Damages"** shall not include:

    **1.**    taxes, fines or statutory penalties, sanctions, whether imposed by law or otherwise (except as provided above with respect to punitive or exemplary damages);

    **2.**    the return, reduction or restitution of fees, expenses or costs for **Professional Services** performed or to be performed by the **Insured**, or disgorgement by any **Insured**;

    **3.**    matters uninsurable under the law pursuant to which this Policy is construed;

    **4.**    the cost of correcting, re-printing or re-performing or completing **Professional Services** or **Media Material**, including any media or products containing such **Media Material**;

    **5.**    future profits, future royalties, costs of licensing, or other costs of obtaining future use; or the costs to comply with orders granting injunctive relief or non-monetary relief, including specific performance, or any agreement to provide such relief.

**M.**    **"Infringement of Intellectual Property Rights"** means plagiarism, piracy or misappropriation of ideas, infringement of copyright, domain name, trade dress, title or slogan, or the dilution or infringement of trademark, service mark, service name or trade name in connection with the **Professional Services** of the **Named Insured**.

N.  **"Individual Insured"** means any past, present or future partner, member, director, officer, or employee of the **Broker/Dealer** who is not a **Registered Representative**.

O.  **"Insured"** means the **Broker/Dealer, Individual Insureds** and **Registered Representatives**.

P.  **"Investment Advisory Services"** means advisory services provided by a **Registered Investment Adviser** pursuant to the Investment Advisors Act of 1940 with respect to **Securities** approved by the **Broker/Dealer,** provided that, prior to providing such services, the **Registered Investment Adviser** gave written notice of such services to the **Broker/Dealer** and received written approval from the **Broker/Dealer** to conduct such transactions.

Q.  **"Internet"** means the worldwide public network of computers which enables the transmission of electronic data and which includes intranets, extranets and virtual private networks.

R.  **"Malicious Code"** means unauthorized and either corrupting or harmful software code, including but not limited to computer viruses, Trojan horses, worms, logic bombs, spy ware or spider ware.

S.  **"Media Communications"** means the display, broadcast, dissemination, distribution or release of **Media Material** to the public by the **Named Insured**, including **Media Material** disseminated electronically on the **Named Insured's Internet Website, Computer System** or the **Internet**.

T.  **"Media Material"** means any data, e-mails, graphics, images, net or web casting, text, sounds, numbers or similar matter, including **Advertisements**.  **Media Material** shall not include **Technology Products**.

U.  **"Named Insured"** means the entity stated in Item 2(A) of the Declarations.

V.  **"Natural Insured"** means an **Individual Insured** or a **Registered Representative** who is a natural person.

W.  **"Newly Acquired Subsidiary"** means any entity of which the **Named Insured** owns, either legally or beneficially, more than a fifty percent (50%) interest:

**1.**  subsequent to the inception date of this Policy by reason of being created or acquired by the **Named Insured** after such date, if the total annual revenue of such entity does not exceed fifteen percent (15%) of the total consolidated annual revenue of the **Named Insured** as of the immediate past 12 months prior to the inception date of this Policy;

**2.**  subsequent to the inception date of this Policy by reason of being created or acquired by the **Named Insured** other than as described in **U.1.** above, but only upon the conditions that:

**a.**  within 60 days of such formation or acquisition, the **Named Insured** has provided the **Company** with written notice thereof, and the **Company** has agreed in writing to insure such entity, but the **Company** shall not be required to insure such entity;

    **b.** the **Named Insured** has paid the additional premium, if any, charged by the **Company** and has agreed to any amendment of the provisions of this Policy.

**X. "Personal and Advertising Injury"** means injury other than **Bodily Injury** arising out of one or more of the following offenses:

    **1.** unfair competition, dilution, deceptive trade practices, false advertising or misrepresentation, wrongful publication, defamation, slander or libel, product or service disparagement, trade libel or other tort related to disparagement or harm to the reputation or character of any person or organization in the **Media Communications** or **Advertisements** of the **Named Insured**;

    **2.** misappropriation or misdirection of messages or media of third parties by the **Insured**, including metatags, **Website** domains and names, and related cyber content;

    **3.** false arrest, detention, malicious use or abuse of process or malicious prosecution; libel, slander, oral or written publication of defamatory or disparaging material or publication in violation of an individual's right to privacy; wrongful eviction or entry; or other invasion of privacy.

**Y. "Policy Period"** means the period from the inception date of this Policy to the Policy expiration date stated in Item 3 of the Declarations or its earlier cancellation date, if any.

**Z. "Professional Services"** means the following services which are provided by the **Insured** to others, including such services that are performed electronically utilizing the **Internet** or a network of two or more computers:

    (1) the sale and/or servicing of **Securities** approved by the **Broker/Dealer**;

    (2) the administration of individual retirement accounts, Keogh retirement plans, qualified 401(K) plans, and employee benefit plans (other than multiple employer or multiple employee welfare arrangements) but only with respect to **Securities** approved by the **Broker/Dealer**;

    (3) the sale and/or servicing of life, health, annuities, accident and disability products, but only with respect to **Registered Representatives** who are duly licensed to do so and only with respect to products that have been approved by the **Broker/Dealer**;

    (4) **Professional Supervision**;

    (5) **Investment Advisory Services** but solely to the extent that such services are rendered by a **Registered Investment Adviser**;

    (6) solely in connection with any of the activities or services described in (1)-(5) above, financial, economic and investment advice, financial planning, provision of computer or internet services, administrative services, and publication of any materials prepared or written by the **Broker/Dealer**.

**AA. "Professional Supervision"** means the **Broker/Dealer's** selection of products approved for sale by its **Registered Representatives,** its oversight and direction of the performance of its **Registered Representatives,** and its creation and implementation of compliance and

supervisory procedures.

**BB.**     **"Property Damage"** means injury to or destruction of any tangible property or loss of use resulting therefrom.

**CC.**     **"Registered Investment Adviser"** means a **Registered Representative,** or any corporation, partnership or other business entity owned or controlled by a **Registered Representative,** providing **Investment Advisory Services** in its capacity as an investment adviser registered as such under the Investment Advisers Act of 1940, as amended.

**DD.**     **"Registered Representative"** means:

(1)  any individual who is licensed as a registered representative or registered principal by the National Association of Securities Dealers, Inc. and who is an independent contractor with, or is employed by, the **Broker/Dealer** during the **Policy Period**;

(2)  the heirs, executors, administrators, or legal representatives of any individual described in (1) above, in the event of death, incapacity or bankruptcy of the individual;

(3)  any entity owned in its entirety by one or more individual(s) described in (1) above; and

(4)  employees of any individual described in (1) above or of any entity described in (3) above;

provided, that an individual or entity will be deemed a **Registered Representative** only with respect to his, her or its rendering of **Professional Services** on behalf of the **Broker/Dealer**.

**EE.**     **"Retroactive Date"** means the date stated in Item 8 of the Declarations.

**FF.**     **"Securities"** means common and preferred stocks, bonds, mutual fund shares, variable annuities, and any other instrument that is a "security" as that term is defined in the Securities Act of 1933, the Securities Exchange Act of 1934, the Investment Company Act of 1940, or any rules or regulations promulgated thereunder.

**GG.**     **"Subsidiary"** means:

**1.**  any entity of which the **Named Insured** owns, either legally or beneficially, more than a fifty percent (50%) interest on or before the inception date of this Policy;

**2.**  any **Newly Acquired Subsidiary**.

The **Company** will only provide coverage for a **Subsidiary** with respect to a **Claim** arising out of a **Wrongful Act** committed on or after the date such **Subsidiary** became a **Subsidiary** and prior to the date such **Subsidiary** ceased to be a **Subsidiary**.  An entity ceases to be a **Subsidiary** under this Policy on the date during the **Policy Period** that the **Named Insured's** legal or beneficial interest in such entity becomes less than 50%.  No coverage will be afforded under this Policy with respect to a **Claim** made against any **Insured** based on any **Wrongful Act** that was committed on or subsequent to such date.

**HH.**     **"Technology Products"** means any computer hardware, software or related electronic product, equipment or device that is created, manufactured, developed, distributed, licensed,

leased, or sold by or on behalf of the **Named Insured** or by others acting under the **Named Insured's** trade name to others, including training in the use of such computer hardware, software or related technology products.

II.    **"Unauthorized Access"** means the gaining of access to a **Computer System** by an unauthorized person or persons, or by an authorized person or persons in an unauthorized manner.

JJ.    **"Unauthorized Use"** means the use of a **Computer System** by a person unauthorized by the **Insured** or a person authorized by the **Insured** who uses the **Computer System** for a purpose not intended by the **Insured**.

KK.    **"Website"** means the software, content and other materials accessible via the **Internet** at a designated Uniform Resource Locator address.

LL.    **"Wrongful Act"** means any actual or alleged act, error, omission, breach of fiduciary or other duty by an **Insured**, or by any person other than an **Insured** for whose actions the **Insured** is legally responsible, in rendering or in failing to render **Professional Services** for clients of the **Broker/Dealer**, including but not limited to:

1.  **Personal and Advertising Injury**;

2.  **Breach of Privacy**;

3.  **Breach of Security**;

4.  **Infringement of Intellectual Property Rights**.

## III.    EXCLUSIONS

This Policy shall not apply:

A.  to any **Claim** based upon, arising from, or in consequence of any fraudulent act or omission or any willful violation of any statute, rule or law by any **Insured**, if a final and non-appealable judgment or adjudication adverse to such **Insured** establishes such a fraudulent act or omission or willful violation;

B.  to any **Claim** for:

(1) **Bodily Injury**; provided, that this Exclusion will not apply to allegations of emotional distress or mental anguish if and only to the extent that they arise solely from an **Insured's** rendering of or failure to render **Professional Services**; or

(2) **Property Damage**; provided, that this Exclusion will not apply to any **Claim** arising from damage to, destruction of, loss of, or loss of use of, client records in an **Insured's** possession;

C.  to any **Claim** based on or directly or indirectly arising out of or resulting from any **Insured** serving as a member, partner, principal, director, officer, trustee, or employee of: (1) any entity that is not an **Insured**, even if such service is directed or requested by an **Insured**; or

(2) any entity acquired by an **Insured**, whether by merger, consolidation or otherwise, at any time prior to the **Insured's** acquisition of such entity;

**D.**   to any **Claim** brought by, on behalf of, or in the name or right of any **Insured**, any affiliate of any **Insured**, any employer or employee of any **Insured**, or any entity through which an **Insured** has sold any investment or insurance product; provided, that this Exclusion will not apply to any **Claim** by an **Insured** in the form of a crossclaim, third party claim or otherwise for contribution or indemnity which is part of and results directly from a **Claim** which is not otherwise excluded under this Policy;

**E.**   to any **Claim** based upon, arising from, or in consequence of:

   **1.**   any written demand, litigation, proceeding, administrative action or hearing brought prior to or pending as of the Prior and Pending Litigation Date stated in Item 7 of the Declarations as well as any future litigation, proceeding, administrative action or hearing based upon any such pending or prior litigation, proceeding, administrative action or hearing or derived from the essential facts or circumstances underlying or alleged in any such pending or prior litigation, proceeding, administrative action or hearing; or

   **2.**   any circumstance, if written notice of such circumstance has been given under any policy of which this Policy is a direct or indirect renewal or replacement and if such prior policy affords coverage (or would afford such coverage except for the exhaustion of its limits of liability) for such **Claim**, in whole or in part, as a result of such notice;

**F.**   to any **Claim** based upon or arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon the land, the atmosphere or any watercourse or body of water, including an aquifer or groundwater;

**G.**   to any **Claim** based upon or arising out of any actual or alleged violation of the Employee Retirement Income Security Act of 1974 or amendments thereto, or similar provisions of any federal, state or local statute or common law, but only with respect to any benefit or welfare plan established or maintained for the purpose of providing benefits to any **Insured**;

**H.**   to any **Claim** based upon or arising out of the any gaining by any **Insured** of any profit, remuneration or advantage to which the **Insured** was not entitled, including, without limitation, any **Insured's** use of, aiding or abetting the use of, or participation after the fact in the use of non-public information in violation of any law, rule or regulation;

**I.**   to any **Claim** based upon or arising out of liability assumed by the **Insured** in a contract or agreement, but this exclusion shall not apply to:

   **1.**   liability of the **Insured** which would exist in the absence of such contract or agreement;

   **2.**   any **Claim** against an **Insured** by a client or customer, if and to the extent that the **Claim** alleges a breach of contractual obligations in the rendering of or failure to render **Professional Services**;

   **3.**   liability **Assumed Under Contract**;

**J.** to any **Claim** based upon or arising out of any actual or alleged: patent infringement; or misappropriation of trade secrets;

**K.** to any **Claim** brought by, on behalf of, or in the name or right of any governmental, quasi-governmental, regulatory, or self-regulatory entity, whether directly or indirectly, in any capacity other than its capacity as a direct client of an **Insured**;

**L.** to any **Claim** based on or directly or indirectly arising out of or resulting from any failure, malfunction or breakdown of: any computer system, database or component (hardware or software); any other communications or information transmission system; or any digital, electronic or mechanical system or unit;

**M.** to any **Claim** for or arising out of or resulting from unsolicited electronic dissemination of faxes or e-mails to multiple actual or prospective customers of the **Insured** or any other third party, including but not limited to actions brought under the Telephone Consumer Protection Act, any federal or state anti-spam statutes, and/or any federal or state statute, law or regulation relating to a person's or entity's right of seclusion. However, this Exclusion shall only apply to the **Breach of Privacy** coverage provided by this Policy;

**N.** to any **Claim** based on or directly or indirectly arising out of or resulting from the insolvency of any bank, banking firm, broker or dealer in securities, clearing agency, insurance or reinsurance company, or any other person or entity; or the inability of any such entity or person to make any payment or settle or effect any transaction of any kind; provided, that this Exclusion will not apply to any **Claim** based on an **Insured's** investment in **Securities** of any such entity on behalf of the claimant;

**O.** to any **Claim** brought by or on behalf of, or in the name or right of, any person or entity with a legal or equitable interest in any form of security of, or other ownership interest in, the **Broker/Dealer**, except to the extent such **Claim** is brought in such person's or entity's capacity as a client or customer of the **Broker/Dealer** and is brought and maintained independently of, and without the solicitation, assistance, participation or intervention of, any other **Insured**;

**P.** to any **Claim** based on or directly or indirectly arising out of or resulting from any **Insured** acting or serving as a clearing agent, specialist or market maker for any securities or failing to clear or make a market for any securities;

**Q.** to any **Claim** based on or directly or indirectly arising out of or resulting from an **Insured's** provision of investment banking services, including, without limitation, any of the following: service as an underwriter, consultant, adviser, or specialist; the giving of financial, economic or investment advice relating to or in connection with any actual or contemplated merger, acquisition, syndication, securities offering (regardless of whether the offering is primary or secondary, or public or private), restructuring, divestiture, proxy contest, or other form of investment banking; and services performed by an investment banking department in the ordinary course of business;

**R.** to any **Claim** based on or directly or indirectly arising out of or resulting from the exercise of discretionary authority with regard to the disposition, management or supervision of assets; provided, that this Exclusion shall not apply to the **Insured's** provision of asset allocation services funded solely with mutual fund shares or variable annuities, as long as such services are provided strictly on a fee basis;

**S.**    to any **Claim** based on or directly or indirectly arising out of or resulting from any transaction involving any of the following: non-covered options; commodities; any type of futures contract; any equity security priced under five dollars ($5.00) at the time of any transaction, unless the security is (i) traded on a national securities exchange, (ii) NASDAQ approved or authorized, or (iii) part of a mutual fund;

**T.**    to any **Claim** based on or directly or indirectly arising out of or resulting from any transaction involving any **Securities** or investment products not approved or authorized by the **Broker/Dealer** for sale by **Registered Representatives**.

**Severability of Exclusions:**

It is understood and agreed that except for **Claims** based on or directly or indirectly arising out of or resulting from, in whole or in part, an **Insured's** commission of or knowing participation in any embezzlement, misappropriation, commingling of funds, or criminal act, Exclusions III.A. and III.H. of this Policy shall only apply to an **Insured** if it is established in fact that the **Insured** participated in or acquiesced in the knowing, intentional, fraudulent, or dishonest act, the willful or intentional violation, or the gaining of profit, remuneration or advantage; and

provided further, that with respect to any **Claim** based on or directly or indirectly arising out of or resulting from, in whole or in part, an **Insured's** commission of or knowing participation in any embezzlement, misappropriation, commingling of funds, or criminal act, if, upon the final disposition of such a **Claim**, an **Insured** to whom Exclusions III.A. and/or III.H. of this Policy applies shall have been found by a court of competent jurisdiction not to have committed or knowingly participated in such embezzlement, misappropriation, commingling, or criminal act, the **Company** will reimburse that **Insured's Claim Expenses** in connection with the **Claim**, such reimbursement to constitute payment of **Claim** under this **Policy** and to be subject to any applicable retention and limit of liability under this **Policy**; and

provided further, that with respect to any other **Claim**, each **Insured** agrees that, if it is finally established that the **Company** has no liability to an **Insured** with respect to a **Claim** by reason Exclusions III.A. and/or III.H. of this Policy, such **Insured** will repay the Underwriter upon demand all **Claim Expenses** paid on behalf of such **Insured** in connection with the **Claim**;

## IV.    TERRITORY

This Policy applies to any **Wrongful Act** committed by the **Insured** anywhere in the world.

However, if a **Claim** is made and suit or arbitration proceedings are brought against the **Insured** outside the United States of America, its territories and possessions, Puerto Rico or Canada, the **Company** shall have the right but not the duty to investigate, settle or defend, the **Claim**, suit or arbitration proceedings. If the **Company** elects not to investigate, settle or defend the **Claim**, the **Insured**, under the supervision of the **Company**, shall make or cause to be made such investigation and defense as reasonably necessary and, subject to prior written authorization by the **Company**, may effect settlement. The **Company** will reimburse the **Insured** for **Claim Expenses** and **Damages** in excess of the applicable self-insured retention (if any) and subject to the applicable Limits of Liability set forth in Item 4 of the Declarations.

All monetary terms of this Policy are in United States of America dollars. If judgment is rendered, settlement is denominated or another element of **Damages** or **Claim Expenses** is stated

in a currency other than United States of America dollars, payment under this Policy shall be made in United States of America dollars at the rate of exchange published in The Wall Street Journal on the date the final judgment is reached, the amount of the settlement is agreed upon or the element of **Damages** or **Claim Expenses** is due, respectively.

No coverage will be available under this Policy for any **Claim** brought against the **Insured** in any country with which the United States of America does not have active diplomatic relations at the time such **Claim** is made.

## V.    LIMITS OF LIABILITY

**A.**  The liability of the **Company** for all **Claim Expenses** and **Damages** for each **Claim** FIRST MADE AGAINST THE **INSURED** AND REPORTED TO THE **COMPANY** DURING THE **POLICY PERIOD**, THE AUTOMATIC EXTENDED REPORTING PERIOD OR THE OPTIONAL EXTENDED REPORTING PERIOD, IF PURCHASED, shall not exceed the amount stated in Item 4(A) of the Declarations for each **Claim**.

**B.**  The total liability of the **Company** for all **Claim Expenses** and **Damages** for all **Claims** FIRST MADE AGAINST THE **INSURED** AND REPORTED TO THE **COMPANY** DURING THE **POLICY PERIOD**, THE AUTOMATIC EXTENDED REPORTING PERIOD OR THE OPTIONAL EXTENDED REPORTING PERIOD, IF PURCHASED, shall not exceed the amount stated in Item 4(B) of the Declarations as **Policy Period Aggregate**.

**C.**  The Limits of Liability for **Claims** FIRST MADE AND REPORTED DURING THE AUTOMATIC EXTENDED REPORTING PERIOD OR THE OPTIONAL EXTENDED REPORTING PERIOD shall be part of, and not in addition to the Limits of Liability as stated in Item 4 of the Declarations and as stated above. If any **Insured** has purchased or does purchase other insurance covering **Claims** FIRST MADE AND REPORTED DURING THE AUTOMATIC EXTENDED REPORTING PERIOD OR THE OPTIONAL EXTENDED REPORTING PERIOD, the coverage provided under this Policy for such **Claims** shall apply in excess of such insurance.

**D.**  **Self-Insured Retention.**

(1) The retention set forth in Item 5 (A) of the Declarations shall be the retention which shall apply to **Damages** and **Claim Expenses** resulting from any **Claim** made against a **Registered Representative** who is a **Natural Insured**, unless the **Claim** is also made against the **Broker/Dealer**, any **Individual Insured**, or any other **Registered Representative** that is not a **Natural Insured**, in which case the provisions of (2) below shall apply.

(2)  The retention set forth in Item 5 (B) of the Declarations shall be the retention which shall apply to **Damages** and **Claim Expenses** resulting from any **Claim** made against a **Registered Representative** that is not a **Natural Insured**, unless the **Claim** is also made against the **Broker/Dealer** or any **Individual Insured**, in which case the provisions of (3) below shall apply. In the event that a **Registered Representative** that is not a **Natural Insured** is one of multiple **Registered Representatives** named in a **Claim**, the **Registered Representatives** that are not **Natural Insureds** shall be responsible, on a pro rata basis, for the entire applicable retention. The **Registered Representatives** agree to indemnify and hold harmless the **Company** for all or any portion of the retention owed by any other **Registered Representative**.

(3) The retention set forth in Item 5 (C) of the Declarations shall be the retention which shall apply to **Damages** and **Claim Expenses** resulting from any **Claim** made against the **Broker/Dealer** or any **Individual Insured**, whether severally or jointly with one or more **Registered Representative(s)**. In the event the **Broker/Dealer** or any **Individual Insured** is one of multiple **Insureds** named in a **Claim**, the **Broker/Dealer** shall be responsible for the entire applicable retention. The **Broker/Dealer** agrees to indemnify and hold harmless the **Company** for all or any portion of the retention owed by any **Individual Insured** or **Registered Representative**.

E. **Multiple Insureds, Claims and Claimants.** The inclusion herein of more than one **Insured** shall not operate to increase the **Company's** Limits of Liability. **Claims** alleging, based upon, arising out of or attributable to the same or related **Wrongful Act(s)** shall be treated as a single **Claim** regardless of whether made against one or more than one **Insured**. All such **Claims**, whenever made, shall be considered first made during the **Policy Period**, the Automatic Extended Reporting Period, or Optional Extended Reporting Period, if purchased, in which the earliest **Claim** arising out of such **Wrongful Act(s)** was first made, and all such **Claims** shall be subject to the Limits of Liability and retention set forth in such Policy.

## VI. CLAIMS

A. **Notice of Claims.** As a condition precedent to coverage under this Policy, the **Insured** shall provide the **Company** written notice of any **Claim** made against any **Insured** as soon as practicable, but in no event later than: (1) the expiration date of this Policy; (2) the expiration date of the Automatic Extended Reporting Period; or (3) the expiration date of the Optional Extended Reporting Period, if purchased.

In the event a **Claim** is brought against any **Insured**, the **Insured** shall forward to the **Company** every demand, notice, summons, complaint or other process or any threat of an intention to hold the **Insured** responsible for any **Wrongful Act** received directly by the **Insured** or by the **Insured's** representatives. Written notice of any **Claim** against any **Insured**, as well as of each demand on or suit against the **Insured**, shall be delivered to the **Company** at the address stated in Item 11 of the Declarations.

B. **Discovery Clause.** If during the **Policy Period** any **Insured** first becomes aware or has reasonable grounds to suspect that an **Insured** has committed or may have committed a specific **Wrongful Act** for which coverage is otherwise provided hereunder, and provided the **Insured** during the **Policy Period** gives notice to the **Company** of:

1. the specific **Wrongful Act**;

2. the injury or damage which has resulted or may result from such **Wrongful Act**; and

3. the circumstances by which the **Insured** first became aware of or suspected such **Wrongful Act**;

then any **Claim** that may subsequently be made against any **Insured** arising out of such **Wrongful Act** shall be deemed for the purposes of this insurance to have been made during the **Policy Period**.

C. **Assistance and Cooperation of the Insured.** The **Insured** shall cooperate with the **Company** and upon the **Company's** request shall (1) provide to the **Company** copies of documents and such other things held by or available to the **Insured** which relate to any **Claim** or to the **Wrongful Act**, transactions or other events which shall have given rise to such **Claim**, (2) submit to examination and interview by a representative of the **Company**, under oath if required, (3) attend hearings, depositions and trials, (4) assist in effecting settlement, securing and giving evidence, obtaining the attendance of witnesses and in the conduct of suits and other proceedings, as well as in the giving of a written statement or statements to the **Company's** representatives and meeting with such representatives for the purpose of investigation and/or defense and, (5) render written status reports regarding each **Claim** no less frequently than every three months and otherwise as may be necessary in order to keep the **Company** currently informed as to fees, costs and expenses being incurred in connection with such **Claim** and as to all material developments or anticipated developments in connection with such **Claim**, including but not limited to such subjects as settlement, potentially dispositive motions as to the **Claim** in its entirety or any aspect thereof and the deposition of any **Insured**, all without charge to the **Company**.

The **Insured** shall further cooperate with the **Company** and do whatever is necessary to secure and affect any rights of indemnity, contribution or apportionment which any **Insured** may have. The **Insured** shall exercise the right to either reject or demand the arbitration of any **Claim** made against the **Insured** in accordance with the written instructions of the **Company**. The **Insured** shall not, except at the **Insured's** own cost, make any payment, admit any liability, settle any **Claims**, or assume any obligation, provided, however, the **Insured** shall have the right to make any settlement of any **Claim** covered by the terms of this Policy subject to the condition that the aggregate amount of such settlement and of the **Claim Expenses** incurred in connection with such **Claim** shall not exceed the self-insured retention amount stated in Item 5 of the Declarations.

D. **False or Fraudulent Claims.** If any **Insured** shall knowingly submit a false **Claim** or commit fraud in proffering any **Claim** under this Policy, as regards amount or otherwise as to any material fact, the insurance provided under this Policy shall become void as to such **Insured** from the date such false or fraudulent **Claim** is proffered, without regard to whether the **Company** has actually relied upon or been damaged by such **Claim**.

## VII.    EXTENDED REPORTING PERIODS

A. **Automatic Extended Reporting Period.** If the **Company** or the **Named Insured** shall cancel or refuse to renew this Policy, then the **Company** shall provide the **Named Insured** an automatic and noncancellable extension of this Policy, subject otherwise to its terms, Limits of Liability, exclusions and conditions, to apply to **Claims** first made against the **Insured** during the sixty (60) days immediately following the effective date of such nonrenewal or cancellation, for any **Wrongful Act** committed before the effective date of such nonrenewal or cancellation and after the **Retroactive Date**, and otherwise covered by this insurance. This Automatic Extended Reporting Period shall terminate after sixty (60) days from the effective date of such nonrenewal or cancellation.

B. **Optional Extended Reporting Period.** If the **Company** or the **Named Insured** shall cancel or refuse to renew this Policy, then the **Named Insured**, upon payment of an additional premium as set forth herein, shall have the option to extend this Policy, subject otherwise to its terms, Limits of Liability, exclusions and conditions, to apply to **Claims** first made against the **Insured** during the 12, 24, 36, 48, or 60 months as purchased immediately following the

effective date of such nonrenewal or cancellation, for any **Wrongful Act** committed before the effective date of such nonrenewal or cancellation and after the **Retroactive Date**, and otherwise covered by this insurance. The extension, if purchased, shall be endorsed hereto and shall be referred to as the "Optional Extended Reporting Period." The premium for the Optional Extended Reporting Period, if purchased, shall be 12 months at 100%, 24 months at 150%, 36 months at 200%, 48 months at 225%, or 60 months at 250%, of the full annual premium for this Policy, plus any additional premium owed for this Policy.

C.  The **Named Insured's** option to elect the Optional Extended Reporting Period must be exercised by notice in writing to the **Company** not later than thirty (30) days after the effective date of the nonrenewal or cancellation of this Policy. If the premium for the Optional Extended Reporting Period is not paid within thirty (30) days of the effective date of the nonrenewal or cancellation of this Policy, the option to elect the Optional Extended Reported Period shall be void.

D.  At the commencement of the Optional Extended Reporting Period, the entire premium shall be deemed fully earned, and in the event the **Named Insured** terminates the Optional Extended Reporting Period for any reason, the **Company** shall not be liable to return to the **Named Insured** any portion of the premium for the Optional Extended Reporting Period.

E.  As a condition precedent to the **Named Insured's** option to elect the Optional Extended Reporting Period, any and all premiums and self-insured retentions that are due must have been paid and the **Named Insured** must have complied with all other terms and conditions of this Policy. If such conditions precedent are not satisfied or if the notice required under this Section VII. C. is not timely given to the **Company**, the **Named Insured** shall not at a later date be able to exercise such option.

F.  If this Policy is cancelled or nonrenewed due to the nonpayment of premium, the Automatic Extended Reporting Period or Optional Extended Reporting Period shall not be available to any **Insured**. The Automatic Extended Reporting Period or Optional Extended Reporting Period shall not be available to any **Insured**: (1) whose fraud causes this Policy to be cancelled or nonrenewed, or (2) whose license, right to practice, or right to conduct business has been revoked, suspended by, or surrendered at the request of, any regulating authority.

G.  The fact that the period during which **Claims** must first be made against the **Insured** and reported to the **Company** under this Policy is extended by virtue of any Automatic Extended Reporting Period or Optional Extended Reporting Period shall not in any way increase the Limits of Liability of this Policy.

H.  The first sixty (60) days of the Optional Extended Reporting Period, if purchased, shall run concurrently with the Automatic Extended Reporting Period.

## VIII.  CONDITIONS

A.  **Subrogation.** In the event of any payment under this Policy, the **Company** shall be subrogated to all the **Insured's** rights of recovery therefore against any person or organization. The **Insured** shall execute and deliver instruments and papers and do whatever else is necessary to secure such rights and the **Insured** shall do nothing to prejudice such rights. Any amount recovered upon the exercise of such rights of subrogation shall be applied as follows: first, to the repayment of expenses incurred toward subrogation; second, to **Damages** and/or **Claim Expenses** paid by the **Insured** in excess of the Limits of Liability

hereunder; third, to **Damages** and/or **Claim Expenses** paid by the **Company**; fourth, to **Damages** and **Claim Expenses** paid by the **Insured** in excess of the self-insured retention; and last, to repayment of the self-insured retention.

B. **Action Against the Company.** No action shall lie against the **Company** unless, as a condition precedent thereto, the **Insured** shall have fully complied with all the terms of this Policy, nor until the amount of the obligation of the **Insured** to pay shall have been fully and finally determined either by judgment against the **Insured** after actual trial or by written agreement of the **Insured**, the claimant and the **Company**. In the event any person or organization or the legal representative thereof has secured a judgment against an **Insured** and such judgment remains unsatisfied after the expiration of thirty (30) days from the service of notice of entry of the judgment upon the attorney for the **Insured**, or upon the **Insured**, and upon the **Company**, then an action may, except during a stay or limited stay of execution against the **Insured** on such judgment, be maintained against the **Company** under this Policy for the amount of such judgment to the extent of the insurance afforded by this Policy. Nothing contained in this Policy shall give any person or organization the right to join the **Company** as a party in any action against any insured to determine the **Insured's** liability. Bankruptcy or insolvency of any **Insured** or of the **Insured's** estate shall not relieve the **Company** of any of its obligations hereunder.

C. **Representations and Severability.** In issuing this Policy, the **Company** has relied upon the statements, representations and information contained in the **Application**. Every **Insured** acknowledges and agrees that all such statements, representations and information (i) are true and accurate, (ii) were made or provided in order to induce the **Company** to issue this Policy, and (iii) are material to the **Company's** acceptance of the risk to which this Policy applies. If any of the statements, representations or information in the **Application** (hereafter referred to as "Facts") are not true and accurate, there shall be no coverage for any **Claim** made pursuant to this Policy with respect to any **Insured Person** who knew, as of the effective date of the **Policy Period**, of any Facts that were not truthfully and accurately disclosed in the Application. The knowledge of any **Insured Person** shall not be imputed to any other **Insured Person** for the purposes of determining coverage.

D. **Other Insurance.** This insurance shall be in excess of the amount of the applicable self-insured retention of this Policy and any other valid insurance available to the **Insured** whether such insurance is collectible or uncollectible only because the Limits of Liability thereof shall have been exhausted, whether such other insurance is stated to be primary, pro rata, contributory, excess, contingent or otherwise, unless such other insurance is written only as a specific excess insurance over the Limits of Liability provided in this Policy.

E. **Changes.** Notice to any agent or knowledge possessed by any agent or other person acting on behalf of the **Company** shall not affect a waiver or a change in any part of this Policy or estop the **Company** from asserting any right under the terms of this Policy, nor shall the terms of this Policy be waived or changed, except by written endorsement issued to form a part of this Policy.

F. **Assignment.** Assignment of interest under this Policy shall not bind the **Company** unless its consent is endorsed in writing hereon.

G. **Cancellation.** This Policy may be canceled by the **Named Insured** by mailing or delivering prior written notice to the **Company** or by surrender of this Policy to the **Company**. If this Policy is canceled by the **Named Insured**, the **Company** shall retain the greater of the

customary short rate proportion of the premium hereon or the Earned Minimum Premium set forth in Item 6(B) of the Declarations. This Policy may also be canceled by or on behalf of the **Company** by delivering to the **Named Insured** by registered, certified or other first class mail, or by electronic means, written notice stating when not less than ninety (90) days after the date of such notice the cancellation shall be effective. The proof of delivery of such notice shall be sufficient proof of notice. If this Policy is canceled by or on behalf of the **Company**, the **Company** shall retain the pro rata proportion of the premium hereon. The **Company** may cancel this Policy on ten (10) days notice for nonpayment of premium due.

**H. Conformity to Statute.** Any terms of this Policy which are in conflict with the terms of any applicable laws construing this Policy are hereby amended to conform to such laws.

**I. Singular Form of a Word.** Whenever the singular form of a defined word is used herein, the same shall include the plural when required by context.

**J. Named Insured Authorization.** By acceptance of this Policy, the **Named Insured** agrees to act on behalf of every **Insured** with respect to the payment or return of premium, the receipt and acceptance of any endorsements, the cancellation of the Policy, the negotiation of renewal, and the giving and receiving of any notice provided for by the terms and conditions of this Policy.

IN WITNESS WHEREOF, the **Company** has caused this Policy to be signed by our President and Secretary and countersigned where required by law on the Declarations page by our duly Authorized representative.


Secretary                                        President

SURPLUS LINES NOTICE

"THIS INSURANCE CONTRACT IS WITH AN INSURER NOT LICENSED TO
TRANSACT INSURANCE IN THIS STATE AND IS ISSUED AND DELIVERED AS A
SURPLUS LINE COVERAGE UNDER THE TEXAS INSURANCE STATUTES.
THE TEXAS DEPARTMENT OF INSURANCE DOES NOT AUDIT THE FINANCES OR
REVIEW THE SOLVENCY OF THE SURPLUS LINES INSURER PROVIDING THIS
COVERAGE, AND THIS INSURER IS NOT A MEMBER OF THE
PROPERTY AND CASUALTY INSURANCE GUARANTY ASSOCIATION CREATED
UNDER CHAPTER 462, INSURANCE CODE.  CHAPTER 225, INSURANCE CODE,
REQUIRES PAYMENT OF _____ (INSERT APPROPRIATE TAX
RATE) PERCENT TAX ON GROSS PREMIUM.

SN-TX 1109

| TEXAS - IMPORTANT NOTICE | AVISO IMPORTANTE |
|---|---|

To obtain information or make a complaint:

Para obtener informacion o para someter una queja:

You may call the company's telephone number for information or to make a complaint at

Usted puede llamar al numero de telefono de la compania para informacion o para someter una queja al

**1-213-270-7000**

**1-213-270-7000**

You may write the Company at

Usted tambien puede escribir a:

*Endurance American Specialty Insurance Company*
*725 South Figueroa Street*
*Suite 2100*
*Los Angeles, CA*
*90017*

*Endurance American Specialty Insurance Company*
*725 South Figueroa Street*
*Suite 2100*
*Los Angeles, CA*
*90017*

You may contact the Texas Department of Insurance to obtain information on companies, coverages, rights or complaints at

Puede communicarse con el Departamento de Seguros de Texas para obtener informacion acerca de companias, coberturas, derechos o quejas al

**1-800-252-3439**

**1-800-252-3439**

You may write the
Texas Department of Insurance
PO Box 149104
Austin, TX 78714-9104
**FAX#** (512) 475-1771

Puede escribir al Departamento de Seguros de Texas
PO Box 149104
Austin, TX 78714-9104
**FAX#** (512) 475-1771

**Web:** http://www.tdi.state.tx.us

**Web:** http://www.tdi.state.tx.us

**E-mail:** ConsumerProtection@tdi.state.tx.us

**E-mail:** ConsumerProtection@tdi.state.tx.us

**PREMIUM OR CLAIM DISPUTES:** Should you have a dispute concerning your premium or about a claim you should contact the company first. If the dispute is not resolved, you may contact the Texas Department of Insurance.

**DISPUTAS SOBRE PRIMAS O RECLAMOS:** Si tiene una disputa concerniente a su prima o a un reclamo, debe comunicarse con la compania primero. Si no se resuelve la disputa, puede entonces comunicarse con el departamento (TDI).

**ATTACH THIS NOTICE TO YOUR POLICY:** This notice is for information only and does not become a part or condition of the attached document.

**UNA ESTE AVISO A SU POLIZA:** Este aviso es solo para proposito de informacion y no se convierte en parte o condicion del documento adjunto.

*SN-TX-12-10*